```
   IN THE DISTRICT COURT OF THE UNITED STATES FOR THE
      MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

UNITED STATES OF AMERICA     )
                             )
     v.                      )   CRIM. ACTION NO.
                             )     2:03cr259-T
LEON CARMICHAEL, SR. and     )        (WO)
FREDDIE WILLIAMS             )
                             )
```

ORDER

Defendants Leon Carmichael, Sr. and Freddie Williams were found guilty of conspiracy to distribute marijuana, and Carmichael was found guilty of conspiracy to commit money laundering, after a eight-day jury trial in this court.

At the conclusion of the evidence, and as required by law, <u>United States v. Hewes</u>, 729 F.2d 1302, 1312 (11th Cir. 1984), the court made oral findings that the government had shown by a preponderance of the evidence all of the requisites for the admissibility of the coconspirator statements about which evidence has been received against Carmichael and Williams. This written order memorializes the court's oral findings, and further sets forth the

reasons for the court's conclusion that the government has proven the requisites for the admissibility of these statements by a preponderance of the evidence; indeed, as demonstrated below, the evidence was so overwhelming that the requisites were proven beyond a reasonable doubt.[1]

## I. Background

The existence of a conspiracy and the defendant's participation in it are preliminary questions of fact that must be resolved by the court pursuant to Fed. R. Evid. 104(a) before a coconspirator statement may be admitted into evidence. Bourjaily v. United States, 483 171, 175, 107 S.Ct. 2775, 2778 (1987). The court must apply a preponderance-of-the-evidence standard in determining whether such preliminary questions of fact have been established under Rule 104(a). Id. at 176, 107 S.Ct. at

---

1. Because the evidence was so overwhelming, it was not surprising that the jury took only three hours to reach its verdicts after eight long days of trial (in general, from 8:30 a.m. to 5:30 p.m. each day) on these somewhat legally and factually complex counts.

2779.  The court has discretion either to require the government to establish the elements of admissibility prior to receiving coconspirator statements, or to admit the out-of-court statements on the condition that the government subsequently produce independent evidence of the conspiracy. United States v. Miller, 664 F.2d 826, 827-28 (11th Cir. 1981).  In this case, the court, in its discretion, admitted the out-of-court statements of coconspirators before all evidence of the conspiracy had been received.

Three elements must be met for a coconspirator's statement to be admissible against a defendant.  The court must find that (1) a conspiracy existed; (2) the coconspirator and the defendant against whom the statement was offered were members of that conspiracy; and (3) the statement was made during the course of and in furtherance of the conspiracy.  Fed. R. Evid. 801(d)(2)(E); United States v. Hewes, 729 F.2d 1302, 1312 (11th Cir. 1984).

## II. Marijuana-Distribution Conspiracy

Because there are two conspiracy counts alleged in this case, the court first considers whether the government has proven by a preponderance of the evidence that a marijuana-distribution conspiracy existed, that the defendants and declarants were members of that conspiracy, and whether the statements at issue were made during the course of and in furtherance of the marijuana-distribution conspiracy.

The evidence indicated that Gary Wayne George and Patrick Denton packaged and sold marijuana for Carmichael, and then delivered the proceeds of the sales to Carmichael at his home and places of business. Evidence also indicated that Denton eventually began "breaking down" the marijuana into smaller quantities with Freddie Williams, and that Carmichael directed large quantities of marijuana to be delivered to Freddie Williams's house. Indeed, the evidence showed that 574 pounds of marijuana were seized from Williams's home on November 17, 2003. Agents learned of this impending delivery after Denton informed them that

Carmichael indicated to him that a shipment of marijuana would be arriving at Williams's residence the next morning.

On the basis of this and other evidence introduced at trial, the court finds by a preponderance of the evidence, and indeed beyond a reasonable doubt, that a conspiracy to distribute marijuana existed, and that both defendants were members of that conspiracy. Furthermore, the evidence shows that the defendants knew their actions were illegal, yet they willfully joined in the plan.

In addition to the defendants, a preponderance of the evidence has established that Gary Wayne George, Patrick Denton, Kena Whisenant, Valerie Carmichael, Sandra Jones and Santiago Hernandez, among others, were also members of the conspiracy. George and Denton were members of the conspiracy for the reasons noted above.

Whisenant was a member of the conspiracy because on several occasions, Denton delivered Carmichael's drug money to her house, located at 970 Ridgecrest Drive in Montgomery. In addition, Whisenant's home was owned by Williams, and

purchased by Carmichael in 2003 at a loss to Williams so clearly beyond his means to bear financially, that it is reasonable to conclude that drug money or drug motivation was behind the purchase. Then, it is against this background that the evidence further showed that Whisenant tried to perpetuate the conspiracy by attempting to warn Carmichael after Williams's house, which is located down the street from hers, was raided. On that day, Whisenant called the Carmichael Center looking for Carmichael. When she learned he was unavailable, she told Carmichael's employee Sherry Pettus that Carmichael was a drug dealer, that Williams's house was raided and that the "stuff," by which she meant marijuana, belonged to Carmichael. See, e.g., United States v. Quinones-Cedeno, 2002 WL 31640468 (6th Cir. 2002) (anonymous note warning coconspirator that the government was "hot on his trail" admissible under Rule 801(d)(2)(E) where purpose of note was to assist coconspirator in avoiding detection); United States v. Skidmore, 254 F.3d 635, 638 (7th Cir. 2001) ("In examining

what constitutes a statement in furtherance of a conspiracy, we have explained that a wide range of statements qualify, includ[ing] comments ... to inform other members about the progress of the conspiracy [and] to control damage to or detection of the conspiracy...") (quoting United States v. Johnson, 200 F.3d 529, 532 (7th Cir.2000)); United States v. Jackson, 67 F.3d 1359, 1364 (8th Cir. 1995) (statements concerning efforts to avoid police detection of conspiracy admissible pursuant to Rule 801(d)(2)(E) because they "were made pursuant to an attempt to keep the conspiracy going"); United States v. Garcia, 893 F.2d 188 (8th Cir. 1990) (statements made in effort to delay or prevent coconspirator's arrest were made "in furtherance" of conspiracy).

Valerie Carmichael, defendant Carmichael's wife, was a member of the conspiracy because, at least on one occasion, she handled drugs for defendant Carmichael. Denton testified that, at her husband's direction, Valerie Carmichael obtained approximately two pounds of marijuana

7

and gave it to Carmichael who in turn gave it to Denton.  In addition, Mrs. Carmichael helped count the million dollars in cash that had been buried and dug up from the ground--money that has been established by a preponderance of the evidence to be tied to the drug conspiracy.

The evidence showed that Jones, a former employee of Carmichael, was also a member of the conspiracy because she was stopped by the Mississippi Department of Transportation driving one of Carmichael's tractor-trailer trucks containing approximately 64.2 kilograms of marijuana.  Carmichael posted Jones's bond after her arrest.  In addition, several years earlier, Jones was found with $42,000 in cash when she was stopped by law enforcement agents after landing at the airport in El Paso, Texas, a drug "source" city.

Finally, the evidence has also shown that Santiago Hernandez was a member of the conspiracy, because he was observed walking and talking with Jones through the airport at the time Jones was stopped and questioned about the

8

$42,000, and denied knowing Jones to law enforcement officials, even though he was clearly her companion at the time. But more importantly, however, Hernandez's statement that he did not know Jones is not hearsay, because it was not offered for the truth of the matter asserted.

In <u>Anderson v. United States</u>, 417 U.S. 211, 94 S. Ct. 2253 (1974), an election fraud case brought under 18 U.S.C.A. § 241, the defendants, who were county officials, were accused of tampering with votes and destroying poll slips in an election to secure the nomination of a particular candidate for the office of County Commissioner. Shortly after the election, a hearing was held in county court on the election contest, where two of the defendants gave sworn testimony about the events of election day. During their ensuing federal conspiracy trial, the government sought to introduce this prior sworn testimony to prove that the defendants perjured themselves at the election contest hearing in a continuing effort to have the fraudulent votes for their candidate counted and certified.

9

The Supreme Court held that this prior testimony was not hearsay, because the testimony was not offered for its truth, but rather, for its falsity. The Court reasoned,

> "Out-of-court statements constitute hearsay only when offered in evidence to prove the truth of the matter asserted. The election contest testimony of [the defendants], however, was not admitted into evidence in the § 241 trial to prove the truth of anything asserted therein. Quite the contrary, the point of the prosecutor's introducing those statements was simply to prove that the statements were made so as to establish a foundation for later showing, through other admissible evidence, that they were false."

Id. at 219-220, 94 S. Ct. 2260-61.

Likewise, in United States v. Munson, 819 F.2d 337 (1st Cir. 1987), the defendant was convicted of drug conspiracy. At trial, a Drug Enforcement Agent testified about statements that the defendant's coconspirators made when they were confronted by the agent upon arrival in Waterville, Maine. The agent asked the coconspirators where they had been earlier in the day and inquired about the ownership of the suitcase in their possession. Subsequent

testimony demonstrated that the coconspirators gave false and conflicting answers. The defendant objected on the basis that this testimony was inadmissible hearsay, and the objection was overruled. On appeal, the First Circuit upheld that ruling, reasoning that while hearsay is an out-of-court statement offered to prove the truth of the matter asserted, "[t]hese statements were admitted to show, through subsequent testimony, that [the coconspirators] were lying about their activities. They were not offered to prove the truth of the matter asserted." Id. at 340.

As in Anderson and Munson, the purpose of the government's introduction of Hernandez's statement was to show that, although he denied knowing Jones, the pair clearly knew each other, as evidenced by their body language and officers' observations that they were walking together, as well as the fact that agents later found Hernandez's phone number (as written on the business card he gave to them) listed in Jones's pager.[2]

---

2. It is very doubtful that Carmichael even preserved
(continued...)

2. (...continued)
his objection to Hernandez's statement that he did not know Jones. Without reading a transcript of the entire trial the court cannot be sure what Carmichael's position on Hernandez's statement was at each stage of the proceeding. Two circumstances contributed to this confusion: First, Carmichael often made seriatim objections, or to put it anther way gave seriatim grounds in support of an objection, sometimes adding new grounds just after the court had recessed to research initial grounds and the court was then ready to rule, and sometimes adding new grounds even after the court had ruled. Second, despite the court's rule allowing one lawyer per party per witness, two or more of Carmichael's lawyers would address the same issue, sometimes offering differing, and even conflicting, grounds as to an objection. The court sometimes felt like it was playing the carnival shell game of "Where is the Pea," with the pea being Carmichael's objection, or the ground for his objection, and the shells being Carmichael's lawyers and with the number of shells being four rather than three because Carmichael had four lawyers.

This confusion is most dramatically reflected in the circumstances surrounding Hernandez's statement. While the court cannot be sure without reviewing a transcript of the trial, it appears that one of Carmichael's lawyers initially objected to Hernandez's statement as hearsay; another of Carmichael's lawyers later wrote the court that the statement had not been offered for the truth of the matter asserted ("Santiago Hernandez made the statement to Detective Chavez that he did not know Sandra Jones. This statement was not offered for the truth of the matter asserted, but merely to show that Hernandez supposedly acted evasively. Thus, the applicability of the co-conspirator exception is irrelevant."); and then, when the court entertained arguments after it had done its research and
(continued...)

As to the other specific statements at issue, a preponderance of the evidence has shown that each of them was made during the course of and in furtherance of the marijuana conspiracy. The statements were made after 1993, when the conspiracy began, and before or on November 17,

---

2. (...continued)
just before it was to make its final oral ruling on whether the government had established the conspiracies, the lawyer who had written the court about the statement then attempted to resurrect the initial hearsay ground.

Because, absent obstruction by the court, the lawyers making an objection are in the best position to articulate the basis and status of the objection, any confusion about the objection's basis and status should be resolved against those lawyers. And the objection's basis and status should not be so uncertain that the court has to review the record _after_ the trial to determine whether _during_ the trial the objection or its ground was preserved. If the basis and status of an objection are not reasonably clear from the record, such that one reading the record _after_ the trial cannot conclude with reasonable certainty that _during_ the trial the basis and status of an objection were reasonably clear, then the objection should be considered as not preserved.

These observations about Carmichael apply to Williams as well, because Williams's attorney routinely adopted all of Carmichael's objections and the representations Carmichael's attorneys made to the court about those objections.

2003, when the conspiracy ended upon or around the time of Carmichael's arrest.

Moreover, even if one or more of the statements of one or more of the minor players (for example, those of Whisenant or Hernandez) could be viewed as not in furtherance of the drug conspiracy or otherwise not admissible, other evidence of guilt in the case was so overwhelming, and the statements, while incriminating, were rendered so ineffectual in this mountain of other evidence, that the admission of the statements was harmless beyond a reasonable doubt.

### III. Money-Laundering Conspiracy

The court next turns to consider whether the government proved by a preponderance of the evidence that a money-laundering conspiracy existed, that defendant Carmichael and declarants were members of the money-laundering conspiracy, and whether the statements were made during the course of and in furtherance of the money-laundering conspiracy.

14

Evidence at trial also showed that Carmichael and his employee, Sherry Pettus, conspired to commit money laundering to promote illegal activity and/or to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the illegal activity.  At Carmichael's direction, Pettus made numerous bank deposits to an account opened in her name at Compass Bank in Montgomery.  The evidence showed that deposits were made several times a week and always consisted of large quantities of cash.  Though the deposit amounts often totaled several thousands of dollars, the amount of the deposits never exceeded $10,000, the amount that triggers the requirement that the bank file a Currency Transaction Report with the Internal Revenue Service.  The court finds by a preponderance of the evidence that the money deposited into this account included the proceeds of the marijuana conspiracy already described, that Pettus knew she was depositing ill-gotten money into the account, and that a conspiracy to commit money laundering existed between defendant Carmichael and Pettus.

Furthermore, the evidence shows that defendant Carmichael knew his actions were illegal, yet he willfully joined in the plan.

Finally, the evidence showed that statements made by Pettus introduced at trial were made during the course of and in furtherance of the money laundering conspiracy, specifically between May 28, 2002 and February 24, 2003.

## IV. Conclusion

For the foregoing reasons, it is ORDERED that the hearsay statements of the conspirators were and are admissible against both defendants Leon Carmichael, Sr. and Freddie Williams with regard to the marijuana-distribution conspiracy, and against defendant Carmichael with regard to the money-laundering conspiracy.

DONE, this the 21st day of June, 2005.

                                             /s/ Myron H. Thompson
                                           UNITED STATES DISTRICT JUDGE