IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 2:03-CR-0259-MHT |
| LEON CARMICHAEL, SR., and | ) | [wo] |
| FREDDIE WILLIAMS | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

On June 17, 2005, a jury convicted Leon Carmichael, Sr. ("Carmichael") and Freddie Williams (collectively, "defendants") of conspiring to distribute 7,000 pounds of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and also convicted Carmichael of money laundering prohibited by 18 U.S.C. 1956(h).[1] Defendants timely asserted an objection to their jury venire and to the jury selection process utilized by the Middle District of Alabama. In lieu of staying the trial, United States District Judge Myron H. Thompson stayed the objection, and on June 20, 2005, referred it for consideration and recommendation by United States Magistrate Judge Delores R. Boyd. Sentencing has been postponed pending final adjudication of this objection.

In *part I* of this *Recommendation*, the Magistrate Judge documents the procedural course of this challenge to the District's jury selection process; *part II* provides factual context; the discussion in *part III* summarizes the contentions and controlling legal standards before analyzing the record to explain that the evidentiary showing is insufficient to sustain all asserted claims; and *part IV* concludes with a recommendation for denial of motions for a new trial.

---

[1]*Superseding Indictment* filed August 17, 2004 (Doc. 227); *Redacted Indictment for Trial Purposes* (Doc. 422, June 17, 2005); *Redacted Jury Verdicts* (Docs. 601 and 602, June 17, 2005).

# I.

# PROCEDURAL BACKGROUND

## A.      Assertion of Objection

For the jury selection scheduled on June 6, 2005, the Clerk made the jury list and juror profiles available to counsel on  June 3. (*Notice*, June 2, 2005, Doc. 383).  Prior to the *voir dire* examination, Carmichael filed "*Defendant Leon Carmichael's Objection to the Composition of the Venire and the Method of Selection of the Venire and Motion to Dismiss the Indictment or Stay the Proceedings against him due to Substantial Failure to Comply with the Provisions of the Jury Selection and Service Act,*" along with  the  affidavit of Marion Chartoff, one of his attorneys (Doc. 400).[2]  The *Objection* specified legal underpinnings in the Due Process and Equal Protection Clauses of the Fifth Amendment to the Constitution, the Sixth Amendment's guarantee of a jury drawn from a "fair-cross-section" of the community,  and the Jury Selection and Service Act ("JSSA") of 1968, 28 U.S.C. §1861, *et seq.*  As the factual basis for his *Objection*, Carmichael represented:

> Only 12 of the 122 members, or 9.8 percent, of the current petit jury venire are African-Americans.  This percentage is in stark contrast to the percentage of African-Americans in the population of the Middle District of Alabama, which according to the 2000 Census is thirty-two percent. . . .  The percentage is also dramatically less than the 25.02 percent of African-Americans who were on the qualified jury wheel that was created for the Middle District of Alabama in 1996.  *See*

---

[2]In criminal cases, before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury.

28 U.S.C. §1867 (a).  Defendants' timely compliance with this statutory requirement is not disputed.

*United States v. Clay*, 159 F. Supp. 2d 1357, 1363 (M.D. Ala. 2001).[3]  Based on these figures, it appears that African-Americans are substantially under-represented in the current petit jury venire.   This significant under-representation raises the presumption that the method currently used for selecting jury venires  improperly allows for the under-representation of African-Americans in the jury venire. [4]

Carmichael  moved the court

> to hold a hearing on this objection, to grant . . . a stay to litigate and obtain discovery in support of his objection, to submit additional briefing on this motion, to dismiss the indictment if the under-representation is shown to have impacted the grand jury that indicted him, and to  grant him a new trial before a different jury venire in which African-Americans are not substantially underrepresented.

Carmichael also requested "an opportunity to amend the motion and [counsel's] affidavit in support

of the motion once he had an opportunity for discovery, additional fact gathering, and consultation

with experts."  (Doc. 400-1*, Objection* at 2).

Promptly upon notice of the  *Objection*, Judge Thompson convened counsel for a "pre- jury

selection hearing"[5] and pointedly inquired of Carmichael counsel:

> You realize that you're not entitled to a percentage of a racial group on the actual jury venire that's selected.  What happens is sometimes we get jury venires that are nine percent and then sometimes we get them that are thirty percent.  I mean, it depends on the results of the random draw.  It's not that we get X percentage each time, and

---

[3]"Counsel recognizes that the 1996 jury wheel is no longer in use at this time, but has not had an opportunity to gather any information about the percentage of African-Americans on the current jury wheel at this point.  Counsel cites to the 1996 jury wheel as evidence of the percentage that could be expected to be found on the current jury wheel."  (Doc. 400, n.1).

[4]For the 23 counties comprising the Middle District, Counsel's Affidavit reported these statistics from the 2000 census: a total population of 1,042,657, of which 683,517, or 66 percent, are Caucasian, and 333,061, or 32 percent, are Black.  "Accordingly, [counsel] would anticipate a jury venire drawn from a fair cross-section of the community of the Middle District of Alabama would be 32 percent African-American and 66 percent Caucasian."     (Doc. 400-2, Chartoff *Aff*. ¶¶ 4-5).

[5]At this conference counsel of record for Freddie Williams orally requested leave to adopt Carmichael's objection and motion, and on August 11, 2005 (Doc. 498) the court granted his *Motion* (Doc. 496, Aug. 8, 2005).

I don't think you're entitled to X percentage each time, as long as the overall system is adequately reflective.  Do you have any evidence  that the entire jury selection process, that is, how we fill the box and everything else, is defective in some way?

Counsel related her affidavit testimony of reports from "attorneys with significant experience in federal criminal jury trials in the Middle District . . . that during the jury selection process in these trials, they found that the jury venires consistently contain substantially less than 32 percent African-Americans."  Conceding her lack of access to all rules used to create the wheel, she  highlighted nonetheless the rule pursuant to which people with children under ten and no child care can automatically be excused from the venire, opining its likely exclusion of a "significant number of African-American women."

The court announced its preference for review in the event of a conviction:

[W]hat I typically do is, and I did in the Clay case and several other cases, is to deny your motion to stay the trial, deny your motion to dismiss the indictment, and then after the trial and if your client is convicted you would like to challenge the jury venire, we will do it at that time.  Obviously, we can't do it in fifteen minutes, which it is, before jury selection.  We have to have an evidentiary hearing.  Obviously, you have to gather your evidence, which can take weeks.  So what I will do, then, unless the government has an objection, is to just delay this until after the trial.

Government prosecutors initially objected but after discussion about the length of any continuance of the trial, they reported " that if the Court wishes to hold the matter in abeyance until the end of the proceedings, . . . we would be satisfied with that. . ."  The court then announced that "the objection to the overall jury selection process", in the event of any  conviction,  would be referred to a magistrate judge for hearing.[6]

---

[6]Trial Tr. vol. I,  4, 6-8, 10 June 6, 2005.

**B.**     **Post-Conviction Clarification of  Objection**

Following a status/scheduling conference with counsel, the Magistrate Judge set a filing

deadline for a "motion which clarifies the nature of [Carmichael's] challenge to the jury selection

plan, and any discovery motion deemed necessary and appropriate. . ."[7]   Carmichael's *Amended

Objection to the Composition of the Venire and the Method of Selection of the Venire* offered case law

support for asserted violations of the Sixth Amendment's guarantee of a jury drawn from a "fair-

cross-section" of the community, *see Duren v. Missouri*, 439 U.S. 35 (1979), the Jury Selection and

Service Act ("JSSA") of 1968, 28 U.S.C. §1861, *et seq.*, the Due Process Clause of the Fifth

Amendment to the Constitution, the Equal Protection Clause of the Fifth Amendment to the

Constitution, *see Cunningham v. Zant*, 928 F.2d 1006 (11th Cir. 1991), and the Middle District of

Alabama's Plan for the Random Selection of Grand and Petit Jurors.  Maintaining his "absolute

entitlement to discovery under the JSSA," Carmichael requested leave to conduct discovery, a post-

discovery evidentiary hearing, an opportunity for additional briefing, and a new trial. [8]

After convening counsel for a protracted discussion in response to the *Amended Objection*,

the court set an August 24 deadline for Carmichael counsel (a) to complete only discovery necessary

to support the contention that "the facts establish a *prima facie* case under the Sixth Amendment and

the Jury Selection and Service Act," and (b) to provide *either* evidentiary support for the claimed

disparity in excess of the ten percent threshold to establish the underrepresentation of African

Americans in the Qualified Jury Wheel ("QJW") or "a pleading which either withdraws the Sixth

---

[7] Doc. 477, July 20, 2005.

[8]Doc. 493, Aug. 9, 2005,  at 1-2 and 16.

Amendment/JSSA claim or shows cause it should not be dismissed."  For any requested discovery on a jury challenge "beyond the Sixth Amendment/JSSA claims specified in the *Amended Objection*, the court set a deadline for clarification of the claim and a showing of its timeliness.   With the requisite consent of the Chief Judge for the Middle District of Alabama, the Magistrate Judge also authorized the Clerk to disclose reports relevant to the Master Jury Wheel ("MJW"), the QJW, and the petit venire in controversy.[9]

Carmichael responded with two briefs.  Initially, Carmichael objected to the court's demand for a pre-discovery evidentiary showing on  "challenges not only [to] the procedure that results in creation of the Qualified Jury Wheel but also the makeup of the jury venires or panels summoned for trials in his case and in the Middle District of Alabama generally and the process that creates those venires."   Carmichael argued, in essence:

> The *prima facie* showing for each challenge is different. The *prima facie* showing the Court has ordered the defendant to make is only applicable to Mr. Carmichael's challenge to the method for creating the qualified wheel.  However, it is not the appropriate *prima facie* test for Mr. Carmichael's challenge related to the makeup of the jury venires.  Furthermore, while the number of registered voters may under certain circumstances be used as an approximate measure of the number of African-Americans in the jury eligible population, the United States Supreme Court made clear that the proper comparison is with the percentage of African-Americans in the community in general, not the percentage of African-Americans among registered voters.
> ***
> Mr. Carmichael has not had the opportunity to which he is entitled under 28 U.S.C. § 1867(f) to review all of the records of the Court Clerk used in the jury selection process, and accordingly has not had the full opportunity to prepare and frame his challenge under the Jury Selection and Services Act.  Discovery would allow him to fully determine, evaluate, and develop the legal theories upon which he bases his

---

[9]Status Conference, Doc. 500, Aug. 11, 2005; *Order*, Aug. 12, 2005 (Doc. 501 at 2-3)

claim for relief.  (*citations omitted*)[10]

In his second brief relating to timely preserved claims apart from the Sixth Amendment and JSSA challenges, Carmichael referenced the request in his initial objection for "an opportunity to amend the motion and his affidavit . . . once he has had an opportunity for discovery, additional fact gathering, and consultation with experts."  He renewed his claim for discovery allowed by the JSSA in order to state with more particularity claims under the Equal Protection and Due Process Clauses of the Fifth Amendment . . . and for non-compliance with the Middle District's Plan for the Random Selection of Grand and Petit Jurors ("the Plan"), all referenced only generally in his objection, as amended and briefed.[11]

### C.        Course of Discovery;  Pre-Hearing Submissions

Carmichael's *Motion for Discovery Pursuant to 28 U.S.C. 1867(f)* directed to the Middle District's  Clerk a total of 24 requests for information "pertain[ing] to the master jury wheel and qualified jury wheels ... created following the 2000 general elections."  Counsel  represented the information as " necessary to litigate his challenges under the JSSA and under the fair-cross section requirement of the Sixth Amendment . . ." and also requested leave to take depositions, including the Clerk's, and to seek supplemental discovery from, *inter alia*, the Census Bureau.  (Doc. 511, Aug. 24, 2005 ).  The United States acknowledged the defendants'  entitlement to limited discovery:

---

[10]*Brief in Response to Magistrate Court's Order of August 12, 2005* (Doc. 510, Aug. 24, 2005) at 1-2, 6.

[11]*Brief in Response to Magistrate Court's Order of August 12, 2005 Regarding Claims Beyond the Jury Selection and Services Act and the Sixth Amendment Challenges* (Doc. 521, Aug. 26, 2005) at 2.

This Court has previously allowed discovery pertaining to the issue of whether the defendant could make a prima facie showing that the jury selection process violated the fair cross-section requirement of the Sixth Amendment However, further discovery may be necessary regarding the defendant's challenge to the equal protection component of the Fifth and Fourteenth Amendments and his challenge regarding an alleged substantial failure to comply with the provisions of the Jury Selection and Service Act of 1968. (citation omitted) While the government agrees that the defendant is entitled to some discovery regarding his jury selection claim, such discovery should then narrowly tailored to the issue before the court. The defendant should not be allowed unfettered access to all records regarding jury selection in the clerk's office.

(Doc. 533, Sept. 8, 2005) (internal citations omitted).

On September 13, 2005, the court issued the first of several orders setting the parameters for the discovery which continued for approximately seven months.[12]  Unanticipated difficulties in securing and interpreting relevant discovery on computer software programs applied in the selection process required extended  discovery and cancellation of the evidentiary hearing initially set for January 26, 2006.[13]

The court directed the parties, on December 8, 2005, to file supplemental, *post-discovery* submissions which would "govern rulings on any requests for depositions and an evidentiary hearing as well as the Recommendation of the Magistrate Judge on Defendants' jury challenge." The *Order* advised defendants to file a pleading as "their final statement of 'objections' [with] specifically narrowed, post-discovery contentions in a manner reasonably sufficient for the United States to

---

[12]*See, Protective Order for Discovery from Clerk* (Doc. 563, Oct. 20,.2005), as modified (Docs. 569 and 570, Oct. 27, 2005); *Order* continuing deadlines for expert disclosures, depositions, and discovery (Doc. 571, Oct. 27, 2005); *Order* Doc. 594, Nov. 10, 2005) denying Rule 37 Motion directed to Clerk (Doc. 580); *Order Authorizing Supplemental Discovery* (Doc. 596, Nov. 10, 2005); *Order* extending deadlines for completion of discovery and final statements (Doc. 624, Dec. 21, 2005); *Order* extending deadlines for discovery depositions and United States' Response (Doc. 652, Mar. 17, 2006).

[13]*See* Doc. 571, Oct. 27, 2005 and Doc. 613, Dec. 8, 2006.

evaluate the need for, and duration of, any expert analyses and reports in opposition."  Defendants were instructed additionally (a) to submit with the pleading "a brief which identifies case law support for contentions" along with "any expert reports and analyses"; (b) to show any compelling cause for the taking of the Clerk's and any other depositions; and to identify any issues warranting an evidentiary hearing and the witnesses projected.   The court instructed the United States to "specify ..any opposition to depositions requested . ..; any need by the United States for depositions or further discovery; any opposition to any requested evidentiary hearing; any arguments and case law authority in opposition to Defendants' narrowed, post-discovery contentions; and whether the United States requires any additional time for submission of any expert reports in opposition to Defendants' expert reports."[14]

Carmichael filed on February 13, 2006, his *Statement of Objections to Venire and to the Jury Selection Procedures of the Middle District of Alabama and Brief in Support Thereof* (Doc. 637-1) and attached as expert support the 44-page  Report of James H. Gundlach, Ph.d., on the Operation of the Jury Selection System of the Middle District of Alabama. (Doc. 637-2).  Carmichael  included in this *Statement* an explanation for requested depositions , additional discovery, and an evidentiary hearing.  An Order filed February 22 (Doc. 641)  finally scheduled  the requested hearing for April 26, authorized supplemental discovery through April 7, and set deadlines  for pre-hearing submissions.  The United States filed on April 3 its *Response to Defendants' Various Motions and Objections to the*

_____

[14]Doc. 613 at 2-3.   The court outlined all of the pleadings – *Docs. 400, 493, 510, and 521*– in which Carmichael "stated generally and/or briefed their preliminary contentions" and noted the court's provision of "a reasonable opportunity for discovery in order to assess the merits of pursuing these contentions and to narrow – and buttress with credible evidence – any meritorious contention." *Id*. at 2 n.2, 3.

*District's Jury Selection Procedures*, attaching a voluminous Report of Expert Witness, Stephen A. Elmore, Sr., C.P.A.(Doc. 663).[15]

### D.     Evidentiary Hearing;  Post-Hearing briefs

The evidentiary hearing commenced on April 26 and continued through April 27, April 28, May 1, and the morning of May 2. The parties submitted stipulations on  the qualifications of expert witnesses and the admission of statistical reports, documents, and other evidence.[16]  Evidentiary exhibits totaled 158 for Carmichael, and 22 for the United States; additionally, the court granted a joint motion to admit the original depositions of all witnesses.[17]

---

[15] Mr. Elmore prefaced his Report with the following disclaimer:

> *We were informed by counsel late Friday, March 31, 2006, that Defendants filed their supplemental expert testimony in this case.  Time has not permitted a comprehensive review of that testimony.  However, it appears that the theory and methodology utilized has changed appreciably in that filing from the one filed February 13, 2006.  Accordingly, we respectfully seek this Honorable Court's indulgence for time to analyze and respond to this newly created filing.  Our Report filed herein is in reply to the Defendant's Report of February 13, 2006.  Our brief review of the newly resurrected issues in the Defendant's latest Report, do not appear to affect any of the conclusions we present herein for the Court's valued consideration.*

In fact, Defendants gave notice to the United States on March 31 of the supplemental expert submission noticed to the court a day before the evidentiary hearing.  (Doc. 682, Apr. 24, 2006).  The court reserved ruling and admitted the report after considering  arguments at the April 25 pretrial conference. *See Defendant Leon Carmichael's Notice of Changes to February 13, 2006 Report* (Doc. 682, Apr.25, 2005)*;   Government's Objections to Defendant's Filing of the Newest Report* (Doc. 683, Apr. 26, 2006);  Hr'g *Tr.* vol. II, 62 - 73, Apr. 27, 2006; *Def.'s Ex.* 154 (Supplemental Report of James H. Gundlach, Ph.D., dated April 24, 2006).

[16]*Joint Submissions for Stipulations of Fact and Evidence* (Doc. 673, April 19, 2006), as amended for stipulation number 3 on April 24, 2006 (Doc. 679).

[17]Hr'g Tr. vol. V,  182-185, May 2, 2006.

(continued...)

Hearing testimony came from six witnesses summoned by Carmichael: James Gundlach, Ph.D ("Dr. Gundlach"), an expert qualified in statistical analysis, sociological research methods, and demography;[18] Robert White, Director of Voter Registration for the Alabama Secretary of State; the Middle District's Clerk, Debra Hackett ("Hackett"); current and former Juror Administrators Melissa Myers ("Myers") and Wanda Robinson ("Robinson"); and Systems Administrator Cornelius White. Stephen Elmore, C.P.A. ("Mr. Elmore"), an expert qualified in forensic accounting and auditing,[19] testified for the United States, and the court admitted the deposition testimony of Stephen Andrews, a management employee of Affiliated Computer Services ("ACS"), the British Columbia, Canada - headquartered company which designed this District's computer-based jury selection program.

On May 15, 2006, Carmichael filed his *Post-Hearing Brief in Support of Jury Composition Challenge* (Doc. 689, "*Def's Post-Hr'g Br.*"); the United States filed on June 3 its *Response to Defendants' Various Motions and Objections to the District's Jury Selection Procedures* (Doc. 701, "*United States' Resp.*"), and Carmichael filed a *Reply* on June 7, 2006 (Doc. 711, "*Def.'s Reply*").

## II.

---

[17](...continued)
> To ensure the confidentiality of jurors identified by name , the court directed that these depositions be filed *under seal* (Doc. 687, *Oral Order*, May 2, 2006): Melissa Myers and Wanda Robinson, both deposed on March 10; Debra Hackett (March 13); James H. Gundlach (March 13); Stephen Andrews (March 24 and 31); and Stephen Elmore (April 5).

[18]*See* stipulation no. 1, *Joint Submission for Stipulations of Fact and Evidence* (Doc. 673).

[19]*See* stipulation no. 2, *id.*

## FACTUAL CONTEXT

The JSSA requires "[e]ach United States district court [to] devise and place into operation a written plan for random selection of grand and petit jurors." 28 U.S.C. § 1863(a).  The Middle District's  current Jury Plan, in place since November 2001 ("the Plan" or "the Jury Plan"),  resulted from a successful challenge, in *United States v. Clay*, 159 F. Supp. 2d 1357 (M.D. Ala. 2001), to the method of selecting criminal petit jurors pursuant to the District's 1997 Jury Plan.   An overview of *Clay*  and post-*Clay* modifications in the Jury Plan provides the foundation for this challenge, and a summary of the essentially undisputed administration of the 2001 Plan completes the   factual background.

### A.     1997 Jury Plan and *Clay*

 Clay's attack on the 1997 Jury Plan  which produced his criminal jury venire included statutory and constitutional objections,  but the court declined to consider the constitutional claim after sustaining a related statutory objections.  The District Judge adopted all of the Magistrate Judge's post-hearing findings and did not convene another evidentiary hearing.   Carmichael's statutory challenge relies, in significant part, on *Clay's* holding, and it is thus appropriate to clarify the decision.

Magistrate Judge Coody described as follows the practices which constituted a "substantial violation" of the JSSA:

> [T]he court concludes that *the combined effect of the Clerk's practice of liberally granting undue hardship deferments to any juror who requests one,[20] placing temporarily deferred*

---

[20]Regarding the liberal deferral policy, Magistrate Judge Coody found:

> The Clerk's office customarily grants temporary deferments from jury service to individuals who claim that jury service would create undue hardship or inconvenience for health, business, family, or personal

(continued...)

*jurors en masse at the top of the summons lists, and excluding K jurors from the coding process which purges the summons lists of excess jurors is a non-random process of creating final venire lists which is a substantial violation of the JSSA.* An unfortunate consequence of this non-random process is that the predominately white K jurors have priority for inclusion on the venire list at the expense of the predominately African-American TZ [21] jurors. Because the record clearly indicates that the Clerk's methodology of constructing venire lists introduces a significant element of nonrandomization into the selection of the District's jury venires that is not only a technical violation, but a substantial violation of the Plan and the JSSA, Clay's motion for a new trial is due to be granted.[22]

The "practice of using [temporarily deferred] jurors in a manner which virtually insures their inclusion on venires," the court concluded, is a nonrandom manner of constructing venire lists which affords room for discrimination."[23] Notwithstanding that "no evidence...remotely suggest[ed] that any

---

[20](...continued)

> reasons without regard to whether they are full-time ministers or members of religious orders; practicing physicians, pharmacists, dentists, or registered nurses; or actively practicing attorneys. These temporarily deferred individuals are designated "K" jurors, and their names are removed from the summons list . . . The names of K jurors are not returned to the QJWs. Approximately 25% of people who receive summons request temporary deferment, and almost all jurors requesting temporary deferment receive them. White jurors request, and consequently, receive temporary deferment at two times the rate of African-American jurors.

Recommendation *("Rec.")* at 8-9, Doc. 550.

[21]The individuals designated as "TZ" jurors "were drawn for a term but have become excess to the needs of the District for a particular term [and] are returned to their respective QJW where they are subject to being redrawn later." *Rec.* at 9.

[22]*Rec.* at 19 (emphasis added)

[23]*Id.* at 19. The court explained:

> It is undisputed that, in this District, jurors who previously received temporary excuses not only receive summons but also are arrayed on the jury administrator's working file list in a manner which insures that

(continued...)

13

person involved in this District's jury selection process has ever acted with discriminatory intent", the court explained that the process afforded an opportunity for discrimination:

> It is undisputed that the substantial majority of K jurors are white and that the jury administrator has direct access to the names of K jurors prior to the construction of the venire list.  There is no established process for determining how many K jurors are placed on a particular summons or venire list. . . . therefore, the jury administrator has complete discretion about how many of the predominately white K jurors to use for a particular term.  This lack of discretion, coupled with the placement of the K jurors in a manner which virtually insures that they will be placed on a venire, means that the jury administrator could theoretically control the racial composition of a venire.[24]

In adopting the   recommendation that Clay receive a new trial, the District Judge "conclude[d] that the findings of the magistrate judge are essentially correct: The practice of almost always granting temporary deferrals, and then, upon expiration of the deferrals, constructing venire lists in such a way as to prefer the previously deferred jurors over those who were drawn directly from the qualified wheel was a substantial violation of the JSSA."  *Clay*, 159 F. Supp. 2d at 1364.

### B.      Overview of the 2001 *Jury Plan*

The  District's 2001 *Plan for the Random Selection of Grand and Petit Jurors* prescribes a  process which starts anew every four years with the creation of a Master Jury Wheel ("MJW") containing not less than five percent of the total number of registered voters selected at random from the voter registration lists of the District's 23 counties.  Each county within the District's three divisions must

---

[23](...continued)

> if any jurors are needed for a venire, these K jurors will be used. Thus, by virtue of a juror's request for deferment, the juror as compared with other excused jurors will comprise part or all of a venire.  This is a form of non-random selection which occurs in the make-up of the venire list.

> *Id.* at 32-33 (citation omitted).

[24]*Id*. at 34.

be substantially proportionally represented in the MJW, in accordance with 28 U.S.C. §1863(b)(3).[25]
The Clerk is authorized, "[f]rom time to time, as required, [to]. . . draw at random from the MJW by
electronic data processing procedures authorized by [the] plan, the names and addresses of persons
to whom questionnaires will be sent for the purpose of examining their qualifications for jury
service."(§10a). Selections "must...insure that the mathematical odds of any single name being picked
are substantially equal." (§6a)

Juror qualification questionnaires are mailed to "all of the persons whose names appear on the
[MJW]," and persons found qualified to serve as jurors – based upon their responses – are transferred
to a "Qualified Wheel" ("QJW"), which is also developed every four years.[26]  As jurors are required
to meet the need of the court, they shall be summoned to appear, on a pure random basis from the
Qualified Wheel for the Division concerned. (§8)[27] All criminal trials are conducted in Montgomery,
unless otherwise ordered, and "criminal petit juries [are] drawn from the District at large . . ."  (§16a).

_____

[25]*See Def.'s Ex.*4 ("Jury Plan") at §5, §6, §7a, §9a ( The MJW . . ."shall be emptied and
refilled every four years not later than the first of September of the year following a general
presidential election year.").

> The Middle District of Alabama consists of three divisions: (1) the Northern Division,
> with 12 counties –  Autauga, Barbour, Bullock, Butler, Chilton, Coosa, Covington,
> Crenshaw, Elmore, Lowndes, Montgomery, and Pike; (2) the Eastern Division, with
> 6 counties – Chambers, Lee, Macon, Randolph, Russell, and Tallapoosa;  and (3) the
> Southern Division, with 5 counties – Coffee, Dale, Geneva, Henry, and Houston. *See*
> Jury Plan at §3.

[26]Once the Master Wheel has been refilled, the Qualified Jury Wheel shall also be emptied and
refilled with those qualified jurors from the newly filled Master Wheel. (§ 9a).

[27]The Jury Plan requires prospective jurors to draw names of prospective jurors from the QJW
"on a pure random basis. . . according to Section 6 of [the] Plan."  The Clerk is also instructed to
"assure that at all times in the QJW there are not less than 600 names from the Northern Division and
200 names from the Eastern and Southern Divisions, respectively.
   (§ 15).

15

Like the 1997 Plan, the 2001 Jury Plan does not impose any affirmative obligations to ensure the receipt and return of jury qualification questionnaires or the summonses for actual jury service.[28] The 2001 Plan does include modifications which were triggered by *Clay's* challenge to its predecessor. Section 11 expressly authorizes the Clerk to determine juror qualifications, exemptions, or excuses. Section 12 governs the "Qualification of Jurors" and states a presumption that persons included in a QJW are qualified for service "if . . . not disqualified, exempted, excused or otherwise ineligible for service for one of the reasons enumerated." (§12b).[29]

Section 14 establishes procedures for processing individual requests for excuse or deferment and for service by such individuals at the expiration of their subsequent service. Pursuant to 28

---

[28] *See Clay* Recommendation (Doc. 550) at 4 ("The Plan does not indicate what, if any, steps the Clerk's office must take regarding questionnaires which are not returned or are undeliverable.") and 6 ("The Plan does not indicate what, if any, steps the Clerk's office must take regarding returned or undeliverable summons.")

[29] Section 12c specifies:

> In accordance with the provisions of 28 U.S.C. § 1865(b), any citizen of the United States who has reached the age of 18 years and has resided for a period of one year within the District shall be deemed qualified to serve on grand or petit juries unless he or she:
>
> i.   is unable to read, write or understand the English language with a degree of proficiency sufficient to satisfactorily complete the juror qualification questionnaire;
>
> ii.  is unable to speak the English language;
>
> iii. is incapable, by reason of mental or physical infirmity, to render satisfactory jury service; or
>
> iv.  has a charge pending against him or her for the commission of, or has been convicted in a state or federal court of record of a crime punishable by imprisonment for more than one year and his or her civil rights have not been restored.

16

U.S.C. § 1866(c), persons summoned for jury service may be excused by the Clerk upon a showing of undue hardship or extreme inconvenience. [30]  Section 14b mandates an excuse or deferment of service upon individual request by persons based on age, work, study, or custodial responsibilities.

### C.    Administration of 2001 Jury Plan: Undisputed Facts

*How* the Middle District's Clerk and Jury Administrators implemented the 2001 Jury Plan up to the selection of Carmichael's jury in June 2005 is essentially undisputed; thus, the court will summarize material facts which will frame evidentiary findings and analysis of the controverted issue – whether their acts or omissions resulted in an impermissible infringement of Carmichael's statutory and constitutional rights.

Section 4 of the Plan authorizes the Clerk and her designated deputies to manage the jury selection process, all "under the supervision and control of the Chief Judge."   Three Jury Administrators participated on this record:   Cindy Kimbrell ("Kimbrell"), until December 2000,

---

[30]Section 14a recites this statutory (28 U.S.C. § 1869(j)) definition of *undue hardship or extreme inconvenience:*

> "[U]ndue hardship or extreme inconvenience," as a basis for excuse from immediate jury service under section 1866(c)(1) of this chapter, shall mean great distance, either in miles or travel time, from the place of holding court, grave illness in the family or any other emergency which outweighs in immediacy and urgency the obligation to serve as a juror when summoned, or any other factor which the court determines to constitute an undue hardship or to create an extreme inconvenience to the juror; and in addition, in situations where it is anticipated that a trial or grand jury proceeding may require more than thirty days of service, the court may consider, as a further basis for temporary excuse, severe economic hardship to an employer which would result from the absence of a key employee during the period of such service.

when she left the Middle District;   Wanda Robinson ("Robinson"), until March 2005, when she

became a courtroom deputy;  and Melissa Myers ("Myers"), the current Administrator.  Cornelius

White, the District's  Systems Manager, installed, modified, and upgraded the computer software

application called Jury Management System ("JMS").  Affiliated Computer Services (" ACS" ), an

American corporation which has its technical support division for the Middle District in British

Columbia, Canada, supplied the JMS.[31]  When the District first implemented JMS,[32] the 1997 Jury

Plan governed jury selection; neither the Clerk nor any other District official notified ACS of the 2001

Plan and  specific modifications in the wake of *Clay*.[33]

### 1.  Creation of MJW and QJW

For the 2001 MJW, the Clerk secured  a  list of all registered voters in the District's 23

counties as of the general presidential election on November 7, 2000.  A company randomly selected

from that list a total of 99,604 people for inclusion in the MJW on February 12, 2001, and assigned

each a participant number.  Undisputed is the accuracy of the registered voters list and the randomly

---

[31]Hr'g Tr. II: 40, Apr. 26, 2006.   Omni-Tech Systems, a Canadian software company, actually partnered with SCT, a Kentucky-based company, on a successful bid to design a national jury management system for the  Administrative Office of Courts ("AOC")  According to Stephen Andrews, an ACS Project Manager, SCT acquired Omni-Tech Systems 17 years ago, and around 2001 ACS purchased SCT.  The JMS program,  in use now by 88 district courts, is "a national system [and] there is not a specific modification to the system for any specific court." Andrews *Dep.* 1:6-7, 18, 22,  Mar. 24, 2006 (*Def.'s Ex.* 11).

[32]Although no testimony or exhibit pinpointed the precise date that the Middle District implemented the JMS program,  the evidence indisputably established its use during the entirety  of the  2001 MJW and the 2001 QJW.

[33]Hr'g Tr. I:215, Apr. 26, 2006.

selected participants placed on the MJW; the racial composition was not measured. [34]

Upon assuming the post of Jury Administrator in December 2000, Robinson supervised the mailing of *jury qualification questionnaires* to 25,000 persons randomly selected by JMS from the MJW. Completed and returned questionnaires totaled 14,324; "returned undeliverable by P.O." were 3,766, and 6,910 questionnaires were not returned.   For any returned questionnaires with forwarding addresses indicated, Robinson re-mailed to the new address but could not document the number in this category.  She did not use any other means of locating accurate  addresses but instead stored all the undeliverable questionnaires after recording in JMS the undelivered participant numbers.  Nor did non-respondents receive any follow-up inquiries or reminders, and their participant numbers remained in JMS without any special code. [35]

The completed questionnaires were  scanned mechanically to categorize  those which are

---

[34]*Def.'s Exs.* 7 (Oct. 31, 2000 request) and 8 (Nov. 30, 2000, response certified by Alabama's Director of Voter Registration for all counties except Chambers and Lee).  The Clerk secured voter lists directly from Chambers and Lee county officials. Hr'g Tr. I at 232.

> Hr'g Tr. I: 232; *Def.'s Ex.* 5.  In the "Part III Sampling of Qualified Jury Wheel" section of  the JS-12 form, Jury Administrator Robinson mistakenly entered the 99,604 number of names on the MJW, but her error did not invalidate the racial composition reported for the QJW.   Hr'g Tr. II: 145.

> Hr'g Tr. I: 233.

[35]Subsequent mailings brought to 47, 229 the total of qualification questionnaires mailed during the life of the 2001 QJW.  *Def.'s. Ex.* 94 reflects the date and number of each mailing between February 23, 2001, and January 9, 2004  . *See* Jury Plan at § 10b ("The Clerk shall mail to every person whose name is drawn from the Master Jury Wheel a juror qualification questionnaire accompanied by instructions to complete and return it to the Clerk by mail within 10 days.  The juror qualification questionnaire required by 28 U.S.C.§§ 1864(a) and 1869(h) shall be in the form prescribed by the Administrative Office of the United States Courts and approved by the Judicial Conference of the United States.")

> *Def's. Ex.* 5;  Hr'g Tr.II: 113-115.

"rejected" as unreadable, warrant further "review" by the Clerk for disqualifications or exemptions, or indicate participants who are "qualified to start." Those found qualified were included by participant numbers on the QJW. [36] Because the Clerk's review and processing of requested excuses and deferments comprises a not insignificant part of Carmichael's challenge, other pertinent facts will be recited in the discussion.

### 2.   Racial Composition of QJW

The Clerk first used the 2001 QJW to draw jury pools on June 4, 2001. [37] Almost seven months later, on January 17, 2002, the Clerk sampled the completed questionnaires and on April 9, 2002, documented the results on an AO form ("JS-12") captioned "Report on Operation of the Jury Selection Plan -Completed Pursuant to 28 U.S.C. § 1863(a)." The Clerk did not use the JS-12 form to evaluate or monitor the District's jury selection process, but instead completed and transmitted it as an AO-mandated report at that time. [38]

---

[36]Hr'g Tr. I: 31-33 (*Myers* testimony).

[37]Hr'g Tr. II: 234; *see* Jury Plan at § 16b ("Whenever required, the Clerk shall draw by a pure random process as authorized by this Plan names from the Qualified Jury Wheel for service as petit jurors.")

[38]Hr'g Tr. I: 236.   Like the Clerk, the Jury Administrators did not appear to appreciate the intended purpose of the racial composition statistics requested on the JS-12 form. The court's dialogue with Jury Administrator Robinson is instructive:

> Q:   Mrs. Robinson, when you became jury administrator, you testified that part of your training was in the form of on-the-job training from your predecessor, Cindy Kimbrell, I believe.
>
> A:   That's correct.
>
> Q:   Did anybody, the clerk of somebody with ACS, or anybody, ever sit down with you and tell you why this form in defendant's exhibit five even questioned the census
> (continued...)

---

[38](...continued)

figures with reference to a racial breakdown?  That is, what is the significance of knowing how many blacks are within the twenty-three county community that comprised the Middle District, how many whites are there, how many blacks are on your qualified jury wheel, how many whites are there, did anybody ever tell you why these numbers are significant and how you should evaluate these numbers?

A:    No, ma'am.

Q:    And during your whole time as jury administrator, you did not come to understand why it is significant or important to know and compare the racial breakdown in the twenty-three county district with the representation of those races on your qualified jury wheel?

A:    Judge, through the working with juries and being the jury administrator, I do understand that there is always a question regarding the racial makeup of juries.  But I did not know that I am supposed to do anything further than draw randomly and to do this report and take it to the Clerk for her review.

Hr'g Tr.II: 151-152.

A similar colloquy occurred between defense counsel and  Jury Administrator Myers:

Q:    What is your understanding based on your training, what's the purpose of the JS 12?  What's it for?

A:    To my best understanding, it's just a sampling of the wheel at that particular point of the wheel.

***

Q:    ...Prior to the jury challenge and all the stuff we've been going through for the last month, were you aware of the requirement that juries represent a cross section of the community?

A:    I didn't know the percentage, no.

Q:    Prior to the jury challenge that we're involved in and the other jury challenge, did you have any idea what the percentage of African-Americans age 18 and over who are citizens was in the Middle District of Alabama?

A:    No, I do not.

(continued...)

21

Of the 14,324 participants who returned questionnaires, 8,862, or 61.87% were White; 2,335, or 16.30% were Black; American Indians, Asians, and other ethnic groups factored in small percentages; and 2,957, or 20.64% did not identify their race.   The "sampling of QJW" reported in Part III of the JS-12 reflected the racial composition of not just a sample but *all* of the 9,860 persons then in the QJW:  7,490, or 75.96% were White,  and 2,045, or 20.74% were Black.

The last portion of the JS-12 form presented a "Statistical Comparison of Jury Wheel Sample against General Population Data, age 18 or over, by Racial, Ethnic and Sex Classifications."   The 75.96%  of Whites then in the QJW  compared with  67.7% of Whites in the District's over-age 18 population.  The 20.74% of Blacks then in the QJW  compared with 30% of Blacks  in the District's over-age 18 population.  It is undisputed that the numbers for the  general population of over-age 18 citizens indicated on this JS-12 form reflects census data.[39]

After transmitting this JS-12 form, the Clerk did not complete another JS-12 form or otherwise evaluate the racial composition of the QJW  at any other time *prior* to the present challenge.[40]  At

_____

[38](...continued)

Q:   And would that be because that was not something that was discussed with you in your training session?

A:   Correct.

Hr'g Tr. I: 36-38.

[39]*Def.'s Ex.* 5;  Hr'g Tr. I:245

[40]AO published in March 2004, a JS-12 form revised for *racial classifications* – from Black to Black or African American; from American Indian to American Indian or Alaska Native; adding categories for Native Hawaiian/Pacific Islander and Multi-Racial – and *ethnicity* classifications – from Hispanic to Hispanic or Latino and from Non-Hispanic to Non-Hispanic or Non-Latino.  No other

(continued...)

22

defense counsel's request, on August 10, 2005,  Jury Administrators Myers did confirm the racial

breakdown for the 17,228 persons who were ever on the 2001 QJW:  20.66% (3,559) Black and

73.77% (12,709) White.[41]

The actual racial composition of the QJW between its creation and expiration nearing the

time of the Carmichael jury selection process, as well as transactions allegedly affecting that

---

[40](...continued)
substantive change in the form is evident, but the form attaches both "data collection instructions"
and random sampling instructions for the "jury representativeness statistics" requested on the JS-12
form.  Of particular relevance are these general instructions:

> The information to be collected on the JS-12 form is for the use of the
> district courts to aid them in (1) determining whether their jury wheels
> comply with the randomness and nondiscrimination provisions of the
> Jury Selection and Service Act, and (2) comparing statistical
> samplings of jury wheels against general population data.  *Although
> the JS-12 form is no longer required to be filed with the
> Administrative Office of the United States Courts, it is required to be
> prepared for retention by the court as one of the jury wheel records.*

> *The JS-12 form is required to be completed upon the occurrence of
> either of the following two events:*

> (1) The periodic refilling of the master jury wheel(s), which is
> required          by 28 U.S.C. § 1863(b)(4) to be done at least every
> four years; or
> (2) An amendment of the rules contained in the court's juror
> selection          plan for the selection, qualification, excuse, or
> exemption of jurors,          such as to affect the qualified jury wheel.
> The latter event requires the completion of only Parts I, III, and IV of
> the form; the former requires the completion of each of the first four
> parts.

> (emphasis added)

[41]*Gov't Ex.* 2.  Myers testified that this report, taken about a month before expiration of the
2001 QJW,  "takes into account every single person that was ever on the qualified wheel," including
persons who had been excused or deferred for jury service. Hr'g Tr. I: 167.

composition, all trigger competing expert opinions which are reserved for discussion.

### 3. Jury Pools Drawn from QJW

Jury Administrators use the QJW for the random selection of "pools" of jurors for service during scheduled terms for criminal trials.  Though the number of pools and number of persons in each pool vary depending on case needs, the Middle District aims to select jury pools "about four to five weeks ahead of [a criminal term]" and "typically sends summonses to 200 individuals." [42]  From the first draw made on June 4, 2001, until the last draw on September 7, 2005, the Clerk drew from the 2001 QJW a total of 92 District-wide pools.[43]  The actual "jury panel" – often interchangeably referenced as a venire – is the group from which jurors for a particular criminal case is chosen, and one or more panels may be constituted from a jury pool.[44]

---

[42]See Plan at §15 ("Names of prospective jurors shall be drawn on a pure random basis from the QJW according to Section 6 of this Plan The prospective jurors whose names have been drawn shall be summoned to appear for a time certain as may be designated by the Chief Judge or such other Judge of the Court as the Chief Judge may designate.")

Hr'g Tr. I:75 and II:125

[43]Hr'g Tr. I: 236.  Dr. Gundlach identified 91 District-wide pools while Mr. Elmore identified 92, a discrepancy explained by Dr. Gundlach without challenge:

> The discrepancy is in the first pool summoned from the 2001 Qualified Wheel.  I determined which pool was the first pool in the 2001 Qualified Wheel by examining the records in the jury records room of the Clerk's Office.  Mr. Elmore apparently relied upon another source.  In any case, the inclusion/omission of the first pool does not significantly affect Mr. Elmore's or my analysis.

Def's. Ex. 154

[44]The Clerk succinctly distinguished a pool from a panel or venire:

(continued...)

24

*Def.'s Ex.* 17, a JMS-generated *Pool Selection Report*, documents the two jury pools summoned for the Carmichael trial: a total pool of 225 persons reflecting an initial draw of 150 and a second draw of 75, added upon notice of the need for additional jurors. The exhibit has been redacted of juror names but includes each participant's number, a JMS-assigned number, the juror's city, and division code. Carmichael's claims relate directly to the selection process for these jury pools, the number of previously deferred and African-American jurors included, and the resulting jury panels or venires.

## III.

## DISCUSSION

### A.    Overview of Contentions

This jury challenge "does not arise in a vacuum," Carmichael emphasizes by arguing the

---

[44](...continued)

> A *pool* is the group that are summonsed to come for a term. We may have three or four, five, fifteen cases or however many cases, but we will summons a pool to come in. We may summons two hundred people, we may summons three hundred people, we may summons sixty people. You know, whatever we feel like we need for that term.
>
> And then a *panel*, a panel would be the people that were actually – the people that were used to strike for a particular case. . . the people who actually went to the courtroom to be struck from. [A panel] wouldn't include anyone who got a deferment . . .any excusals . . .people who just don't show up . . .[b]ut if you ran a pool report it would include all of those people.

Hr'g Tr. II: 13-15

impact of *Clay* on challenged acts and omissions;  his overarching theme is  that the "end result of the actions and inactions . . . was a jury system in this District that employed and perpetuated procedures, the  effects  of  which  were  deliberately  ignored,  which  yielded  a  jury  selection  process  that systematically underrepresented  African-Americans in the 2001 QJW and the pools of jurors selected from this QJW."   While maintaining that "continuing deficiencies of jury selection in the Middle District of Alabama" reflect violations of the Jury Plan, the JSSA, the  Sixth and Fifth Amendments, Carmichael posits the fundamental problem as  underrepresentation of African-Americans:

> Perhaps most tellingly of all, even *before* the actions of the Jury Administrator which were in violation of the M.D. Jury Plan, the representation of African-Americans on the 2001 QJW had declined from the 25.2% found on the 1997 QJW by this Court in *Clay*, 159 F.Supp.2d at 1363, to no more than 20.74% African-Americans in the initial stages of the 2001 Q.JW. . . In other words, even if the litany of violations of the M.D. Plan and JSSA demonstrated in the hearing before the court is completely ignored, the underrepresentation of African-Americans in the Middle District of Alabama's jury system has *increased* since the District Court's decision in *Clay* and the subsequent adoption of a new M.D. Jury Plan intended to address the discriminatory practices found in 2001.[45]

Conceding that Carmichael's "microscopic scrutiny. . . has uncovered some lapses in the procedures of the Clerk's office" the United States responds:

> Fortunately, none of the oversights of the Clerk's Office was substantial, and none

---

[45]*Def.'s Post-Hr'g Br.* at 1, 4-5; *see also Def.'s Reply Br.* at 67:

> These  practices  are  not  a  result  of  accident,  or  racially  neutral procedures.   They  occurred  within  a  jury  system  which  provides substantial discretion to the Clerk and an opportunity to discriminate. They were a result of: violations of the M.D. Jury Plan; lack of proper training  and  supervision;  a  failure   to  check  the  results  of  the  jury selection  process  to  determine  if  they  are  in  compliance  with  the requirements of the M.D. Jury Plan and are producing jury pools that do not substantially underrepresent African-Americans; and just plain indifference to the mandates of the M.D. Plan, the JSSA, and the Constitution..

impinged upon Carmichael's constitutional rights.  And, more importantly, none were the result of intentional actions, but were rather the product of either a computer glitch or a honest human mistake.   Therefore, because the oversights were not intentional, were not substantial, and did not impinge upon Carmichael's rights, the Court may rest assured that the jury in Carmichael's case met all of the mandates of the Jury Service and Selection Act and the Constitution.

As did defendants, the United States tinged its submissions with a central, recurring theme: "perfection is not the standard" for any of the violations asserted:

> Carmichael cannot demonstrate [for his fair cross-section claim] that any one of his four defects leads to the systematic exclusion of African-Americans, even making the most favorable assumptions on Carmichael's behalf.  Because systematic exclusion did not occur, any possible underrepresentation cannot be constitutionally defective.

> The Government acknowledges that there exist three known irregularities that occurred during the life of the 2001 Qualified Wheel.  Carmichael additionally alleges others.  None, however, violate the Jury Act.  No complex system involving computers or people is flawless.  While efforts are made to maintain standards, an error-proof jury selection process is impossible.   Fortunately, perfection is not the standard.

> In this case, unfortunately, the Clerk's office fell short of perfection.  Nonetheless, perfection is not the standard. [46]

Different standards of review govern Carmichael's alleged violations of the  JSSA, his "fair cross-section" claim resting on the Sixth Amendment, and the equal protection and due process claims asserted under the Fifth Amendment.  The statutory claim is distinguished from the constitutional claims in another important respect:  the right to a jury selected "at random"  originates only in the statute:  28 U.S.C. §1861 declares:  "It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes."  *See*

---

[46]*United States' Resp.* at 2, 11, 38-39, 53.

*United States v. Hawkins*, 566 F.2d 1006, 1012 (5ᵗʰ Cir. 1978) (describing the right to a jury chosen at random as a "statutory creation"); *United States v. Kennedy*, 548 F.2d 608, 614 (5ᵗʰ Cir. 1977). [47]

The discussion which follows prefaces analysis of each claim with a summary of the applicable standard as well as specific contentions.  Where appropriate, the court first settles disputed issues of fact or law before delving into the analysis.

### B.     JSSA CLAIMS

#### 1.  *"Substantial Violation" Standard*

There is  no dispute on the standard for evaluating  alleged violations of the JSSA, which provides a remedy only for "a substantial failure to comply" with specified provisions.  28 U.S.C. § 1867(d)  "Substantial" is a word "added by Congress to allow room for the doctrine of harmless error." *United States v. Bearden*, 659 F.2d 590 (5ᵗʰ Cir. Unit B 1981), *cert. denied,* 456 U.S. 936 (1982), *citing* H.R. Rep. No. 1076, 90ᵗʰ Cong., 2d Sess.(1968), *reprinted in* 1968 U. S. Code Cong.& Admin. News 1792, 1805 ("House Report").

 A clearly stated framework from the Eleventh Circuit should guide the application of this standard:

> [T]he alleged violations must be weighed against the underlying principles of the Act. A substantial violation of the Act will be found only when two important general principles are frustrated: (1)random selection of juror names and (2) use of objective criteria for determination of disqualifications, excuses, exemptions, and exclusions. Mere "technical" deviations from the Act or even a number of them are insufficient if they do not frustrate the obtaining of jury lists that represent a cross section of the

---

[47]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11ᵗʰ Cir. 1981) (en banc), the U.S. Court of Appeals for the Eleventh Circuit adopted as binding precedent all of the former Fifth Circuit's decisions made prior to the close of business on September 30, 1981.

relevant community and do not result in impermissible forms of discrimination and arbitrariness.

*United States v. Gregory*, 730 F. 2d 692, 699 (11th Cir. 1984), *citing* in part the holding in *Bearden*, 659 F.2d at 601, 602;  *see also United States v. Paradies*, 98 F. 3d 1266, 1279 (11th Cir. 1996); *United States v. Davis*, 546 F. 2d 583, 589 (5th Cir. 1977);  *United States v. Clay*, 159 F. Supp. 2d 1357, 1365 (M.D. Ala. 2001).

A showing of "prejudice" is unnecessary to prove a substantial violation of the JSSA, as the court explained in *United States v. Kennedy*, 548 F. 2d 608, 612 (5th Cir. 1977):

> A litigant need not show prejudice to establish a "substantial failure to comply" with the Act.  Congress deleted just such a requirement from the bill presented to the conference committee. *See* H.R.Rep. No.1076, 90th Cong., 2d Sess. (1968), *reprinted* in 1968 U. S. Code Cong. & Admin. News, pp. 1792, 1806.  Moreover, when a statutory violation directly affects the random nature of the selection process, there is no need to show that the violation tended to exclude some cognizable group from that process.  Congress did not simply outlaw certain disparities in representation of certain groups on juries; it designed a procedure of random selection to ensure that no such disparities would arise.  A departure from the statutory scheme that directly affects the random nature of selection establishes a substantial violation independently of the departure's consequences in a particular case.

Proof  that a practice, policy, or omission is non-compliant with  a court's  jury selection plan is insufficient alone  to establish a violation of the JSSA:

>  The same analysis is applied for claims alleging a failure to comply with the Local Plan.  The court must determine whether noncompliance with the Plan has resulted in a substantial violation of the Act and its underlying principles. The mere claim the Plan has been violated is insufficient, absent a further showing the Act itself and its goals have been frustrated.

*Bearden*, 659 F. 2d at  601. (internal citations omitted)

## 2.  *Summary of Alleged JSSA Violations*

Carmichael contends that the evidence establishes a dozen acts, practices, or failures  which

constitute, individually and cumulatively, a substantial violation of the M.D. Jury Plan and the JSSA.

(1) the use of outdated mailing addresses; (2) the Clerk's deferral practices; (3) the violations of the

15% limit; (4) scattering of previously deferred jurors; (5) double-draw jury pools; (6) the violation

of ¶ 16(e) of the M.D. Jury Plan; (7) the violation of ¶ 16(a)(ii) of the M.D. Jury Plan; (8) the failure

to empty the 1997 QJW; (9) the failure to supplement the QJW; (10) ACS Software and Support;

(11) Training and Supervision of Jury Administrators; and (12) Absence of Quality Control.

Matters relating to *(10) ACS Software and Support, (11) Training and Supervision of Jury*

*Administrators, and (12) Absence of Quality Control* clearly implicate administrative management or

supervision policies. Carmichael nonetheless detail apparent deficiencies in these categories in a

plea for ameliorative action by the Court, explaining:

> While the matters discussed in detail . . . do not directly violate any particular provision of the JSSA or the M.D. Jury Plan, it is clear that each of these practices and procedures contributed significantly to the direct violations of the JSSA and M.D. Jury Plan that occurred. Both the JSSA and the M.D. Plan are intended to insure that juries are randomly selected and that they represent a fair cross-section of the community. The failings of the Clerk and ACS in the three areas outlined in these sections created the circumstances where such violations were virtually inevitable. By doing this, these failings were part and parcel of the violations of the JSSA and the M.D. Plan. While they may not independently support a basis for relief under Defendant's statutory argument, they are inextricably intertwined with the collective substantial violations that occurred, and Defendant respectfully submits that the problems in these areas are significant and deserve the attention of this Court in order to insure that the Middle District has a jury system that not only functions within the constraints of the JSSA and the M.D. Plan, but that fully represents all segments of this community.[48]

Without intending to undermine the seriousness of these problems – whether actual or

---

[48] *Def.'s Post-Hr'g Br.* at 74-75. The United States declined any response to these matters, characterizing them (along with violation nos. 6, 7, and 9) as "minor, somewhat frivolous arguments." *United States' Resp.* at 51.

perceived – the court embraces them as policy concerns which do justify examination by the entire court, for the precise reason stated: "to insure that the Middle District has a jury system that not only functions within the constraints of the JSSA and the M.D. Plan, but that fully represents all segments of this community." This court's already cumbersome task in analyzing cited violations of the Plan and JSSA need not be burdened with unnecessary commentary on the truth and consequences of admitted non-violations.

Another claim clearly in the category of a non-violation is the Clerk's alleged failure to supplement the QJW (violation no. 9). Carmichael premises this claim on his steadfast view that this District's reliance on voter registration lists alone reduces African-American representation on juries sufficiently to justify supplementation with source lists such as drivers' licenses. They acknowledge, however, that "the express language of § 5 of the Jury Plan appears to preclude . . . such supplementation."[49] For this reason and because this challenge does not include a direct challenge to this District's use of voter registration lists to establish the MJW, no discussion is necessary.

Initially discussed are violation nos. 7, 8, and 9 – *violation of ¶ 16(a)(ii) of the M.D. Jury Plan, the failure to empty the 1997 QJW, and the failure to supplement the QJW,* each determined to be a technical or insubstantial violation. Next discussed is violation no. 1, *the use of outdated mailing*

---

[49]Section 5 provides:

Registration of citizens eligible to vote is uniformly conducted throughout the District. A random selection of a fair cross section of the citizens residing in the Counties of the Divisions of the District can be made from the active general election voter lists in the various Counties of the Divisions which comprise the District. To foster the policy and protect the rights secured by sections 1861 and 1862 of the Act, it is not necessary to resort to sources other than the voter registration lists. Accordingly, names of jurors shall be selected at random from the voter registration lists of the Counties that comprise the District.

31

*addresses,* an undisputed practice which, as the court explains, violates no specific provision of the

Plan or the JSSA.   Rounding out the discussion is a handful of somewhat related violations (nos. 2-

6) which do implicate specific provisions in the Jury Plan and warrant more deliberative analysis:  the

Clerk's deferral practices;  the violations of the 15% limit;  the scattering of previously deferred jurors;

and double-draw jury pools.  After analyzing them individually and cumulatively, the court concludes

that these alleged violations do not constitute substantial violations of the  JSSA.

### 3.  Technical Deviations from Jury Plan –
- the violation of ¶ 16(a)(ii) of the M.D. Jury Plan
- the failure to empty the 1997 QJW,

*Section 16a(ii) of the Jury Plan* dictates that jurors for criminal cases be "drawn from the District

at large by drawing names from each Division Wheel in approximately the same proportion to the

total number drawn as the number of names in the Master Wheel from that Division bears to the total

number of names in the Master Wheel."   For the 2001 QJW, the divisional percentages prescribed

for compliance with §16a(ii) were  49% for the Northern Division,  20% for the Southern Division,

and 31% for the Eastern Division.  In fact, the 225 jurors consisted of 106 from the Northern Division

(47%), 59 from the Southern Division (26%), and 60 from the Eastern Division (26%).[50]

---

[50] Hr'g Tr. II: 133-139.  Jury Administrator Myers received these divisional percentages for the 2001 QJW from her predecessor and "typed those in every time [she] did a district-wide pool." Myers related her practice to guard against errors when she typed in the percentages: "[B]efore I ever move on to the next screen, I'm just particular for this, I always look and add them up to make sure they add up to a hundred percent so that I make sure I did it correctly."  Hr'g. Tr. I: 77.   Because she "trusted the computer", Myers did not make it a practice, however, of examining the printed pool selection report to determine if JMS supplied the correct number of jurors from the three divisions; nor could she account for the discrepancies for the Carmichael pools which were uncovered in this challenge. *Id.* at 80.

(continued...)

That the Jury Administrator did not validate the JMS-generated allocations generates Carmichael's complaint about the resulting loss of the requisite 11% differential between the Southern and Eastern divisions and the 2% diminution in jurors from the Northern Divisions: " This failure compromised the random selection of juries . . . by including too many jurors from the Southern Division and too few from the Eastern and Northern Divisions. It also violated the fair cross-section policy by including too few jurors from the Northern Division, which the Government's expert testified contained a higher percentage of African-Americans." The expert's opinion is not bolstered by any compelling analysis, and absent any persuasive evidence or case law precedents, this proposition merits short shrift.

During the course of discovery on this jury challenge, the Clerk identified "approximately five or six people" with apparent activity in both the 1997 QJW and the 2001 QJW; because records confirmed that "they never sat on a jury", this deviation from Section 9(a) of the Plan and Section 1863(b)(4) of the JSSA[51] is harmless error. Carmichael notes correctly that these jurors did not get randomly selected from the 2001 MJW, but he cannot demonstrate that the improper placements on the 2001 QJW destroyed the randomization process for selections from the QJW. Indeed, the

_____

[50](...continued)

> Unlike her successor, Robinson did not "check the results of the pool that [she] drew to determine whether or not [she was] complying with the Middle District Plan's requirement requiring a certain percentage came from each division; instead, she "assumed that the system was working correctly." Hr'g. Tr. II: 140-141.

[51]In pertinent part, § 9(a) provides: The Master Wheel currently in full force and effect shall be emptied and refilled every four years not later than the first of September of the year following a general presidential election year. Once the Master Wheel has been refilled, the Qualified Jury Wheel shall also be emptied and refilled with those qualified jurors from the newly filled Master Wheel.

evidence does not establish even their selection onto a jury pool, and given the unrebutted evidence

that they never served as jurors, the mistake yielded no harm.

### 4.  Use of outdated mailing addresses

Consistent testimony from the Clerk and  Jury Administrators Robinson and Myers  confirms

that the Clerk does not employ a service or an in-house plan or routine practice for securing updated

addresses for jury qualification questionnaires returned as "undeliverable" by the post office. The

evidence established that 15% (3,766) of the 25,000 questionnaires mailed initially were undeliverable

while almost 28% (6,910) never responded at all and had no follow-up contacts to ascertain a reason.

Carmichael's claim that the use of outdated mailing addresses  violates the JSSA is fueled by

his expert's opinion that African-Americans form a significant portion of both the undeliverable

subjects and the non-responders.    The evidentiary underpinnings for Dr. Gundlach's essentially

unchallenged opinion are multiple:   (a) his expert studies in this and the *Clay* jury challenge

supporting his "conservative estimate that at least 30% of the nonresponders were actually

undeliverables, due to bad mailing addresses; (b) his report that the underrepresentaton of African-

Americans decreased by  3% absolute disparity when the Clerk's Office "did a one-step follow-up

mailing to non-responders" when it "us[ed] a private company named Wang to mail out qualification

questionnaires for the 1997 QJW"; ( c ) an analysis of "the effect of bad mailing addresses on the

underrepresentation of African-Americans on the QJW" [showing that] the "proportion of African-

Americans who were renters was about 80% higher than Whites", and they were thus "1.8 times more

likely to not receive their mail due to bad addresses than were whites." [52]

---

[52]*Def.'s Post-Hr'g Br.* at 9.

The United States opted not to contest Dr. Gundlach's opinions as they defend the Clerk's failures as non-violations of the JSSA "[b]ecause the Jury Act does not require a clerk to affirmatively pursue undelivered questionnaires" [or] "to take measures to correct a low response rate."[53]   The court need not evaluate these expert opinions for a more fundamental reason:  they do not establish, and Carmichael is otherwise unable to prove his core proposition:

> The number on the JS-12 would have warned the Clerk, had she understood that one of the duties under the JSSA was to ensure fair representation of a cross-section of the community, that the QJW was on the threshold of legally proscribed underrepresentation, since that report showed the QJW was 20.74% African-American and a community that was 30.0% African-American, an absolute disparity of 9.26%.   A quick and simple calculation of the numbers which the Clerk used to comprise the MJW, . . ., would lead to the conclusion that there was something in the process of mailing and return of questionnaires that was leading to a substantial reduction in the representation of African-Americans.  The JS-12 also confirms what the Clerk had to know: only 14,324 of the original 25,000 jury questionnaires were returned.  Since no one from the Clerk's office testified to observing something going on in the qualification process, the only logical culprit was the mailing process.[54]

Such reasoning simply cannot substitute for proof that African-Americans in fact constituted the vast majority of the 3,766 whose questionnaires were undeliverable or of the 6,910 who failed to respond from the initial mailing of 25,000 questionnaires; more importantly, no evidence at all supports the inferential leap from this unproven subsidiary fact to the general proposition that the Clerk's inaction with respect to undeliverable and non-returned questionnaires caused a significant underrepresentation of African Americans in the 2001 QJW.   The initial mailing of 25,000 forms, made between mid-February 2001 and mid-April 2002 represents roughly 53% of the 47,229 questionnaires mailed over the life of the 2001 QJW (*Def.'s Ex.* 94), but no data is supplied for non-

---

[53]*United States' Resp.* at 48.

[54]*Def.'s Post-Hr'g Br.* at 10.

responders and non-recipients of the remaining 22,229 questionnaires.

Dr. Gundlach's studies document some realities about this District's racial composition which should serve a useful purpose in the Clerk's assessment of the policies now governing the transmission and processing of jury qualification questionnaires. The question before the court, however, is not policy-driven; it is whether the District's Jury Plan and/or the JSSA *mandate* affirmative action in response to undeliverable questionnaires and non-respondents. Neither does,[55] and Carmichael does not disagree. Instead, he seeks to distinguish this case as one which demonstrates compelling evidence of both the need for the Clerk's affirmative action and the racially discriminatory effects of her inaction.[56] If Carmichael's evidentiary showing for this proposition matched its billing, the court's

---

[55]*See Clay Rec.* at 23 ("It is undisputed that the Clerk's office does not take affirmative steps to seek valid addresses for persons whose preliminary juror qualification questionnaires are returned to the Clerk's office or are otherwise undeliverable. However, neither the JSSA nor the Plan expressly provides that any action be taken when questionnaires are returned or not deliverable. Furthermore, the defendant has not presented, and the court has not found, any authority which indicates that the failure in this regard is a substantial violation of the JSSA or the Plan. Given this lack of authority, the court concludes that this practice is not a substantial violation of the JSSA or the Plan.")

> The JSSA does *authorize* the Clerk to address non-responders in this manner: "Any person who fails to return a completed juror qualification form as instructed may be summoned by the clerk . . . to appear before the clerk . . . to fill out a juror qualification form." 28 U.S.C. §1864(a).

[56]Carmichael argues:

> In distinct contrast to all of the cases relied on by the Government, the instant case involves evidence that the Clerk was actually on notice, by the creation of the JS-12 dated April 9, 2002 (*Def.'s Ex.*5), that the mailing of jury questionnaires resulted in not only a high rate of "undeliverables" but a high rate of "non-responders," and that the resulting QJW was 20.74% African-Americans in a community that, according to the Clerk's own figures on the JS-12, was 30.0% African-American. Further, Defendant proved that when the Clerk
>
> (continued...)

conclusion might be different.[57]

### 5.   Clerk's deferral practices

### ( a ) *JSSA and Jury Plan* requirements

The JSSA enumerates  five disqualifications for jury service and authorizes "the clerk under supervision of the court if the court's jury selection plan so authorizes, [to] determine solely on the basis of information provided on the juror qualification form and other competent evidence whether a person is unqualified for, or exempt, or to be excused from jury service.[58]

_____

[56](...continued)

> used a private company named Wang to mail our jury questionnaires for the 1997 QJW, the company used a single-step follow-up letter, which resulted in the reduction of underrepresentation of African-Americans by 3% absolute disparity, yet the Clerk abandoned this process for the 2001 QJW.
>
> Defendant's argument in regard to the use of outdated mailing addresses, then, was that the Clerk knew she was using a mailing process that yielded a QJW that underrepresented African-Americans by an absolute disparity of 9.26% (by the Clerk's own JS-12 figures), and that in order to insure one of the two primary goals of the JSSA, a fair cross-section of the community, the Clerk was required to take easily available and inexpensive steps to reduce that underrepresentation.

> *Def.'s. Reply  Br.* at 5-6:

[57]*See also United States v. Grisham*, 841 F.Supp. 1138, 1149 n.22 (N.D. Ala. 1994), *aff'd*, 63 F.3d 1074 (11th Cir. 1995); *United States v. Aguero*, 248 F.Supp.2d 1150, 1154-44 (S.D. Fla. 2003).

[58]*28 U.S.C.§ 1865 (a)*.   In making decisions on qualifications, exemptions, or excuses, the Clerk "shall deem any person qualified to serve on grand and petit juries in the district court unless he –

> (1) is not a citizen of the United States eighteen years old who has resided for a period of one year within the judicial district;
> (2) is unable to read, write, and understands the English language with a degree of
> (continued...)

37

Section 1863 (b)(5(A) of the  JSSA allows a court's jury plan to "specify those groups of persons or occupational classes whose members shall, on individual request therefor, be excused from jury service," but those persons "shall be excused *only if the district court finds, and the plan states, that jury service by such class or group would entail undue hardship or extreme inconvenience* to the members thereof, and excuse of members thereof would not be inconsistent with sections 1861 and 1862 of this title.[59] (emphasis added).  Consistent with this provision, this District's Jury Plan empowers the Clerk

---

[58](...continued)

> proficiency sufficient to fill out satisfactorily the juror qualification form;
> (3) is unable to speak the English language;
> (4) is incapable, by reason of mental or physical infirmity, to render satisfactory jury service; or
> (5) has a charge pending against him for the commission of, or has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored.
> *28 U.S.C. § 1865 (b)*

Section 12c of the Jury Plan mirrors this statutory statement of disqualifications.

[59]Section 1861 is the "declaration of policy" section of  the JSSA:

> It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes.  It is further the policy of the United States that *all citizens shall have the opportunity to be considered for service* on grand and petit juries in the district courts of the United States, ***and shall have an obligation to serve as jurors when summoned*** for that purpose.(emphasis added).

Section 1862 provides for *Exemptions*:

> No citizen shall be excluded from service as a grand or petit juror in the district courts of the United States or in the Court of International Trade on account of race, color, religion, sex, national origin, or

(continued...)

with discretionary authority to grant excuses to persons summoned for jury service *"upon a showing of undue hardship or extreme convenience."* (emphasis added).  In pertinent part, Section 14(a) of the Plan declares:

> (P)ersons summoned for jury service may be excused by the Clerk upon a showing of undue or extreme inconvenience.[60]  Based upon this statutory authority [28 U.S.C. § 1866] this Plan provides that the Clerk of the Court is authorized to excuse persons summoned for jury service for undue hardship or extreme inconvenience, *or any other factor which the Court has specified in this Plan.*  The Court finds that this delegation of authority to the Clerk, and designated deputies, is consistent with the intent of 28 U.S.C. §1869(j), which defines undue hardship or extreme inconvenience as factors which the Court has determined warrant excuse.  (emphasis added).

The language *"or any other factor which the Court has specified in this Plan"*  appears to have no practical application for two reasons:  the  Plan fails to  specify *"any other factor"* and the Court recites its *finding* of authorization to the  Clerk to grant excuses *consistent with the JSSA's intent* that "undue hardship or extreme inconvenience" be the only "factors which the Court has determined warrant excuse"   Section 14a continues with the full text of the definition supplied by  28 U.S.C. §1869(j), for "undue hardship or extreme inconvenience."

> [U]ndue hardship or extreme inconvenience," as a basis for excuse from immediate jury service under section 1866(c)(1) of this chapter, shall mean great distance, either in miles or travel time, from the place of holding court, grave illness in the family or any other emergency which outweighs in immediacy and urgency the obligation to serve as a juror when summoned, or any other factor which the court determines to constitute an undue hardship or to create an extreme inconvenience to the juror; and in addition, in situations where it is anticipated that a trial or grand jury proceeding

---

[59](...continued)
　　　　　　　　economic status.

[60]Reading this plan provision in its entirety suggests inadvertence in this initial reference to "undue or extreme inconvenience" rather than to "undue hardship or extreme inconvenience."

may require more than thirty days of service, the court may consider, as a further basis for temporary excuse, severe economic hardship to an employer which would result from the absence of a key employee during the period of such service.

Regarding the *processing* of individual requests for excuses from jury service, the JSSA is silent except that 28 U.S.C. 1863 (b) (8) can be construed reasonably to require that the court's Plan "specify the procedures to be followed."[61]   In fact, the Middle District's Plan does specify procedures, as follows:

> 14c.   <u>Excuses or Deferments on Individual Request</u>.  In addition to the excuses or deferment permitted in this plan, and consistent with the determination made in this plan, any judge or the Clerk of the Court may excuse or defer any person summoned for grand or petit jury service when it is determined that service by the person would entail undue hardship or extreme inconvenience.  A person summoned for service may request in writing an excuse or deferment prior to reporting or may make a request for excuse or deferment before a judge in open court.  Written requests should be addressed to the Clerk of the Court and set forth the reason or reasons why service would cause undue hardship or extreme inconvenience.  The Clerk of the Court shall maintain a record of all requests for excuse or deferment and the action taken.  The Clerk of the Court shall inform a person granted a temporary excuse or deferment that she or he will be subject to subsequent random selection for jury service.

> ### (b) Evidentiary findings for the 2001 QJW
> ### Processing of Individual Requests for Excuse or Deferment

For the "individual requests for excuse of deferment" made over the life of the  2001 QJW, evidentiary findings are appropriate concerning (a) the criteria used by the decision makers who

---

[61]This section of the JSSA requires specification of the Clerk's procedures "in assigning persons whose names have been drawn from the qualified jury wheel to grand and petit jury panels." The names of persons requesting excuse from petit jury service necessarily were drawm from the QJW.

40

granted these excuses substantially, if not altogether, without exception, and (b) the quantitative analyses on the excuses or deferments granted during the entire wheel.

*CRITERIA:*    The Clerk evaluated the requests and decided "most of the time" whether to grant an excuse from jury service by initialing the letter "K" on the request as her authorization. She recalled that she did reject requested requests "on occasion", granting more than she denied, but she could not give "a rough guestimate" on the "grant versus deny" proportions.[62] The following excerpts from her testimony establish her determinative consideration:

> Q:    What are the reasons you believe are appropriate to grant a deferral to a juror who is requesting postponement of their jury service?
>
> A:    That they have a reason that they cannot be there at that time previously as scheduled. Something was previously scheduled, or something that they have got to do at that time and to come would be inconvenient and they can come at a different time.[63]

---

[62]Hr'g Tr. I: 278-279;  Defs' Exs. 87-93; Deposition of Debra Hackett (*"Hackett Dep."*) , 141, March 13, 2006.

[63]*Hr'g. Tr.* I: 279.  Defense counsel used the transcript of the Clerk's testimony on April 11, 2006, at a hearing on another pending jury challenge to probe further regarding the criteria she applied:

> Q:    And I ask you if you recall this question on page 451: Question: "I understand, and I'm not disagreeing with you, that you objectively look at each one, but do you compare each one to, if anything? Just a standard of reasonableness, is that what your were saying?"  Is that the question?
>
> A:    And your answer was: "I would guess so.  It's got to be a reasonable excuse.  You know, that is one, I think, that would warrant being deferred."    Is that the question and answer on that date?
>
> A:    That's the question and answer.

(continued...)

41

The Clerk did not have a written statement of "undue hardship or extreme inconvenience" considerations or criteria to guide her or the Jury Administrators with delegated authority to act on requests. [64]  In deciding deferral requests, the Clerk did not look at the requesting juror's "history file" to determine if the juror had responded to a previous summons by securing a requested deferment.[65]

---

[63](...continued)
*Id*. at 280.

[64]At her deposition on March 13, 2006, Hackett testified, in relevant part:

Q:      Let's take a look at Defendant's Exhibit 60 which is the plan.  Paragraph fourteen might be what we're looking for.  Looking at that, then, can you tell me what standard you use for granting and denying a deferral when you get a request for a deferral from a juror who has received a summons?

A:      Check to see that they fit into one of these objective standards.

Q:      Are there any other written standards that you rely on or refer to when you are determining deferrals?

A:      No.

Q:      Who makes the final decision on deferral requests?

A:      I do.
***
Q:      Do you generally want to accommodate jurors if they have a reason that seems to make sense to you that you be accommodating?

A:      If they have a reason that fits one of the categories, yes, if they have got a reason.

(*Hackett Dep*. at 138-139; 141-142)

[65]The pertinent testimony follows:

Q:      So you did not go back and look at whether or not this juror that's requesting a particular deferral had done so before.

                                                                                (continued...)

42

Finally, and most importantly for the parties' disputed contentions regarding the Clerk's deferral practices, the court finds it undisputed that the Clerk did not "look at the race" of the person requesting an excuse as a decisional factor.[66]

When Jury Administrators Robinson and Myers made decisions to grant excuses from jury service, the evidence discloses consistency with the Clerk's pattern and practices. Like the Clerk, neither Administrator could provide precise numbers on requests granted or denied, but both granted substantially more than they denied.[67] Neither ever considered the race of an individual requesting

---

[65](...continued)

A:     No.

Q:     And you didn't look at the reasons.

A:     No.

Q:     So it didn't matter to you whether they had gotten one deferral before, or zero deferrals before or five deferrals before.

A:      No.

*Hr'g Tr. I: 280-281.*

[66]Hr'g Tr.I: 177-178;  II: 20

[67]Robinson felt it "fair to say that more than 90% of the requests were granted" and they "didn't turn many down."

Q:     Because you didn't want to inconvenience people?  Just like you wouldn't want to be inconvenienced if you had some plans?

A:     That is true.

Q:     Are there any deferral requests that just stick our in your mind that, no, I wouldn't
(continued...)

an excuse, and they did not examine the requestor's history for seeking excuses.[68]  Robinson used an "everyday life. .. common sense judgment" standard in assessing the requested excuses: "[i]f it made sense I granted it.  If it did not, I did not grant it."[69]

QUANTITATIVE ANALYSES:    The United States did not challenge the reported facts made by Dr. Gundlach based on a review of "the physical files in the jury room at the Clerk's Office to analyze patterns of the granting of deferral and excusal requests,[including] conducting a random sample of deferral requests to determine the rate of granting/denying of such requests, as well as reviewing letters requesting deferrals or excusals." As acknowledged in the "substantiality" analysis, *infra,* the United States' expert did take considerable exception to Dr. Gundlach's opinions on

---

[67](...continued)
        grant a deferral for this?

A:      My dog is sick.

Q:      Something silly, right?

A:      Right.

Q:      If somebody said I have a trip planned or I have got a sick child or my child has got a school trip that I am supposed to chaperone, if it's a legitimate excuse, they are going to get a deferral, right?

A:      Yes.

Deposition of Wanda Robinson ("*Robinson Dep.*"), 103-104, March 10, 2006; *see also* Deposition of Melissa Myers ("*Myers Dep*"),161-164, March 10, 2006..

[68]Hr'g Tr. I: 177-178; II: 171-186; III: 64-66.

[69]Hr'g Tr. II:167-168.

whether the Clerk's indisputably liberal policy in granting deferral requests established Carmichael's asserted legal claims.

The court finds that a total of 3,427 deferrals were granted during the 2001 QJW, with jurors receiving one or more deferrals in these numbers:[70]

| Number of Deferrals | Number of Jurors |
|---|---|
| 1 | 2,624 |
| 2 | 624 |
| 3 | 141 |
| 4 | 27 |
| 5 | 5 |
| 6 | 5 |
| 7 | 1 |

Dr. Gundlach's analysis demonstrated that "Whites who are summoned to a jury panel are almost twice as likely as African-Americans to request a deferral from jury service on the panel they are summoned for: . . . 6.08 percent of all juror history transactions involving Whites are requests for deferrals compared to 3.20 percent for African-Americans."[71]  A probative fact for these statistics, however, is the court's finding – admitted by Dr. Gundlach – that the Clerk's rate of granting the requested deferrals is not greater for Whites than for African-Americans.[72]

### ( c ) *Substantiality Analysis*: *Deferral Practices*

The United States argues that *Clay* settled by answering in the negative any question whether the Clerk's liberal practices in granting excuses from jury service, then in connection with the 1997

---

[70]*Def.'s Ex.3* at 2; *Def.'s Ex.* 156.

[71]*Def.'s.'Ex.* 3 at 15.

[72]Hr'g Tr. IV: 57.

Wheel, constitutes a substantial violation of the Plan and the JSSA.[73]   Carmichael concedes *Clay's*

conclusion that "[b]y itself, then, the clerk's policy of granting deferrals was not a substantial violation

of the JSSA" but seeks to sustain this claim first by reference to the  court's cautionary note about

jurors' self-awareness of their freedom to choose service as jurors.  To appreciate the context of the

specific note on which Carmichael relies,[74] the court sets forth the complete portion of relevance:

> Arguably, then, when the clerk almost always granted deferrals to jurors, essentially
> permitting selected jurors to opt in or out of a trial term at will, the practice introduced
> a non-random element into the jury-selection process.*  However, even if this practice
> introduced a non-random element, the practice, standing alone, frustrated none of the
> purposes of the JSSA.  There is no evidence that, by itself, it caused juries to consist
> of something other than a fair cross-section of the community, or that it provided
> opportunity to discriminate against any cognizable group or any individuals in the

---

[73]The Government's expert witness noted:

> We agree that the Clerk has continued to liberally grant deferrals for jury
> service.  However, Judge Thompson's Order in the Clay case was clear about how
> this affects compliance with JSSA. (citations omitted) . . . Only the convergence of
> three independent practices of the Clerk's office, namely its liberal deferral policy,
> complete discretion over the use of previously deferred jurors in the selection process,
> and intentional stacking of previously deferred and non-deferred jurors on the venire
> lists, compelled the Court to hold that the Court's implementation of the Plan was a
> substantial violation of the JSSA.
>  *Gov't Ex.* 1 at 29-31

> Counsel for the United States similarly responded:  This District has already addressed
> this exact issue in *Clay*. . . Moreover, the unrebutted testimony was that the Clerk and
> the Jury Administrator uses neutral criteria when deferring jurors."
> *United States' Resp.* at 49-50.

[74]Carmichael  cited this line as the court's "warning": "[I]f the jurors in this case  were aware
that they had such control [over when they served[, the court would be confronted with the possibly
more substantial claim that the practice of granting deferrals itself was a substantial violation of the
statute." *Id.* at 1368 n.29.,*Def.'s Post-Hr'g Br.* at 12

selection process.  By itself, then, the clerk's policy of granting deferrals was not a substantial violation of the JSSA.[75]

Carmichael argues that the Clerk's unabated non-adherence to the statutory standard for excuse from jury service, undue hardship or extreme inconvenience, " has now implicated Judge Thompson's cautionary note on a scenario  allowing selected jurors to opt out of jury service at will: "the continuing practice of the Clerk's Office, dating back to the period of the 1997 QJW  in Clay, of granting virtually all jurors has bound to have communicated to a not-insignificant portion of the community that it is possible to control when, and if, you serve on a jury in this District Court."[76]  The argument is bootless, however, because it is grounded solely on speculation and conjecture rather than evidence that any, most, or all of the beneficiaries of the liberal deferral practice had notice of their likely success in avoiding  jury service, temporarily or altogether, in response to a jury summons from the Middle District.

Nor need this court devote much analysis to Carmichael's  argument that "the increase of the

———————————

[75]*Clay*, 159 F.Supp. 2d at 1368. [*n.29: "This argument does not turn on finding that the jurors who volunteered not to serve by asking for deferrals subjectively were or were not aware of their control over when they served.  If the jurors in this case were aware that they had such control, the court would be confronted with the possibly more substantial claim that the practice of granting deferrals itself was a substantial violation of the statute."]

[76] *Def.'s Post-Hr'g Br.* at 68; *Def.'s Ex.* 3 at 17 ("Once a juror is summoned and requests a deferral, and the deferral is granted, *the juror has the opportunity* to learn that he controls when, if, he actually performs his jury service. [He *will also have the opportunity* to share what he has learned with friends and neighbors.] Conversely, any one of these summoned *jurors could decide* not to seek a deferral if summoned if they were aware of a particular jury trial (through media reports or word of mouth) that was scheduled for a date that coincided with the date on their summons." (emphasis added).

number of deferrals granted had a direct impact on the underrepresentation of African-Americans." This contention rests on Dr. Gundlach's opinion that reducing by 50% the rate of granting deferrals would increase the African-American representation in the jury pools by ... six or seven tenths of a percent." [77]  Notwithstanding that the Clerk's rate of granting deferrals did not differ by race, the court accepts *arguendo* this opinion by Dr. Gundlach but rejects it as a sufficient basis for finding that the Clerk's deferral practices serve to frustrate the JSSA's policy mandating "grand and petit juries selected at random from a fair cross section of the community." [78]

In sum, Carmichael's evidentiary submission fails, as it did in *Clay*, to prove that the Clerk's liberal deferral practices, standing alone, frustrated a primary objective of the JSSA – random selection of juror names in order to ensure jury representation by a fair cross section of the community.  Nor does the evidence establish that the Clerk seized the opportunity [available solely if jurors indicated their race on juror questionnaire forms and the Clerk reviewed the form for that purpose before

---

[77]*See* Dr. Gundlach's pertinent testimony at Hr'g Tr.III: 111-112; IV: 57-59; *Def.'s. Ex.* 3 at 14-20

[78]*See, e.g.*, *United States v. Bearden*, 659 F.2d 607 ("the number of errors found in the present case is insignificant in relation to the large number of prospective jurors handled by the clerk's office.  The persons wrongfully excluded comprised only 1.2% of those screened by the clerk personnel, and only 1.6% of those placed on the qualified wheels.  Thus, the pool of available jurors would have increased only slightly if these errors had not been made.  *Compare United States v. Evans*, 526 F.2d 701 (5th Cir.), *cert. denied*, 429 U.S. 818, 97 S.Ct. 62, 50 L.Ed. 2d 78 (1976) (small number of wrongful inclusions and exclusions of persons from qualified wheel is not substantial violation); . . . with *United States v. Hill*, 480 F.Supp. 1223 (S.D.Fla. 1979) (excusal by clerk of 31 of 77 grand jurors called, or 40.3%, which left only 46 persons from which to pick a grand jury of 23, resulted in a substantial violation of the Act where done without authorization or knowledge of judge).  *See also* House Report, *supra*, at 1805 (example of harmless error would be use of 1,990 names on master jury wheel where plan calls for 2,000, or .5% error rate)).

evaluating the written request] to discriminate against African-Americans;  in fact, the undisputed

evidence is that almost all excuses were granted without any consideration of race.  Accordingly, the

court concludes that the challenged deferral practices do not constitute a substantial violation of the

JSSA.

Notwithstanding this conclusion, this court is constrained to recommend a re-evaluation by

this court of a finding in *Clay* that the JSSA's definition of "undue hardship or extreme

inconvenience"  establishes a "liberal standard" for the granting of excuses from jury service. [79]

Indeed, this finding may be responsible for admitted  practices since *Clay* which, if nothing more,

provide the appearance that jury service within the Middle District is a strictly optional civic duty.[80]

Reconsideration of this issue is dictated by controlling case law, the text of the JSSA, and

congressional intent.   In addition to the random selection of juror names, *United States v. Gregory*,

730 F. 2d 692, 699 (11th Cir. 1984) identified as the second important principle underlying the JSSA

---

[79]See *Clay Rec*. at 21, discussing Clay's claims regarding "Undue Hardship Excuses":
> [T]he court can quickly dispose of Clay's argument that the District's practice of liberally granting undue hardship excuses for reasons other than those specifically enumerated in 1863(b)(5) is a substantial violation of the JSSA.  Clay's argument ignores §1866(c)(1) which provides for temporary excuses from jury service based upon undue hardship or extreme inconvenience.   The JSSA defines undue hardship. . .(omitted text of 18 U.S.C.§ 1869(j)).  *Given this liberal standard*, the Clerk's practice of granting temporary excuses from jury service for work, health, family, or business-related reasons is clearly permissible under §1866( c )(1), and consequently, is not a substantial violation of the JSSA.
>
> (emphasis added).

[80]*See, e.g.*, *Def.'s Ex*. 3 at 18-20; *Def.'s. Exs*. 87-93; *Def.'s Post-Hr'g Br*. at 14-16.

the "use of objective criteria for determination of disqualifications, excuses, exemptions, and exclusions." The legislative intent is clear, however, that both principles work in tandem to produce juries which represent the community fairly.[81]

In *Gregory*, defendants contended that asserted acts of non-compliance frustrated the goal of random selection, and thus relieved the court of any analysis regarding the use of objective criteria. *Bearden*, 650 F.2d 590, the October 19, 1981, opinion of the Fifth Circuit on which *Gregory* relied for the "two important general principles" of the JSSA, articulated these principles after reviewing the text and legislative history of the Act. In fact, the court expressly credits Congress for declaring these principles:

> The legislative history states the Act embodies two important general principles: (1) random selection of juror names from the voter lists of the district or division in which court is held; and (2) determination of juror disqualifications, excuses, exemptions, and exclusions on the basis of objective criteria only. These principles provide the best method for obtaining jury lists that represent a cross section of the relevant community and for establishing an effective bulwark against impermissible forms of discrimination and arbitrariness.

---

[81]These principles provide the best method for obtaining jury lists that represent a cross section of the relevant community and for establishing an effective bulwark against impermissible forms of discrimination and arbitrariness.

House Report at 1793.

> The second principle – determination of disqualifications, excuses, exemptions and exclusions on the basis objective criteria only – is designed to work with random selection to produce juries that represent the community fairly. In essence, this principle would prohibit the widespread current practice of imposing qualifications above and beyond those specified by Congress.

S.Report No. 891, at 17-18 (Dec. 6, 1967) ("Senate Report").

*Bearden*, 659 F.2d 600-601, *citing* House Report at 1793.

Alleged violations of the JSSA in *Bearden*, unlike the case in *Gregory*, did involve, *inter alia*, excusals by the jury clerk of jurors who had been summoned.  Unlike this case, however, the excusals in question were not made pursuant to requests premised on undue hardship or extreme inconvenience but  instead under the Local Plan's provisions for excuses "on the basis of age, occupation, intradistrict moves, or prior jury service."  In evaluating the charge of improper excusals by the clerk's office, many of which the United States admitted were violations of the Plan and/or the Act, the *Bearden* court upheld the district court's finding of 495 wrongful exclusions in four categories; on the issue of whether the exclusions were a substantial violation of the Act, however, the court emphasized that its  analytical framework implicated the second general principle of the JSSA – determinations on the basis of objective criteria only:

> For wrongful exclusions, determining whether there has been a substantial violation has both quantitative and qualitative aspects.  Quantitatively, a substantial violation generally will not be found if the number of errors is small.  House Report, *supra*, at 1805.  *Qualitatively, the inquiry is whether there has been a frustration of the Act's underlying principle of exclusions on the basis of objective criteria only.*  Id. at 1793.  The application of extrastatutory, subjective criteria in the selection process in contravention of this principle may require a finding of a substantial violation even though the number of errors is relatively small.

*Id.* at 607 (emphasis added, internal citation omitted ).   The district court found that the clerk's erroneous excusals represented a substantial violation of the JSSA because they were made on the basis of "subjective, nonstatutory criteria."  The *Bearden* appellate court rejected this reasoning because the legislative history intended that the "subjective criteria" referenced to be criteria "which,

intentionally or not, result or are likely to result in discrimination, or which fail to produce juries representing a fair cross section of the community . . . The mere misinterpretation or misapplication of the objective criteria by a clerk's office," *Bearden* concluded, does not violate the objectivity principle, in the absence of a discriminatory potential or effect." *Id.*

The court has found no Eleventh Circuit case law on the specific question of whether jury administrators should use a liberal or rigid standard in applying the JSSA's objective criteria for excuses from jury service.[82]  Some clue is found in both the  JSSA's text and its legislative history.  The stated policy, at 28 U.S.C. §1861,  contemplates that one summoned for jury service will serve: "It is further the policy of the United States that all citizens of the United States shall have the opportunity to be considered for service on grand or petit jurors **and shall have an obligation to serve as jurors when summoned** for that purpose." 28 U.S.C. § 1861 (emphasis added).  Granting multiple excuses repeatedly to a citizen – without examining the record of that citizen's prior requests and reasons –

---

[82]In *United States v. Paradies*, 98 F. 3d 1266, 1279 (11th Cir. 1996), appellants presented an untimely challenge to the district court's action in  excusing over 70 of 250 potential jurors *sua sponte* prior to voir dire pursuant to § 1866( c) and in accordance with the Local Plan. They alleged that the action constituted a "substantial violation" of the JSSA because the jury questionnaires for these jurors  "provided insufficient evidence of actual bias and undue hardship."

> Of the 400 prospective jurors summoned in *United States v. Barnette*, 800 F.2d 1558, 1567-68 (11th Cir. 1986), 360 responded to the questionnaire; 249 requested pre-trial excusals due to hardship; the court granted 245 of these requests.  In "permitt]ing] practically every prospective juror to decide for himself before trial whether or not...to serve, "the district court, according to the appellants, was left with a jury that was not randomly drawn."  Rejecting this argument, the court did not have occasion to decide if the hardship excusals were granted too liberally, holding instead that "[e]ach request for a hardship excusal was personally considered by the district court and ruled on based on its individual merits."

52

would appear to be inconsistent with this policy; so would granting an excuse or deferment simply because the citizen prefers to be elsewhere for pleasures or optional pursuits.

That Congress intended citizens to place a priority on jury service is further evidenced by the limits placed on the clerk's authority to make an excuse not delineated in the statutory definition of "undue hardship or extreme inconvenience ." Just two reasons are listed as a basis for excuse from immediate service: (1) great distance, either in miles or travel time, from the place of holding court; and (2) grave illness in the family or any other emergency which outweighs in immediacy and urgency the obligation to serve as a juror when summoned. The statute's delegation of authority to the clerk for approval of any other reason can hardly be characterized as "liberal" because any additional reason must fall within one of two specified categories, each still requiring a degree of "undue hardship or extreme inconvenience":

- or any other factor which the court determines to constitute an undue hardship or to create an extreme inconvenience to the juror;
- and, in addition, in situations where it is anticipated that a trial or grand jury proceeding may require more than thirty days of service, the court may consider, as a further basis for temporary excuse, severe economic hardship to an employer which would result from the absence of a key employee during the period of such service.

The legislative history also signals congressional intent that a court not evaluate liberally requested excuses from jury service:

Under the bill, each plan will specify groups whose members may be excused or exempt from service. Although individual hardship excuses will still be possible, the specification of the groups who may justifiably avoid jury service will make it more difficult for members of the community who do not fall within these groups to avoid service on spurious grounds. *Many professional and business people now easily avoid service on the ground that they are "busy people." Some will still be able to obtain individual*

53

*excuses when they are under genuine hardship.*  But the casual granting of excuses to these presumably more intelligent members of the community will no longer be possible. Enhanced jury performance, as well as an enhanced community cross section, will be the result.

House Report at 1797 (emphasis added)

But section 1866 also recognizes that "qualified" candidates who are not within the categories of exemption and excuse set forth in plan may yet be eliminated under proper circumstances when they are summoned to court. . . clause (1) of subsection (c )enables the judge *to grant to persons not included within the excuse categories set forth in the plan excuses for undue hardship or extreme inconvenience (e.g., grave illness in the family).*  These excuses may be granted for such period as the judge deems necessary. At the end of the period, the prospective juror shall be summoned again for jury service.  When resummoned, *such person may be reexcused if the hardship or inconvenience persists.*  This process of summons and excuse may be repeated as often as the judge determines that is appropriate.  When the cause for excuse finally ends, however, the person excused is to be summoned for service immediately without having his name reinserted in the qualified jury wheel.

House Report at 1804. (emphasis added)

In sum, a liberal construction of "undue hardship or extreme inconvenience" is one which would ignore the adjectives "undue" and "extreme."  Such a standard is at odds with the statutory policy encouraging jury service, the narrowly phrased statutory definition, and congressional intent that desired goals of randomness and objectivity be reflected in a jury selection process which is not guided by impermissible arbitrariness or discrimination.[83]

_____

[83]In an effort to document the Clerk's liberal deferral policy, Carmichael highlighted (during his examination of the Clerk and Jury Administrator) a dozen or so requests which seemed spurious if evaluated under a stricter standard of "undue hardship or extreme convenience, and the exhibits used for all the depositions also included 55 "excuse" files.  In light of the 3,724 deferrals granted during the 2001 QJW, this evidence is far too paltry for even a finding that the Clerk applied a liberal standard for all, or most, of the excuses granted.  It would be plainly wrong to equate her admittedly liberal policy in granting excuses with a liberal standard in construing "undue hardship or extreme inconvenience."  Any credible finding must be grounded on careful scrutiny of the basis for excuses in all, or a statistically sound sample, of the 3,724.

**6.   Violations of the 15% limit**

**(a) Post-*Clay* modification in Jury Plan § 14d**

Upon notice during the *Clay* challenge of a practice which caused previously deferred jurors

to acquire a priority which frustrated the statutory goal of a randomly selected jury, the Middle

District modified its Jury Plan, at Section 14d, to restrict the number of "temporarily excused or

deferred jurors" summoned for service jury service.

> 14d. <u>Service By Persons Excused or Deferred</u>.  If a person summoned for jury service is
> granted a temporary excuse or deferment for a period of time, upon the expiration of
> that period of time, the person shall be subject to jury service as set forth in this
> section.
>
> i.      Temporarily excused or deferred jurors whose period of excuse or deferment
>         has expired shall be summoned on a pure, random basis for service on a civil
>         or criminal petit jury.
>
> ii.     For each civil or criminal petit jury, the total number of temporarily excused
>         or deferred jurors summoned shall not exceed fifteen percent (15%) of the
>         total number of jurors summoned for civil or criminal petit jury service.
>
> iii.    The methods employed to comply with the requirement that temporarily
>         excused or deferred jurors are summoned for jury service at the end of the
>         period of excuse or deferment shall insure that these persons are not given any
>         preference over any other person with respect to the final compilation of the
>         lists from which jurors will be selected for service on a civil or criminal petit
>         jury.

**(b)  Undisputed  Violations of  § 14d**

Carmichael asserts two categories of violations.  With reference to the first category, the

United States "concedes that the clerk's office violated the Middle District's Jury Plan when the number of deferred jurors summoned exceeded the mandated 15% . . . in four of the last five district-wide criminal jury pools during the life of the 2001 Qualified Wheel."[84]   Included among these admitted violations is the Carmichael case pool, and then-Jury Administrator Myers acknowledged responsibility for these unintended violations.  Former Jury Administrator Robinson acknowledged her culpability for the second category of asserted violations: the transfer of 1093 jurors from the deferral maintenance pool ("DMP") into the QJW.   It is also undisputed that both categories of violations affected the last 44 pools of the 2001 QJW, including the Carmichael case pool. [85]

Carmichael contends that "the cumulative result of these violations was that, according to the testimony of Dr. Gundlach, 35 out of the last 44 jury pools drawn from the 2001 QJW contained more than 15% previously deferred jurors."  The *fact* that these actions occurred is undisputed.  The United States does disagree with Carmichael's interpretation of "deferred jurors", and they argue that the admitted Plan violations simply do not amount to substantial violations of the JSSA.  Thus, the court examines the only disputed issue of fact – the definition of a deferred juror –  before analyzing whether these § 14d(ii) violations of the Plan constitute a substantial violation of the JSSA.

### ( i ) Deferred jurors

Carmichael's expert "counted a juror as previously deferred if the juror had ever requested and received a deferral prior to being selected on the jury pool that was being analyzed for the 15%

---

[84]*United States' Resp.* at 39.

[85]*See Def.'s Ex.* 99 (Chart F "Percent of Pools Containing Wanda Robinson DCGH Transfers of 1,093 Jurors from Deferral Maintenance Pool."); *Def.'s. Ex.* 100; *Gov't Ex* 1 at Ex. VI, Ex. IX.

violation." Disagreeing with the United States' expert  – that if there is an intervening event of being summoned to a jury after the deferral, then the juror is  no longer deferred – Dr. Gundlach testified:

> I disagree with it because it doesn't alter the racial composition of the group. . .  The contested are every bit as white as the previously deferred dissected any other way, and this way of taking them back into the random selection process has the same whitening effect on the wheel as if they were drawn from the random selection – transferred by Miss Robinson, if  they were drawn directly from the deferral maintenance pool in excess of the fifteen percent.[86]

The United States' expert does not take exception to Dr. Gundlach's contention that the "intervening event" does not alter either the juror's race or his status as one who previously secured a deferral.[87] In the view of the United States, however,  persons in the DMP "could either be ineligible for jury service due to the deferral or eligible to be summoned through the deferral maintenance pool:

>  Once summoned, whether the person actually serves on a jury or is summoned but not needed, the deferred person is placed in the Qualified Wheel.  However, that person is not put back in the deferral maintenance pool.  That person is no longer considered "deferred" because he/she is not in the deferral maintenance pool.  Thus, while the government concedes that on four unexplainable occasions 20-24% of deferred jurors were summoned from the deferred maintenance pool, the other 40 alleged jury pool violations must be explained by other means.[88]

The experts are in accord that their dispute on this issue affects only 171 out of 3,427 jurors

---

[86]Hr'g Tr. III: 164-165 .

[87]Hr'g Tr. V: 69-70.

[88]*United States' Resp*. at 39-40.  Mr Elmore, the United States' expert, "would not include [as previously deferred jurors] those jurors who had previously had deferred in their history if they had already removed that deferral status from their history, either by being selected and serving or being selected and not used and getting an excuse . .."  Hr'g Tr. IV: 170.

receiving deferrals during the life of the 2001 QJW.  If the court accepts the United States' view, the analytical effect is to reduce from 35 to 27 the number of the last 44 jury pools allegedly affected by the 15% violations.[89]

      The Plan does not provide a definitive answer to this question of interpretation, but a literal reading of its text is somewhat instructive .  The word "deferment" is first referenced in the caption of Section 14 – Individual Requests for Excuse or Deferment, and the Plan consistently uses "excuse or deferment" in a manner which suggests that a granted excuse results in a deferment.  Section 14a pinpoints 28 U. S.C § 1866 as the source of the Plan's  authorization to the Clerk to excuse "persons summoned for jury service...upon a showing of undue or extreme inconvenience." That section of the JSSA clearly contemplates that a person so excused should expect to be summoned again and thus the initial excuse places him in a state of deferment (i.e., a deferred juror) until the conclusion of the undue hardship or extreme inconvenience which warranted the initial service.[90]  Neither the JSSA nor § 14 of the Plan reference at all persons who are summoned, report, but do not serve on that occasion for non-selection or cancellation of the trial or term.  Based solely on the text included and

---

[89]*Def.'s Post-Hr'g Br.* at 18-19 n.8.

[90]Section 1866( c ) sets this pertinent proviso for any excuse granted:
> That any person summoned for jury service may be (1) excused by the court, or by the clerk under supervision of the court if the court's jury selection plan so authorizes, upon a showing of undue hardship or extreme inconvenience, for such period as the court deems necessary, at the conclusion of which such person either shall be summoned again for jury service under subsections (b) and ( c ) of this section or, of the court's jury selection plan so provides, the name of such person shall be reinserted into the qualified jury wheel for selection pursuant to subsection (a) of this section, or .... [ ].

omitted, one logical construction of the Plan is that the latter class of jurors (*i.e.*, non-serving respondents to a summons) should not be deemed "deferred" jurors because they did not seek an excuse from their summons.

It is clear from the evidence that jury administrators interchangeably referenced excused and deferred jurors but also considered the non-serving respondents as "deferred" jurors entitled to a temporary excuse under § 16e[91] from being re-summoned.[92] The evidence is also clear that the JMS software did not provide a ready mechanism for distinguishing on the QJW this category of excused deferred juror from those deferred pending the expiration of the undue hardship or extreme inconvenience which generated their request for excuse.[93]

The court concludes that the dispositive question – do the 15% violations pass muster for

---

[91]*Section 16e* sets a one-year period of deferment for non-serving respondents:

> Names of petit jurors who are called but who are not needed or not chosen for actual service shall be deferred for one year and then placed back into the Qualified Jury Wheel.

Section 14b(iv) protects summoned jurors who do serve from a re-summons for two years..

> Any person who has served as a grand or petit juror in a state or federal court prior to his or her current call within the past two years.

[92]The confusion wrought by efforts to distinguish an excuse from a deferment is reflected in Jury Administrator Myers' relevant dialogue with defense.  Hr'g Tr.I: 45-63.  The JMS does automatically track the two-year excuse period for summoned jurors who serve (*Id.* at 48). During the 2001 QJW, contrary to § 16e, Myers also gave two year excuses to those reporting but not selected for jury service, a mistake corrected for the 2005 wheel by assigning to these excused jurors, still on the QJW,  "an excusal code of X" which identified them in the deferred maintenance pool. (*Id.* at 49, 52-56).

[93]Hr'g Tr. I: 56; 254-256 (Clerk's testimony); III: 164-165, 186-188(Robinson testimony).

JSSA substantiality – can be analyzed without resolving this dispute on the definition of a deferred juror. That is because whether the 171 jurors are included or excluded in the analysis, thereby resulting in either 27 or 35 jury pools with Plan violations, the substantiality analysis leads to the same conclusion. Therefore, for analytical purposes, the court can accept either Carmichael's more inclusive statistics or the United States' statistics excluding the 171 contested jurors; for convenience only, given the stated outcome of the analysis, the court will refer primarily to Carmichael's statistics.

### (ii) Robinson violations

Once a deferral is granted to one requesting an excuse from a summons for a particular trial, the administrator identifies the juror as a deferred juror on JMS by inputting the juror's participant number and the date of the trial term to which his jury service is continued. Because JMS advises how many deferred jurors have been continued already to the selected date, the administrator has the ability to select another "continued to" date in order to ensure that the deferred jurors who are eligible for jury service do not exceed 15% of the jury pool for a single trial term. Thus, "the purpose of the deferral maintenance pool is to collect all the previously deferred jurors in one spot and track their deferred-to dates and make sure that the fifteen percent rule [§ 14d(ii)] is applied correctly." During her tenure, Jury Administrator Robinson set 10% rather than 15% as the JMS default for the maximum number of deferred jurors on a term, and she trained her successor to do the same.[94]

Robinson's §14d violations were triggered by her discovery on August 4, 2003, that the JMS deferred maintenance pool contained a very large number of jurors who were not being used. She

---

[94]Hr'g Tr. II:188-193; 126-131 (Robinson testimony); Hr'g Tr. I: 68-70 (Myers testimony).

"attempted to return some of those in the deferral pool to the master wheel . . . [s]o they would have

an opportunity to serve, so that they can go in and once again be a qualified juror from the master

wheel." Due to a transmission error inexplicable by Robinson, her attempt routed these jurors instead

to the qualified wheel and thereby resulted in two indisputable facts of significance: first, the deferred

jurors thus transferred to the QJW became eligible immediately to be summoned for jury service; and

second, because they were not transferred onto the QJW directly from the deferred maintenance pool,

the JMS could no longer distinguish them as deferred jurors and thus could not enforce the 15% rule

as to them.[95]

Using this inappropriate procedure, Robinson transferred on August 4, 2003, a total of 291

jurors from the DMP directly onto the QJW, and seven similar transfers through March 18, 2004,

brought the total in controversy to 1093.[96]  Between 41.4% (453 jurors) and 42.9% (469 jurors) were

---

[95]Hr'g Tr. II: 194; III: 6-8.

[96]In fact, Robinson made the first such transfer on February 12, 2002, and the breakdown of
the 1093 deferred jurors in controversy is shown as follows on *Def's. Ex.* 98:

| Date | Jurors |
|------|--------|
| 2/12/2002 | 1 |
| 2/20/2002 | 1 |
| 3/1/2002 | 1 |
| 4/8/2002 | 3 |
| 8/4/2003 | 291 |
| 8/7/2003 | 2 |
| 9/15/2003 | 1 |
| 10/10/2003 | 15 |
| 10/14/2003 | 5 |
| 10/20/2003 | 5 |
| 11/3/2003 | 2 |
| 3/18/2004 | 710 |

(continued...)

later drawn  from the QJW for criminal jury pools,[97] including seven drawn for the Carmichael jury

pool.[98]   She did not realize the error of her actions until Government counsel and its expert brought

it to her attention until April 5 this year, on the day before her scheduled deposition in another jury

composition challenge. [99]   Robinson refused to assign any reason for her urgency in attempting to

remove deferred jurors from their dormant state in the deferred maintenance pool to a position of

eligibility for service;   since the reason is less important than the impact of her action – as a matter

of fact and law – the court need not make specific findings on Carmichael's proffer.[100]

### (iii) Myers violations

Jury Administrator Myers violated the 15% limitation [for previously deferred jurors] to the

following degrees in four of the last five, district-wide  jury pools selected in 2005 nearing the end of

---

[96](...continued)

11/2/2004                1

[97]The relatively small difference of 16 jurors reflects Defendants' (469 jurors, as shown on *Def.'s.Ex.* 99) disagreement with the United States (453 jurors, as shown on *Gov't Ex. 1*, Ex. IX) on the definition of deferred jurors.  *See Def.'s Ex.* 99 at 2 and *Gov't Ex* 1, Ex.VI (re Carmichael jury pool).

[98]*Def.'s Ex.* 99 at 2, reflecting for the Carmichael Pool (#20105061) 7 transfers on 3/18/2004, the date for Robinson's transfer of 710 jurors from the DMP directly onto the QJW.

[99]Hr'g Tr. III: 20-21

[100]*See, e.g.*, *Def.'s'Ex.* 94 (establishing a lapse of 15 months before the Clerk resumed on December 2, 2003,  the mailing of the jury qualification questionnaires used to screen persons in the MJW to be transferred to the QJW. During the preceding period – February 23, 2001, to May 3, 2002, such questionnaires were mailed for consecutive days monthly through July 2001 and in April and May 2002.)

the 2001 QJW; the first violation represents the Carmichael Pool (*)[101]:

| Pool No. | Total Jurors in Pool | # of Deferred Jurors | % Deferred |
|---|---|---|---|
| 201050601* | 225 | 47 | 20.89% |
| 201050602 | 200 | 49 | 24.50% |
| 202050701 | 125 | 30 | 24.00% |
| 201050801 | 200 | 49 | 24.50%[102] |

At the time of these selections of deferred jurors, Myers had adjusted the JMS default from selecting a maximum of 10% to a 15% maximum.[103] Nor was she aware contemporaneously with her

---

[101]*Def.'s Ex.* 100, *Gov't Ex.* 1, Ex. VI.

> Myers drew Carmichael's pools to prepare the summonses around "the end of April of the first part of May in 2005." For the first pool of 150 jurors, she followed the typical process prescribed on the JMS screen for creating new pools, inputting: June 5, 2005 as the reporting date; the Northern Division in Montgomery as the reporting place; and the prescribed percentages of jurors needed from each of the three divisions. (*See* Hr'g Tr. I: 91) For the second pool of 75 jurors, Myers did not use the "create new pool" screen but instead the screen for adding on a pool to an existing pool. After inputting the preliminary data requested on the first JMS screen and indicating her "acceptance" on the next screen, Myers addressed the third screen, a "deferral screen" which displays "the number of people on the deferred maintenance pool that are eligible to serve at that time;" permits the selection of a percentage of those deferred jurors for the jury pool being drawn; and calculates the number indicated by the percentage chosen. (*See* Hr'g. Tr. I: 78-84).

[102]*Def.'s Ex.* 100 and *Gov't Ex.* I, Ex. XI; for pool#20105062, Carmichael shows 49 jurors for 24.50% and the United States shows 50 jurors, for 25%. The minor difference is not important on the analytical questions.

[103]Hr'g Tr. I: 83-86; II:126-129. Though she could not recall at trial a reason for this change, she testified at deposition: "At the time that . . .the Carmichael pool was chosen, we were at the end of the 2001 wheel. . . According to the jury plan, we could use up to 15% from the deferral wheel.

(continued...)

selections that she had selected deferred jurors in excess of the § 14d(ii) limitation and could not provide any explanation for the mistake; in fact, she became aware of her error only during the course of discovery in this jury challenge.[104]

### ( iv) Statistical summary:  Robinson and Myers violations

To summarize the previously deferred jurors on the Carmichael jury pool, seven reflected Plan violations by Robinson while  47 resulted from Myers' Plan violations.   Pursuant to their contested definition of "previously deferred jurors," Defendants include another 6 jurors in that category so that they calculate as deferred jurors 26.667% of the 225 persons summoned in the two jury pools drawn.[105]

---

[103](...continued)
Therefore, I chose to use the 15%. . . I don't know for any reason other than we could use 15% from the deferral." (*Myers Dep.* at 72-73).

[104]Hr'g Tr. I: 129- 131; 135-139.  Pressed for some explanation, including the possibility of an accidental computer error resulting in a request for more than 15% deferred jurors, Myers responded:

> I do not know [how that happened], and I wish I could magically tell you why it happened.  I do not know.  I have racked my brains since this started and I have no idea. . . .  No sir, I would not have gone above 15%. . . I would not have made that mistake.  I take my job very seriously, and . .. The system allows you to check yourself and recheck yourself, and I would have caught that if I had even remotely dropped something on the keyboard.  The system allows you to check yourself before you accept anything.

> *Id.*, at 130.

[105]*Def.'s Ex.* 154 at 9;  *Def.'.' Ex.* 96 (summarizing the previous deferrals granted to the 60 deferred jurors: 2 had 1, 39 had 2, 12 had 3, 6 had 4, and 1 had 6).

> *Def.'s Ex.* 103  describes the racial composition of all 225 jurors summoned and shows African Americans comprising 16% of that total;  only 4 of the 60 previously deferred jurors (6.67%) were African-Americans while they totaled 32 of the remaining 165 (19.394%).

Excluding the 6 contested jurors does not alter the unchallenged fact that the deferred jurors on the summoned Carmichael pool exceeded the 15% stipulated in the Plan, whether by 11.667%, accepting Defendants' 6 additional jurors, or by 9%, using only the 54 jurors represented by the admitted Robinson and Myers violations.

### ( c ) Substantiality analysis for §14d Plan Violations

Carmichael does not overstate the consequence *in fact* of these §14d(ii) violations, at least to the following extent:  the violations "insur[ed] that more previously deferred jurors than allowed by the M.D Jury Plan were [] eligible for selection (the jurors transferred into the QJW by Ms. Robinson) and [caused the selection of] too many previously deferred jurors out of the deferral maintenance pool (the violations by Ms. Myers).   As for the legal consequences of the violation, Carmichael argues:  "these violations had an impact on the fair cross-section requirement by reducing the percentage of African-Americans on the juries selected while these violations were occurring, during the last 44 District-wide pools drawn from the 2001 QJW, including the Carmichael pool."[106]   The argument must be scrutinized by the standard of review specified by the Eleventh Circuit for  Plan violations alleged to constitute substantial violations of the JSSA.

The stated policy of the JSSA  is to assure a litigant that potential jurors will be selected at random from a representative cross section of the community;  the statute does not  ensure that the jury actually selected is representative of the community or has a specified representation from the

---

[106]*Def.'s Post-Hr'g Br.* at 69.

litigant's race.  In evaluating whether the excessive, and admittedly erroneous, placement of deferred jurors on the jury pools impacted impermissibly the JSSA's fair-cross section requirement, the determinative analytical query is a narrow one:  did these Plan violations frustrate the statute's goal of the random selection of juror names?  If they did, the Plan violations also constitute a substantial violation of the JSSA.  *See United States v. Gregory*, 730 F.2d at 699.

In the opinion of Dr. Gundlach, the Plan violations by Robinson and Myers "combined resulted in 35 of the final 44 pools [ the pools indisputably affected by these Plan violations] having more than 15% previously deferred jurors on the list."  The evidence predictably showed no deferred jurors at all on the pools drawn at the beginning of the QJW followed by:

> • a fairly reasonably large number of district-wide pools that are consistently running along at below ten percent, and are clearly in compliance with the fifteen percent limitation. . .  consistent with the testimony of Ms. Robinson that during ...a certain period of time she was consistently doing a ten percent  (pools listed 12-47, inclusive of pool no. 201020102 through pool no. 201030802) [;and]

> • a fairly quick rise in the proportion previously deferred [commencing with] pool no. 201030903 [the pool listed 48, showing 25%previously deferred percent]. . .  it stays reasonably high for a short period and then it begins to taper off.... [107]

Dr. Gundlach's investigation showed (a) a correlation between the patterns of large numbers of pools with more than 15% deferred jurors and  Robinson's largest transfers (291 and 710)  of deferred jurors from the DMP onto the QJW, along with  (b) an impact of the  Myers' violations on the last five pools commencing with the Carmichael pool.[108]

---

[107] Hr'g Tr. III: 97;  *Def.'s. Ex.* 97.

[108] Hr'g Tr. III: 120-123, *Def.'s Ex.* 100.

Save for its exclusion of 171 jurors from the "previously deferred" category, thereby reducing from 35 to 27 the number of pools having deferred jurors in excess of the 15% limit, the United States does not dispute the Plan violations reflected but maintain, instead, that they nonetheless do not constitute substantial violations of the JSSA.   Specifically responding to the Myers' violations resulting in four jury pools having deferring jurors in excess of 15%,   the United States reasons:

> These deferred jurors were randomly selected from the deferred maintenance pool and randomly disbursed throughout the jury pool.  Thus, while the Jury Plan has been violated, the Jury Act has not.. . . There is no evidence that the Clerk's office applied any non-objective or subjective criteria in violation of the second principle. [109]

Concerning Robinson's transfer of 1093 jurors from the DMP directly onto the QJW, the United States argues first, in reliance on Section 1866 (c) of the JSSA,  that the persons transferred were eligible to return to the QJW because the term of their deferment had expired.  Defendants respond correctly, however, that undisputed evidence established that JMS could not enforce the 15% limitation for deferred jurors specified in § 14d(iii) whenever  deferred jurors in the DMP – irrespective whether their deferments have expired – are transferred directly onto the QJW.  Jury Administrator Robinson clearly acknowledged her understanding that this software deficiency established her transfers as erroneous because the system could no longer track these previously deferred jurors in order to enforce the 15% limitation for summoning them.

Although conceding that Robinson's transfers of 1093 deferred jurors "inflated the number of people that are classified as deferred," the United States notes that less than half of the transferred

---

[109] *United States' Resp.* at 40-41

jurors appeared thereafter in criminal pools, with the remainder "either...never called for jury service

or ..called to serve on a civil case."   According to its expert's analysis of the last 44 jury pools in

controversy, Robinson's transfers resulted in only a .6% alteration of the racial composition of these

pools: "The last 44 pools contained 19.9% African-Americans.  If the 1093 jurors were never moved

out of the deferred maintenance pool, the last 44 pools would have contained 20.5% African-

Americans."[110] Carmichael dismisses the United States' assignment of "harmless error" for these

violations as "trumped by the binding authority of *United States v. Kennedy*, 548 F.2d at 608, 612 (5th

Cir. 1977)."[111] The referenced holding in *Kennedy*, however, hinges on a showing of nonrandom

selection: "Moreover, when a statutory violation directly affects the random nature of the selection

process, there is no need to show that the violation tended to exclude some cognizable group from

that process."

The United States' argument that JMS still randomly dispersed the affected jurors actually

summoned for criminal pools – 498 of the 1093 – properly focuses the analytical query on whether

the Plan violations by Robinson and Myers "directly affect[ed] the random nature of the selection

process."  Section § 14d(ii) of the Plan mandates: Temporarily excused or deferred jurors whose

period of excuse or deferment has expired *shall be summoned on a pure, random basis for service on a civil

or criminal petit jury*."  (emphasis supplied)  Thus, for both the Robinson and the Myers violations of

---

[110]United States' Resp. at 41-42; Gov't Ex. 1 at 21-31;  Exs. IX and X;  Hr'g Tr. IV: 205-209.

[111]*Def.'s Reply* at 15

the Middle District's Plan, the court can find these Plan violations also constituted a substantial violation of the JSSA only if the evidence establishes a frustration of the randomness principle identified by the Eleventh Circuit as one of the two overriding principles which must be measured.[112]

The evidence does not establish that these Plan violations frustrated the statutory goal of randomness, and the second principle of *objectivity* is not implicated. No evidence establishes that Robinson – who did have an awareness of her affirmative actions in transferring jurors from the DMP – or Myers – who did not attempt to transfer more than the prescribed limit of deferred jurors – hand-picked these jurors or otherwise manipulated their transfers in a manner which even allowed for non-randomness. The undisputed evidence is that both made transfers by using a JMS function which identified deferred jurors only by participant numbers. Nor does the evidence suggest any impermissible motivations by either. Robinson's attempt to secure technical guidance from ACS personnel belies any ulterior motive to shift these deferred jurors directly onto the QJW so that their

---

[112]Carmichael's submissions consistently incorporate the "fair cross-section requirement" as a statutory objective on par with JSSA's objective of randomness. While he correctly references the former Fifth Circuit's 1977 opinion in *Davis*, he ignores the Eleventh Circuit's *Gregory* opinion in 1984. These opinions are not at odds as each recognizes as major goals of the JSSA the prohibition of discrimination in the selection process as well as the selection of juries at random from a fair cross section of the community *(see Davis*, 546 F.2d at 589). This court is constrained to follow the specific guidance provided in *Gregory* to measure obstacles to achieving the major goals articulated: "A substantial violation of the Act will be found only when two important general principles are frustrated: (1) random selection of juror names and (2) use of objective criteria for determination of disqualifications, excuses, exemptions, and excuses." *Gregory,* 730 F.2d at 699. Because this analytical framework has been consistently applied by and within the Eleventh Circuit on other claims of JSSA violations, the court addresses all claims of direct "fair cross-section" violations pursuant to the prescribed standard of review for a Sixth Amendment challenge. *See, e.g., United States v. Paradies*, 98 F.3d 1266 (11th Cir. 1996); *United States v. Barnette,* 800 F.2d 1558, 1567 (11th Cir. 1986 (citing the Gregory standard for evaluating substantial violations of the JSSA)

status as deferred jurors could no longer be tracked.[113]   Neither Myers nor Robinson, an African-American herself, demonstrated any particular appreciation of the finding in *Clay* that Whites constituted a higher percentage of the deferred jurors on the 1997 QJW, and no credible evidence attributes to either any purpose knowingly to undermine the integrity of the selection process.[114]

*Most importantly in weighing whether these administrators' errors frustrated the randomness principle: no evidence indicates anything but the JMS's random distribution of these affected jurors among the other jurors to be selected for a jury pool.*   The offending action in *Clay* – direct placement of deferred jurors en masse at the top of a jury pool, having the effect of giving them a priority – is not presented here. Both jury administrators depended on the randomness components of the JMS software to ensure that

---

[113]Hr'g Tr. III: 8 -20.

> On the question of how she made the erroneous transfers, Robinson explained:
>
> > There was a process of looking at those in the deferral maintenance pool, a list of those individuals who have been deferred.   The jury administrator could go through that list and put a check, or an electronic check by the ones that she chose to return to the master wheel as I thought.   And that's the procedure that I did.. . . I believe what I did was looked at those ones who had been in the deferral pool the longest and chose those ones.
> > *Id*. at 9.
>
> Regarding the help she solicited, Robinson testified: "I do recall calling the A.C.S. hotline. . . I do not recall what the conversation was, but I do know that I did all.   And after the conversation I followed up with the process. (*Id.* at 10)

[114]*See* Hr'g Tr. III: 43-45; 64-66.

goal,[115] and no authority condemns their reliance as unreasonable. [116]    There is no claim that the

---

[115]Robinson's cross-examination testimony underscores this point:

Q:    When I say this person was randomly selected, you didn't go into the computer and handpick this person to go into a jury pool.

A:    That's correct.

Q:    You didn't go into the qualified  wheel and go through the JMS system and physically check off maybe a hundred people to be summoned into a jury pool.

A:    No.

Q:    The computer did that for you.

A:    Yes

Q:    And your understanding was that the computer did that randomly.

A:    Yes.

Hr'g Tr. III: 67-68

[116]The court in *United States v. Davis*, 546 F.2d at 592, underscored the point:

> The jury-selection process, in particular, lends itself to automation because of the substantive importance to the process of random selection and objectivity – both of which are promoted by electronic data processing.  Forty-one federal judicial districts have automated their jury-selection systems.  Furthermore, the Judicial Conference of the United States has urged upon the courts the very type of system here at issue.   Accordingly, we will not thwart the welcome development of electronic data processing in jury selection by requiring that the clerk of the court perform each mechanical function in the computerized process or that one of his deputes be able to attest, based on personal knowledge and expertise, that the system is technically sound. . . .  It is enough, therefore, that the clerk, under the ultimate supervision of the court, take all reasonable and necessary

(continued...)

71

JMS's randomness components failed to function as designed.[117]   The fact that these errors increased the number of previously deferred jurors on some of the  jury pools, including the Carmichael pool, cannot substitute for the requisite showing of  non-randomness.   Thus, the court cannot conclude that the  Plan violations by Jury Administrators Robinson and Myers amounted to  a substantial violation of the JSSA.

### 7.   Scattering of previously deferred jurors

---

[116](...continued)

> steps to see that a randomized, objective and reliable system of jury selection is established and maintained and that he or his deputies exercise all the discretion at every point in the process where there is room for discretion or choice.

[117]One of the benefits of the JMS software application is its design to facilitate a "purely random selection process."  Under its contract with AO to design the software for use in federal courts, the Canadian company now owned by ACS. received the following instruction in March 1998 to incorporate a National Institute of Standards and Technology (NIST) random algorithm into the software: *"Whenever the system performs a random selection, the algorithm specified in Section J, Attachment 13 of the contract [is] to be used."*  On April 27, 200, the company certified its application of that algorithm to the JFW/JMS software for both one and two step processing courts.

*Jury Management System Implemented Random Algorith Used by Juror for Windows Software  Certification,*  http://jnet.ao.dcn/District/Jury-Management/Jury-Management-System/juror-for-windows.html.

> Technical examination of the  performance of the pseudo-random number generator that is the basis for that algorithm resulted in this expert advice, on March 21, 2002: "Under a definition of fair selection in which each possible candidate has an equal chance to be selected for a jury pool, this algorithm is adequate."

*Letter from Nell Sedransk, Ph.D, to David Williams, Administrative Office of the United States Courts*, available at http://jnet.ao.dcn/District/Jury-Management/Jury-Management-system/Nist-html/.

Section 14d(iii) of the 2001 Jury Plan reflects a post-*Clay* revision to ensure that previously deferred jurors did not receive preferential treatment for selection from a jury pool when they became eligible again to be summoned.  For convenient reference, the text is again cited:

> The methods employed to comply with the requirement that temporarily excused or deferred jurors are summoned for jury service at the end of the period of excuse or deferment shall insure that these persons are not given any preference over any other person with respect to the final compilation of the lists from which jurors will be selected for service on a civil or criminal petit jury.

Carmichael's expert performed statistical analyses to determine if jury pools selected from the 2001 QJW satisfied this provision and concluded that, while he did not discern the "*Clay* effect – where the previously deferred were placed in a group at the top of the summons list...result[ing] in a preference for selection for jury duty" – nonetheless he found non-random distribution, described as follows:

> I selected a test for randomness, and I found that for the previously deferred as opposed to the not previously deferred, there is a significant violation of random distribution among the previously deferred for the summons for the district-wide pools in the 2001 wheel as a whole.  And I found nine pools that even with small numbers were significantly in violation of random distribution. [118]

It is undisputed that "three of these nine pools were ....the three pools out of 91 pools from the 2001 QJW that were selected in two draws, as opposed to one draw.  One of these three pools was the

---

[118]Hr'g Tr. III:97-98; 171; 172-179 (explaining at 172-173 the recognized statistical test he used – "nearest neighbor chi" "It's based on the idea that if you have hypothetically a list that is 25% of one type and 75% of another, and you had random distribution, you would expect no more than 25% of that small category to have a neighbor on the list that was from that same category")analyses supporting his conclusion); *Gov't Ex 1*, at Ex. 19 (illustrating the 9 pools identified)

Carmichael jury pool."[119]

From the perspective of a statistician, Dr. Gundlach may be absolutely correct about the purity of the statistical randomness for the placement of previously deferred jurors on the isolated jury pools. This court discerns no need at all to validate or dispute his contentions because a substantial violation of the JSSA is not to be decided by compliance with statistical randomness, as measured by recognized statistical tests. Confronted with a somewhat analogous challenge, the court in *United States v. Bearden*, 659 F.2d at 602 explained:

> Analysis of required randomness in a statistical sense misses the mark. The legislative history makes clear that Congress did not intend for "random selection" under the Act to be defined as statistical randomness:
>
>> To the extent that the bill does provide for random selection, it does not insist upon randomness in the sense in which that term might be understood by statisticians. Many districts may seek the aid of statisticians in developing systems of selection that do meet the standards of that profession, and they are encouraged to do so. No doubt such systems enhance the likelihood of attaining the cross sectional goal of the bill. But for reasons of administrative feasibility your committee did not deem it necessary to require the use of random selection in the statistical sense. It is sufficient for the purpose of this legislation if the plan adopts some system of selection that affords no room for impermissible discrimination against individuals or groups.
>>
>> Thus, for example, the plan may specify selection of every 70th name from the voter list, or every name at the bottom of a page in the list, or all the names on the list, even though in certain cases statisticians might not agree that truly random selection would be the result. Likewise, in drawing names from the master and qualified wheels some similar processes may be designated. Under this definition of randomness, the plan may also permit courts to continue to use "rotation methods" or "jury pools" in assigning persons to grand and petit juries, provided that these methods, too, are free from any taint

---

[119]*Def.'s Post-Hr'g Br.* at 32.

of impermissible discrimination against groups or individuals.
*S.Rep.No.* 891, 90th Cong.,1st Sess. 16 n.9 (1967).[120]

Concerning the jury pools Dr. Gundlach finds not to reflect *statistical* randomness, the court is presented no probative evidence that the process by which deferred jurors were placed on the pools smacked of, or allowed for, impermissible discrimination or manipulation, likely to prevent panels selected from those pools from being representative of a fair cross section of the community. His theoretical concern – that if ordered in a statistically random manner, the incidence of one previously deferred juror following another would be lower than that indicated on the pools in question – would have practical application for the court's substantiality analysis if grounded on evidence that the placement of these deferred jurors on, and their distribution from, the jury pools, gave them an unfair advantage over non-deferred jurors for selection to a panel from which the petit jury would be picked. No such evidence is presented, and accordingly, the court concludes that the "scattering violation" identified by Dr. Gundlach does not constitute a substantial violation of the JSSA.

### 8. Double-draw jury pools

Carmichael's claim arising from the three "double-draw jury pools" from the 2001 QJW, including his own, does not warrant much analysis based on the court's findings and conclusions in response to the "scattering" and "15% limits" claims. The vice identified is not the *reason* for a double-draw pool – the need for more jurors for a particular pool – but instead the undisputed fact

---

[120]*See also United States v. Haley*, 521 F.Supp. 290, 294(N.D. Ga. 1981) (declaring, in reliance on citing legislative history that "absolute, or 'true' statistical randomness is not required...")

that the JMS software fails to effect a random dispersal of the deferred jurors within the additional pool.  Deferred jurors within the first draw of 150 jurors summoned for this case were randomly dispersed, but for the second draw of 75 jurors summoned, 11 deferred jurors in that group were not dispersed, but instead, were grouped at the top.[121]  While all 225 jurors received summons, it is also undisputed that the panel from which jurors were selected did not include persons on the second draw."[122]  The other add-on juries drawn during the 2001 wheel "were never called for service."[123]

---

[121]*See Hr'g Tr.I:* 154 ("..we will stipulate as in our brief that ...these eleven jurors were not random, that they were stuck at the top of the added on pool"); Hr'g Tr. I: 193)

> *See Def.'s. Ex.* 17 (Carmichael Pool Selection Report) , showing *(a) the first draw* starting with participant no. 100028821- *no.01-0001* and continuing on page 3 through participant no. 100025478 - *no. 01-0150,* and indicating the dispersed previously deferred jurors by either an "X" or "WAR"*;   and (b) the second draw* starting on page 3 with participant no. 1000555001 - *no. 01-0151* and continuing through page 4 with participant no. 100038602, no. 01-0225, and indicating an previously deferred jurors the eleven listed consecutively by no. 01-0151 through no. 01-01-0161.

[122]Hr'g Tr. IV: 98(testimony of Dr. Gundlach)

> Q:    Are you aware or through your analysis did you determine whether the Carmichael pool or panel ever got down to, when going through the voir dire process, ever got down and used those people that were summoned through the second draw?

> A:    It is my understanding that they did not get down to these people.

> Q:    Do you recall how far down in the list?

> A:    The highest line number I found for somebody who had a record for attending a jury was 56.

(continued...)

During the course of this jury challenge the Clerk discovered the JMS software deficiency – rooted in its different programming for "creating a pool" and "adding-on a pool" –  and has requested a correction to prevent the software from grouping the deferred jurors at the beginning of the second pool.[124]

Carmichael  insists that this violation adversely affected the composition of their jury pool. Given the undisputed facts that the non-randomly dispersed jurors were not included on the jury panel, the court readily concurs with the United States that this error qualifies as a technical deviation or harmless error which, in any case, does not qualify as a substantial violation of the JSSA.

### 9.   Violation of ¶ 16(e) of the M.D. Jury Plan

The evidence establishes another admitted  deviation from the Plan with respect to the requirement in ¶ 16(e) that "petit jurors who are called but ..not needed or not chosen for actual service...be deferred for one year and then placed back into the Qualified Jury Wheel."  In fact, Jury Administrators were trained to, and did, defer such jurors for two years ; they  did not recognize their practice as violative of the Plan and proceed to remedy it until the beginning of the 2005 QJW.[125]

---

[122](...continued)
>    *See Def.'s. Ex.* 59 to deposition testimony ( outlining "jurors, except as indicated who answered roll call on 6/6/05).  Of the "12l" pool members on this exhibit, 15 absences and 5 excuses reduced the venire to 101.

[123]Hr'g Tr. II: 30.

[124]Hr'g Tr. II: 25-27.

[125]*Hr'g Tr.* I: 46-56 (Myers testimony, in pertinent part: "in the 2001 wheel, I was trained to – that those that come and not serve, they are excused for two years." *id*. at 49; "we actually went
(continued...)

Carmichael summarizes as follows his contention that this deviation from the Plan constituted a substantial violation of the JSSA:

> The racial impact of the violations of the M.D. Jury Plan is a result of the process in which previously deferred jurors get summoned more often and more quickly than excused jurors. The granting of two year excusals to all jurors who were summoned but did not serve rather than one year excusals as required . . . would have increased the length of the excusal period as to all these jurors, thereby contributing to the fact that previously deferred jurors were re-summoned more often and more quickly than excused jurors. [126]

In reliance on another statistical test used by Dr. Gundlach, "regression analysis," Carmichael concludes that this practice had the "consequential effect of increasing the underrepresentation of African-Americans on the last 44 District wide jury pools."[127]

The court cannot find a sufficient evidentiary basis for the *causality* link independent of Dr. Gundlach's statistical test, which also suffers from precise proof of the correlations theorized, and in any case, cannot be dispositive of the issue of " randomness" within the meaning of the JSSA. No substantial violation of the JSSA is established absent proof (a) that these extended excusals in violation of 16(e) actually frustrated the randomness or objectivity principles governing these jurors' placement and dispersal on the list for selection from a jury pool, or (b) that the jury administrators purposely violated the Plan for the purpose of increasing the number of previously deferred jurors on

---

[125](...continued)
back to the beginning of the 2005 wheel and corrected this." *id* at 53. )

Hr'g Tr. I: 254-260 (Hackett testimony); Hr'g Tr. II: 153-161 (Robinson testimony).

[126]*Def.'s. Post-Hr'g Br.* at 38 n. 14.

[127]*Id.* at 72; Hr'g Tr.III: 114-115; 116; 124- 131; *Def.'s Exs.* 101 and 154 at 15.

78

the jury pools.

### C.    FAIR CROSS-SECTION CLAIM - SIXTH AMENDMENT

#### 1.    *Analytical Framework*

##### (a)   The *Fair Cross-Section* Right; *Prima Facie*  Violation

The Sixth Amendment is the source of the constitutional right to a jury which is drawn from a "fair cross-section" of the community.  In holding that "petit juries must be drawn from a source fairly representative of the community," the Supreme Court explained, in *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975),  that "jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id*. at n. 20.  The fair cross-section requirement does not mean, however, "that petit juries actually chosen must mirror the community." *Id*. at 538; *Holland v. Illinois*, 493 U.S. 474, 480-84 (1990).  A defendant has no entitlement to a jury of a particular composition, whether based on race or gender. *See United States v. Green*, 742 F.2d 609, 611 (11th Cir. 1984).

In *Duren v. Missouri*,  439 U.S. 357, 364 (1979), the  Court identified  three components of of proof for a prima facie violation of the fair cross-section requirement:

> (1) that the group alleged to be excluded is a "distinctive" group in the community;
> (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and
> (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

The Sixth Amendment challenge ends with failure on any element of this prima facie case.  *United*

*States v. Pepe*, 747 F.2d 632, 649 (11th Cir. 1984). If a defendant does succeed in establishing all three elements, "it is the State that bears the burden of justifying this infringement by showing attainment of a fair cross-section to be incompatible with a significant state interest. *Duren*, 439 U.S. at 368; *Taylor*, 419 U. S. at 533-535.

The first element of the prima facie case is seldom disputed; like "women" who were beneficiaries in *Taylor* and *Duren*, African-Americans comprise a sufficiently distinctive and populous group in America. The "underrepresentation" which is the subject of the second requirement and the "systematic exclusion" required to prove the third element of the prima facie case have generated more interpretive disputes, and this case is no exception. Thus, the court cannot analyze defendants' showing for a prima facie case without first resolving the parties' extensively briefed disagreement on the proper benchmarks for measuring "underrepresentation" and the nature of the proof dictated by the "systematic exclusion" requirement.

### b.  Proper Benchmarks to Measure Underrepresentation

The submissions on the "underrepresentation" prong of the *prima facie* case present two questions: (1) what is the appropriate "community" for establishing the  population of African - Americans as   the excluded group? (2) what degree of disparity is sufficient to establish unconstitutional underrepresenation?  As now discussed, general guidance from the Supreme Court's opinion in *Duren* and specific rulings by the Eleventh Circuit assist this court in readily resolving the parties' fundamentally  different views on these questions.

RELEVANT COMMUNITY:   As the appropriate "community" to measure the population of African-Americans, Carmichael offers "2000 census data for citizens age eighteen and over who reside in the twenty-three counties that comprise the Middle District of Alabama."  The minimum age is consistent with the minimum age stipulated in  § 12c of the Plan and Section 1865(b) of the JSSA for qualification to serve on grand or petit juries.   The parties  stipulate that "the 2000 Census figures show that African-Americans constituted  30.466% of the citizen population age 18 and over in the 23 counties of the Middle District of Alabama."[128]   The United States insists that controlling Eleventh Circuit law sets the relevant community as the "population eligible for jury service" and "case law, policy, and fairness all dictate that the percentage of African-American voters in the Middle District is the correct population."[129]

Careful scrutiny compels the conclusion that case law precedent favors Carmichael's

---

[128]*Def.'s Post-Hr'g Br.* at 177; *Def.'s Reply* at 33; Doc. 679, amended stipulation no. 3.

> Dr. Gundlach believes that the census actually undercounted Alabama's population of African Americans in this category, explaining: "The best methods of census evaluation suggest that the 2000 U.S. Census under-counted non-Hispanic Blacks by about 1.8%, while over-counting non-Hispanic whites by about 1.1% (*footnote omitted*).  Accordingly, the actual percentage of African-Americans in the jury-eligible population in 2000 was in all likelihood higher than 30.466%."  *Def.'s. Ex.* 154 at 2.

> The United States' expert, Mr. Elmore, prefers voter lists as the source population principally because  the Middle District's "Master Jury Wheel is created using the voter registration list as the "general population" and "census data does not have distinguishing criteria built in, as voter lists do, to "weed out" those persons unqualified to vote or serve on juries."  *Gov't Ex.* 1 at 12-13, n.2.

[129]*United States' Resp.* at 11- 21, *id.* at 21

contention and is consistent with the Supreme Court's firmly expressed view upon consideration of a similar dispute in *Duren*: "In any event, the fair cross-section requirement involves a comparison the makeup of the jury venires or other sources from which jurors are drawn with the makeup of the community, not of voter registration lists." 439 U.S. at 365 n. 23. (emphasis in original).[130]

The United States cites from several Eleventh Circuit and Fifth Circuit cases the general proposition that those "qualified for jury service" comprise the relevant community for comparative purposes on a fair cross-section; fair interpreted, however, these cases do not equate that standard with "only registered voters" rather than "age-qualified for jury service." In *United States v. Grisham*, 63 F.3d 1074, 1078-1079 (11th Cir. 1995), *cert. denied*, 516 U.S. 1084 (1996), the Eleventh Circuit concluded that appellants' fair cross-section challenge in the Northern District of Alabama failed on the "underrepresentation" element of the prima facie case and stated as follows the relevant community compared:

> To examine the second element, we must *compare the difference between the percentage of the distinctive group among the population eligible for jury service* and the percentage of the distinctive group on the QJW. *Pepe*, 747 F.2d at 649; *United States v. Esle*, 743 F.2d 1465, 1479-80 n.3 (11th Cir. 1984) (Tjoflat, J., concurring). If the absolute disparity between these two percentages is 10 percent or less, the second element is not satisfied. *Rodriguez*, 776 F.2d at 1511; *Tuttle*, 729 F.2d at 1327.

---

[130]The census data on which *Duren* relied included only persons 21 years of age and older, a fact considered adversely by the lower courts because voter registrations lists include persons aged 18 to 21. The Supreme Court did not find the distinction significant because "the 1970 census data not only included a summary row showing that 54% of persons 21 years of age and older were women [the excluded group in question], but also included data showing that an even greater percentage of persons between the ages of 18 and 21 were women." *Id.* In essence, the court found the *Duren* petitioner's presentation "clearly adequate prima facie evidence of population characteristics for the purpose of making a fair cross-section violation." *Id.* n.24.

Nowhere in *Grisham* does the court define *"the population eligible for jury service"* as "registered voters" nor does it identify the source for its declaration that "[t]he percentage of African-Americans among the population of the Northern District eligible for jury service was 18.31%." Because *Grisham* argued that the relevant community should be the District's Southern *Division*, with its higher African-American population of 28.98%, the court focused on the meaning of "community" in the context of whether it contemplated the court's entire District or its smaller divisions. A review of the District Court opinion affirmed in *Grisham* does clarify census data as the source of the District's relevant community. *See* 841 F.Supp. 1138, 1143 (N.D. Ala. 1994)

Analysis of the Eleventh Circuit case law cited by the United States leaves little doubt that references therein to "qualified for jury service" should be construed as "age-qualified" rather than "registered voter-qualified" for jury service. See *Cunningham v. Zant*, 928 F. 2d 1006 (11th Cir. 1991) (absolute disparity calculation based on percentage of women and African Americans *above the age of eighteen in the general population* and on the venire); *United States v. Pepe*, 747 F.2d 632, 649 (11th Cir. 1984); *Gibson v. Zant*, 705 F. 2d 1543 (11th Cir. 1983) (absolute disparity calculation based on breakdown of jury lists *using census data*); *Machetti v. Linahan*, 679 F. 2d 236 (11th Cir. 1982) (absolute disparity calculation based on five year old *census data* appropriate where no evidence that census data "significantly distorted" percentage of women in county).

In addition to case law precedent, the court deems it significant that that the Administrative Office of Courts dictates that federal courts make statistical comparisons of jury wheel samples "against general population data, age 18 or over, by racial, ethnic and sex classifications"; this court

used the 2000 census data to provide the requested general population data for the 2000 QJW.[131]

UNCONSTITUTIONAL DISPARITY:       "While the Supreme Court has never pronounced an immutable threshold disparity that a defendant must show, *Gibson v. Zant*, 705 F.2d 1543, 1547 (11th Cir. 1983)," the Eleventh Circuit "has consistently required an absolute disparity of over 10% between the underrepresented group's proportion of the general or age-eligible population and its representation on the venire before a prima facie case is established." *United States v. Tuttle*, 729 F.2d 1325 (11th Cir. 1984), *citing Butler v. United States*, 611 F.2d 1066, 1069-70 & n. 9 (5th Cir.) (9.14% insufficient), *cert. denied sub nom.  Fazio v. United States*, 449 L.Ed. 2d 35 (1980); *United States v. Maskeny*, 609 F.2d 183, 190 (5th Cir.) ("as much as ten percent" insufficient), *cert. denied*, 447 U.S. 921 (1980).   In the twenty–plus years since this assessment in *Tuttle* – an underrepresentation attack resolved by findings based on composition of the master jury wheel – the Eleventh Circuit has not varied from this absolute disparity standard irrespective of the controverted juncture in the jury selection process. *See United States v. Grisham*, 63 F.2d at 1079 (comparing relevant community with percentage of African Americans on qualified jury wheel).

### c.   *Evaluation of Systematic Exclusion*

The Supreme Court in *Duren* described "systematic exclusion" as "inherent in the particular-

---

[131]*See Defs.' Exs*. 5 and 6 ("The information to be collected on the JS-12 form is for the use of the district courts to aid them in .. . comparing statistical samplings of jury wheels against general population data.")

jury selection process utilized," and the proof in that case should inform this court's task:

> Petitioner's proof met this requirement. His undisputed demonstration that a large discrepancy occurred not just occasionally, but in every weekly venire for a period of nearly a year manifestly indicates that the cause of the underrepresentation was systematic – that is, inherent in the particular jury-selection process utilized.
>
> Petitioner Duren's statistics and other evidence also established when in the selection process the systematic exclusion took place. . . – the construction of the jury wheel from which persons are randomly summoned for service.
> The resulting disproportionate and consistent exclusion of women from the jury wheel and at the venire stage was quite obviously due to the *system* by which juries were selected. Petitioner demonstrated that the underrepresentation of women in the final pool of prospective jurors was due to the operation of Missouri's exemption criteria – whether the automatic exemption for women or other statutory exemptions – as implemented in Jackson County. Women were therefore systematically underrepresented within the meaning of *Taylor.*

439 U.S. at 366-377. (emphasis in original).

Citing *Duren,* the Eleventh Circuit found no systematic exclusion in *Cunningham v. Zant* for lack of evidence that jury pools selected regularly or consistently contained a significant underrepresentation of any group." 928 F.2d at 1013. The Eleventh Circuit has found "systematic exclusion" inhered in "a system easily capable of being manipulated." *Gibson v. Zant*, 705 F.2d 1543, 1549 (11th Cir. 1983) (using registered voters' list, jury commissioners selecting grand or trial jurors knew the sex and race of each of the prospective jurors)

## 2. Evidentiary Analysis

Guided by the legal standards summarized, the court now analyzes the evidentiary record and concludes that because defendants' proffer for systematic exclusion is deficient, they fail to establish a prima facie violation of the fair cross-section requirement.

### a.   Absolute Disparity

It is the Defendants' contention that African-Americans are underrepresented by an absolute disparity of more than 10% on the 2001 QJW and the jury pools selected from that QJW. To evaluate the alleged underrepresentation of African-Americans in the jury selection process, the court adopts 30.466% as the stipulated population of African-Americans in the relevant community – citizens in the 2000 census population who were age-qualified for jury service.

### (i) absolute v. relative disparity

Carmichael first argues that the analysis should not rest on *absolute* disparity because *relative* disparity "provides a clearer picture of the extent of underrepresentation . . . where the community in question is approximately one-third of the community at large." As Dr. Gundlach explained the significant distinction in the two measures:

> "Absolute disparity" is simply the difference in the percent of a minority, in this case African-Americans, in the community as a whole and that same calculated percent for the qualified wheel. "Relative disparity" is the percentage of the minority population that is missing from a qualified wheel compared to what it would be if it matched the community as a whole. A ten percent absolute disparity where the minority constitutes half the population is a relative disparity of twenty percent . . . Relative disparity is a better measure of the proportion of the minority population excluded, and as you have some changes in the percentage of the population in the minority a relative measure allows you to more precisely compare the rate that the minorities are missing from one area to the next.[132]

Dr. Gundlach acknowledged that "relative disparity would be a bad measure . . . for populations

_____

[132]Hr'g Tr. III: 195-196; Defs.' Post-Hr'g Br. at 81 n. 19.

where the minority is, say, less than five percent of the population."[133] The Eleventh Circuit

acknowledges that "the absolute disparity method is not the sole means of establishing unlawful jury

discrimination" and caselaw analysis discloses no hard and fast rule prohibiting an alternative or

supplemental method.   *See United States v. Rodriguez*, 776 F. 26d 1509, 1511 n.4 (11th Cir. 1985)

("where small absolute disparities are proven, as in this instance, and the minority group involved

exceeds ten percent of the population, which is also the case in this challenge, it is not necessary to

consider other statistical methods")[134]; *United States v. Maskeny,* 609 F.2d 183, 190 (5th Cir.1980)[135];

---

[133]Hr'g Tr. III: 198.

[134]In *Rodriguez*, a challenge to the jury selection process in the Miami Division of the Southern District of Florida, the court considered only one issue on appeal – alleged error by the trial court in determining that Blacks and Hispanics were not underrepresented in the jury selection. Finding none, the court noted the small absolute disparities proven – 6.674% for Blacks and 5.52% for Hispanics – and their representation in the divisional population – 18.82% and 24.45% respectively.

[135]For their Sixth amendment attack on the selection process for the grand and petit juries in the southern district in Georgia, the *Maskeny* appellants proved a less than 10% disparity between the percentage of each allegedly "distinctive" group in the community and the percentage of that group either returning jury questionnaires or ending up on the qualified wheel.  They urged the Fifth Circuit to "either find that an absolute disparity below 10% violates the constitution or . . . base [their] decision on data derived from other statistical methods, specifically comparative disparity or disparity in standard deviations."  The court responded, in pertinent part:

> This Court . . . has referred to statistical methods other than absolute disparity (note with citations omitted) but has never found a constitutional violation based on the data produced by such methods. Finally, the Supreme court focused on absolute disparities in Duren, ...  Appellant argues that reliance on absolute disparity could lead to approving the total exclusion from juries of a minority that comprised less than ten percent of the population of the community.  *We need not, however, speculate here on how we would treat such a situation for all the groups analyzed in appellant's statistics comprise more than ten percent of the community.* 609 F.2d at 201.  In sum, we
>
> (continued...)

87

*United States v. Butler*, 611 F.2d 1066, 1069-70 (5th Cir.), *reh'g denied*, 615 F.2d 685, 686 (1980) (other

statistical methods not necessary when small absolute disparity shown and minority more than ten

percent of population); *United States v. Goff, 509 F.2d 825, 826-27 & n.3 (5th Cir. 1975), cert. denied,*

*423 U.S. 857 (1975)*[136]

In stated reliance on these precedents, this court indicated its disinclination to consider a

comparative disparity measurement in *United States v. Holstick*, 875 F.Supp. 795, 798 n.4 (M.D. Ala.

1994), *aff'd without opinion*, 178 F.3d 1302 (11th Cir. 1999).  Accordingly, this court recommends that

the court ground its analysis on absolute disparity and   consider relative disparity only as a

supplemental measure, if deemed necessary, to weigh the true impact of any absolute differential.

Such an approach does not appear inconsistent  where the absolute disparities are much larger than

the numbers involved in the case law precedents  and the minority population constitutes almost a

third of the relevant community.


### (ii) absolute disparity measures of 2001 QJW

If the 30.466% of African -Americans in the relevant community is compared to the 20.74%

of African- Americans in the qualified jury wheel near its start, on  January 17, 2002, the differential

---

[135](...continued)
> decline appellant's invitation to focus on comparative or standard
> deviation disparity. . . (emphasis supplied)

[136]In *Goff,* the selection challenge presented a statutory rather than a constitutional claim, and while the court grounded its JSSA analysis on absolute disparity differentials, it made only this passing observation about alternative methods: "n]either the absolute nor the comparative measure of underrepresentation can be considered determinative of the substantiality question.."

of 9.725% is below the Eleventh Circuit's threshold for absolute disparity.  If compared to the 20.66% of African-Americans measured in the QJW near its end, on August 10, 2005, the differential of 9.80% still falls short of the threshold.  The United States commends these two measures of the QJW because the "near the beginning" percentage is inclusive of "each and every person on the QW" as of that date  and the "near the end" percentage "calculates…all African-Americans that were ever on the wheel."[137]

Carmichael maintains that because neither the 2002 differential nor the 2005 disparity presents an accurate portrayal of the QJW nearer to the time of selection for the Carmichael pool, "the proper measure of the absolute disparity . . . should be the actual pools drawn from the QJW, especially the last 44 jury pools drawn from the QJW during the time the violations of the M.D. Jury Plan were affecting the composition of those jury pools."  Otherwise, they argue in reliance on this court's following-stated advice in *Holstick,* 875 F. Supp at 798, the effect of the Plan violations by Robinson and Myers would not be measured:[138]

---

[137]As shown by *Def.'s Ex.* 5, a total of 9,860 citizens were in the wheel on January 17, 2002, of whom 2,045, or 20.74%, identified as Black.  *Gov't Ex.* establishes 17,228 citizens in the wheel over its term, as of August 10, 2005, with 3,559, or 20.66% identified as Black.

[138]Carmichael explained:

> During the evidentiary hearing, the Government, through Mr. Elmore, argued that the correct measure of the 2001 QJW could be found in two figures: the 20.74% African-Americans found in the JS-12 based on data drawn on January 17, 2002 . . . and the 20.66% African-Americans found in the Race/Gender Report dated August 10, 2005. . . . The evidence is undisputed that neither of these numbers take into account the eligibility status of the members of the QJW at the time they are measured.  In other words, if a member of the QJW is in the middle of his or her two year excusal period, and ineligible to be summoned on a jury, they will nonetheless be counted.  This
> (continued...)

> If the challenge is to the alleged systematic exclusion of a distinctive group *after* the creation of the qualified wheel – for example, the contention that a distinctive group is being systematically excluded because of the process in which summoned jurors whose names are drawn from the qualified wheel are being excused – then whether the qualified jury wheel sufficiently reflects the percentage of the distinctive group in the overall population eligible for jury service would not necessarily be informative; the focus should instead be on whether the jury venires reflect the percentage of the distinctive group in the overall population eligible for jury service.

875 F.Supp at 798 (emphasis in original)

Because Carmichael does seek to demonstrate systemic exclusion after creation of the 2001 QJW, the court finds it more probative to compare the relevant African-American community to their representation in jury pools generated from the 2001 QJW. While the experts' statistics on the racial composition of these pools differ in degrees, there is sufficient consistency in key areas. Both measured the percentage of African-Americans in all the jury pools drawn from the 2001 wheel, in only the last 44 pools, and in the Carmichael pool.

Dr. Gundlach calculated 19.96% as the percentage of African-Americans who were sent

---

[138](...continued)
> measure would also not account for any jurors who were currently in a period of deferral and therefore ineligible for service.

*Def.'s Post-Hr'g Br.* at 84-85.

Mr. Elmore responds that it is precisely because the JMS software does not make the excusal v. deferral distinction urged by Defendants that the QJW remains the most accurate indicator:
> Dr. Gundlach incorrectly assumes "eligible" is synonymous with "qualified" when discussing the QJW. He asserts that the QJW should be reduced by the number of participants in a deferred or excused status. According to ACS, once a participant is "qualified", they retain that qualified status throughout the life of the wheel, unless they are "disqualified." In other words, a juror can be in a deferred status, an excused status, or may have served on a jury within the last 24 months and is not eligible to be selected, but is still a member of the Qualified Wheel.

*Gov't Ex.* 1 at 16-17.

90

summonses to serve on the 91 pools he examined;  Mr. Elmore, who identified a "first" pool from the

wheel not apparent on the discovery records used by defendants, found the number to be 19.988%.[139]

Accepting *arguendo*  Defendants' 19.966% for comparison with the 30.466% population yields a

10.5% differential while substituting the United States' 19.988% calculation of all the pools yields a

10.478% difference; since both exceed the 10% threshold for absolute disparity, albeit by less than a

percent, and because both calculations are credible, the court deems it unnecessary to adopt either

as the analytical difference is *de minimis.*

>     Regarding the question of absolute disparities in the individual jury pools,  Defendants found
>
> a greater than 10% in 53 out of the 91 pools, or over 58% of the pools. . . [T]he
> absolute disparity was greater during the period in which Jury Administrators Wanda
> Robinson and Melissa Myers were violating the M.D. Plan by selecting jury pools with
> more than 15% previously deferred jurors.  This activity affected the last 44 jury pools
> drawn from the QJW.  During this period, 27 of the 44 jury pools underrepresented
> African-Americans by an absolute disparity of greater than 10%, ore more than 61%
> of the jury pools.[140]

---

[139] *Def.'s. Ex.*102, 104, 105; *Def.'s. Post-Hr'g Br.* at 82.

[140] *Def.'s. Ex.* 102; *Def.'s. Post-Hr'g Br.* at 82; Hr'g Tr. III:98, 106-108. Dr. Gundlach found that "the last 44 pools had activity surrounding the processing of the deferred that were in violation of the 15% limit on a regular basis." *Id.* at 109.

>     Dr. Gundlach's explanation of the "racial effect caused by the overinclusion of
> previously deferred jurors"is premised on his calculation of Whites being "about 1.8
> times as likely to request a deferral and be granted a deferral as African Americans:
>
> > If we look at the proportion of the Carmichael pool who were not
> > previously deferred, we see that they were 19.394% African-
> > American.  The previously deferred were only 6.66%.  When the
> > previously deferred were pulled in and added to that, that brings the
> > overall percentage for the total pool down to 16%."  *Id.* at 110-114;
> > *Def.'s. Ex.* 103.
>
> > > (continued...)

The United States' expert reports the same raw numbers and percentages for the Blacks summoned on these pools (*compare* Ex. IX, *Gov't Ex.* 1 and *Def.'s. Ex.* 102) so that the court can make a factual finding that 27 of the last 44 pools included African- Americans in percentages which, if compared to their 30.466% in the community, would reflect an absolute disparity in excess of 10%.[141]

Both experts also document the same numbers and percentages for the Carmichael jury pool (no. 20105061): 36 of 225 African Americans , or 16.000% representation and, if compared to the 30.466% African Americans in the community, the result is an absolute disparity of 14.466%.[142] The United States correctly notes, however, that absolute disparity is not to be measured by consideration of an individual jury pool but instead contemplates an evaluation of all pools from the wheel over an extended period. *See Duren*, 439 U.S. at 360-362; *United States v. Holstick*, 875 F.Supp. at 362.

In sum, for the *underrepresentation* prong of the *prima facie* case, the court finds first an absolute disparity of 10.48% based on the United States' argument for accepting its expert's

<hr />

[140](...continued)
    As the court has found  irrespective of the larger number of Whites requesting deferrals, the evidence shows no racial impact in the Clerk's granting of such requests as she granted practically all requests, whether from Whites or Blacks.

[141]The United States' expert also examined jury pools 1 through 48, none of which included previously deferred jurors in excess of the 15% limits, and he calculated that African-American representation averaged 20%. Comparing this 20% representation to either his calculation of a 19.998% or Dr. Gundlach's 19.966% calculation for the last 44 pools [27 of which did include excessive jurors in the previously deferred category] compelled him to conclude: "there is virtually no impact on the racial composition resulting from the excess use of deferred jurors in the 2001 wheel." *Gov't Ex.* 1 at 21; Ex. X.

[142]*Def.'s Ex.* 103; Hr'g Tr. III: 98, 109-111. For the Carmichael pool, Dr. Gundlach calculated a relative disparity of 47.482%, "meaning that the 47.482% of the African-Americans you would expect on the pool are missing." *Id.* at 111.

calculation of 19.998% of African-Americans in all of the 92 criminal pools drawn from the 2001 QJW [30.466% in the relevant community less 19.998% in all the pools = 10.468%].[143]   As indicated, however, accepting Carmichael's 19.966% calculation based on 91 pools yields only a slight increase in the absolute disparity, 10.5%.   Based on undisputed statistical evidence, the court also finds absolute disparities of greater than 10% in 27 of the last 44 pools, or in 29.34% of the total 92 pools.

As now explained, notwithstanding the absolute disparities demonstrated, the proof is lacking for any conclusion that they resulted from systematic exclusion of African-Americans in the indicted portions of the jury selection process.

### b.   Systematic Exclusion

The jury selection *system* or *process* is the necessary focus for the third requirement of a prima

_____

[143]The United States argues, in pertinent part:

> [T]he sample number must reflect the total jury pools that are relevant to qualified wheel being challenged. . . . Because Carmichael's trial was located at the very end of the life of the 2001 Qualified Wheel, *the best measure of jury sample is an aggregate of all the district-wide criminal jury pools drawn during the life of the 2001 Qualified Wheel.  The Government's Expert did this.  His aggregated sample calculated the percentage of African-Americans in the 92 district-wide criminal jury pools as 19.998%.*  Dr. Gundlach, on the other hand, only accounts for 91 of the 92 district-wide criminal jury pools that were drawn during the relevant period that Carmichael challenges and his jury pool percentage totaled 19.966%."

> [B]ecause the only way that Carmichael can pass the absolute disparity threshold is to use census numbers . . . Carmichael's fair-cross section claim must necessarily fail.

*United States' Resp.* at 25-28.

facie violation of the fair cross-section requirement.  As narrowed by Carmichael's contentions and the evidentiary record, the specific inquiry is whether the jury selection process in place for the life of the 2001 QJW inherently caused previously deferred jurors to appear on jury pools in numbers which exceeded the 15% limits prescribed in the Middle District's Plan.  The answer cannot be in the affirmative, for the Plan itself established a process which mandated the limit, and the District utilized a system designed to enforce the limit.  It would not be fair to characterize the process or the system as inherently deficient or operationally defective.

To be sure, administrators committed mistakes which resulted in the vice the system or process aimed to prevent:  excessive numbers of previously deferred jurors on a single pool based on a finding from the operation of the previous four-year wheel that Whites were likely to predominate in this category of jurors and could thus jeopardize the goal of racial representativeness on a jury pool.  For a violation of a constitutional magnitude, the Court in *Duren* sought to eliminate practices, rules, or conditions which were part and parcel of the system or the standard operating plan; accordingly, it required that any impermissible underrepresentation be *inherent* in the system.  For the problem, practice, condition, or rule to be "inhere" in the system", it should be  "existing in someone or something as a permanent characteristic or quality," "intrinsic"or "existing as a permanent, inseparable, or essential attribute or quality of" the system.[144]  Case law illustrations help to inform the intended meaning of "systematic exclusion":  a system prohibiting women from jury service unless

---

[144]*See   New Webster's Dictionary & Thesaurus of the English Language* 498 (Lexicon Publications, Inc., 1992);  *Black's Law Dictionary* 798 (8th ed. 2004).

they filed a written declaration of willingness to do so (*Taylor v Louisiana*); a system of automatic exemptions or other statutory exemptions excusing women from jury pools (*Duren*); or the regular practice of having jury commissioners convene to discuss and select grand and petit jurors by using race- and gender-identified lists (*Gibson v. Zant*).

As applied in *Duren* and other caselaw, "systematic exclusion" does not contemplate an accident, a fluke, a computer glitch, a single or occasional occurrence, an innocent mistake, an error premised on a good-faith belief or judgment in the propriety of the act or omission in controversy, or even a careless actor oblivious to the import of her action. All that Carmichael presents is putative proof that as a direct result of mistakes by Jury Administrators Myers and Robinson, almost 30% of the jury pools from the 2001 wheel, including their own, contained previously deferred jurors outside the prescribed limits. These administrators did not act pursuant to an official policy or plan or a superior's directive which had the purpose or effect of modifying or undermining the Middle District's system or process for, *inter alia*, regulating the number of previously deferred jurors summoned for a single pool. Nor did they act knowingly or willfully on their own to thwart the existing system or process.

These errors occurred within the same system and process in place for the first 48 jury pools drawn from the 2001 QJW; that these pools evidenced no underrepresentation of African- Americans is testament to the absence of any inherent or systemic problem. Indeed, the same jury administrators operated adequately the system and process during those draws and for the overwhelming number of pools (65 of 92, or 70.6%) which evidenced no absolute disparity. That the jury pool in the *Carmichae*l case and 26 other pools fell short of the prescribed racial representation is regrettable but

95

not remediable as a constitutional wrong because African Americans were not *systematically excluded* from the 92 district-wide jury pools drawn from the 2001 qualified jury wheel.

### D.   Fifth Amendment CLAIMS

#### 1.  Equal Protection

Proving an equal protection violation in the jury selection context requires a defendant to establish (1) that he or she is a member of a group capable of being singled out for discriminatory treatment, (2) that members of this group were substantially underrepresented on the venire, and (3) that the venire was selected under a practice of providing an opportunity for discrimination. *Cunningham v. Zant*, 928 F. 2d 1006 (11th Cir. 1991); *Castaneda v. Partida*, 430 U.S. 482, 494-95 (1977) (describing the third prong as a "selection procedure that is susceptible of abuse or is not racially neutral [which] supports the presumption of discrimination raised by statistical showing).

Discriminatory purpose is a critical element of the prima facie case, as the Eleventh Circuit explained when it specified proof standards and burdens in *United States v. Grisham*, 63 F. 3d at 1081-82:

> Although the prima facie case for an equal protection claim resembles the elements of a fair cross-section claim, the purpose of an equal protection claim is to determine whether the disparity in the jury venire is re result of a discriminatory purpose. *Duren*, 439 U.S. at 368 n.26, Thus, whereas the inquiry in a fair cross-section claim focuses on the representativeness of the jury venire, the focus of an equal protection claim is whether members of a discrete group have been intentionally denied the opportunity to serve on a jury.    If the defendant makes his prima facie case, the burden shifts to the
government to dispel the inference of intentional discrimination. *Castenda v. Partida*, 430 U.S. 482, 497-98; *see also Gibson, 705 F. 2d at 1546.* If the government provides a legitimate explanation, the

ultimate burden of proving discriminatory intent rests on the defendant challenging the jury selection process. *Batson v. Kentucky*, 476 U.S. 79 (1986)

Like the fair cross-section claim asserted under the Sixth Amendment, Carmichael's equal protection claim under the Fifth Amendment falls for insubstantial evidence on the third prong of the prima facie case – "selection procedures...susceptible of abuse or..not racially neutral."   As evidence, Carmichael reasserts his litany of administrative omissions, policy judgments, and operational deficiencies which should not have occurred within a Clerk's office presumptively on notice of *Clay* and of  the modified Jury Plan.   Missing altogether, however, is any glimmer of a discriminatory purpose at the root of any selection procedures which resulted in underrepresentation on the jury pools.  Based on a careful reading of deposition testimony and close scrutiny of the trial testimony, this court can readily conclude that the Clerk and Jury Administrators were not at all motivated by any semblance of discriminatory purpose or intent.  In the presence of racially neutral selection procedures – and even a racially neutral, albeit condemned, practice of granting liberal deferrals, Carmichael's showing for discriminatory purpose or intentional discrimination pales.[145]

---

[145]As the court explained this third factor in  *Bryant v Wainwright*, 686 F.2d 1373, 1377-78) (11th Cir. 1982):

> The third factor of the prima facie test, establishment that the selection process is susceptible to abuse, can also affect the gravity of the disparity.  A selection process which can be easily maneuvered in discriminatory fashion is more likely to give rise to a presumption of discrimination than a selection process which would be difficult, but not impossible, to manipulate.. . .The goal of this entire balancing process is, of course, to eliminate chance or inadvertence as a cause of the disparity; the statistical evidence must convince the court that discrimination is the only reasonable explanation.

### 2. Due Process

While case law from other circuits suggests that a defendant may assert that a jury selection process violates the fundamental fairness under the Due Process Clause, Carmichael's legal and evidentiary support for such a claim on this record merits short shrift. In reliance on *Peters v. Kiff*, 407 U.S. 493 (1972), Carmichael declares: "[t]he only showing that is required to make out a Due Process claim that is in addition to the showing required under the Sixth Amendment claim is that the jury procedure which resulted in the underrepresentation of African-Americans was operated in a fashion that 'arbitrarily excluded' this segment of the community."[146] Accepting without deciding the accuracy of this claim, the court can and does decide it adversely to Carmichael solely on his failure to make the predicate showing of a Sixth Amendment prima facie case.

## IV.

## CONCLUSION

It is the *Recommendation of the Magistrate Judge* that Carmichael's objection, as amended, to the composition of his venire and the method of selection of the venire be OVERRULED and that each of the following-styled pleadings filed to assert and clarify his objection be DENIED:

*Doc. 400:*   Defendant Leon Carmichael's Objection to the Composition of the Venire and the Method of Selection of the Venire and Motion to Dismiss the Indictment or Stay the Proceedings against him due to Substantial Failure to Comply with the Provisions of the Jury Selection

---

[146] *Def's 'Post-Hr'g Br.* at 99.

and Service Act;

    Doc. 493:    Amended Objection to the Composition of the Venire and the Method of Selection of the Venire

    Doc. 637:    Statement of Objections to Venire and to the Jury Selection Procedures of the Middle District of Alabama

To the extent of Defendant Williams' "adoption" of Carmichael's objection and motion, as amended and clarified, it is *also the Recommendation of the Magistrate Judge* that Williams be bound by all of these adverse rulings such that Williams' objections to the composition of his venire and the method of selection of the venire are all OVERRULED.

**It is further ORDERED that the parties shall file any objections to this Recommendation by July 14, 2006.** Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981), *en banc*, adopting as binding precedent all of the decisions of the former Fifth

Circuit handed down prior to the close of business on September 30, 1981

DONE THIS 29th   DAY OF JUNE, 2006.[147]


/s/ **Delores R. Boyd**
DELORES R. BOYD
UNITED STATES MAGISTRATE JUDGE

---

[147]Notwithstanding this adverse Recommendation, this Magistrate Judge cannot ignore that the same evidentiary record which warrants denial of a new trial to these defendants also documents a compelling need for the Middle District of Alabama to examine, and undertake to remedy, administrative inaction and operational deficiencies which may undermine the integrity of, and public confidence in, the District's Jury Plan. For court personnel assigned to implement the Jury Plan, the *Clay* decision should have served, at the very least, to heighten an appreciation for the statutory and constitutional imperatives to ensure each criminal defendant's right to a jury which is at once representative of a fair cross-section of the community and representative of a fair selection process. That it did not is a fact underscored repeatedly and with unmistakable clarity from the testimony and exhibits adduced at the evidentiary hearing.

It cannot be disputed that perfection cannot be the standard for evaluating compliance with the District's Jury Plan. Nor should there be any reticence, however, to acknowledge a reasonable expectation for affirmative action, at minimum, to establish and to monitor policies, practices, and procedures designed specifically to achieve compliance. To its credit, the United States joins the defendants in highlighting the need for remedial action. After addressing for almost a year the discovery issues, hearings, and legal analysis generated by this jury composition challenge, this court is constrained to add its voice to the chorus for operational changes which, if not undertaken, may burden the District with repeated litigation.

100