IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL ACTION NO. |
| | ) | 2:03cr259-MHT |
| LEON CARMICHAEL, SR. and | ) | (WO) |
| FREDDIE WILLIAMS | ) | |

OPINION AND ORDER

Defendants Leon Carmichael, Sr. and Freddie Williams
have challenged the makeup of the jury venire and the
method of selection of the trial jury that convicted them
of conspiring to distribute marijuana and, in
Carmichael's case, conspiring to commit money laundering.
As relief, the defendants request that the court grant
new trials.  The defendants base their challenge on the
due process and equal protection clauses of the Fifth
Amendment; the Sixth Amendment's guarantee of a jury
drawn from a fair cross-section of the community; the
Jury Selection and Service Act ("JSSA"), 28 U.S.C.

§§ 1861-1871; and the Middle District of Alabama's local plan for the random selection of grand and petit jurors.

United States Magistrate Judge Dolores R. Boyd has recommended that the requested relief not be granted. After consideration of her well-written recommendation and after an independent and de novo review of the record, the court concludes that the recommendation should be adopted, albeit with different reasoning on some points.

## I. INTRODUCTION

A jury convicted the defendants of conspiring to distribute 7,000 pounds of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and convicted Carmichael of money laundering prohibited by 18 U.S.C. § 1956(h). Prior to the voir-dire examination, the defendants challenged the composition and method of selection of the venire; they said that their concern was ignited by the observation that the number of African-Americans in the

pool from which they were selecting their trial jury did not appear to be reasonably proportionate to the number of African-Americans in the overall court district. The court reserved consideration of the jury challenge until after the trial, referring the challenge to Magistrate Judge Boyd for consideration and recommendation. The 12-person jury that convicted the defendants had three African-Americans, though two of these were on the jury only because the court sustained the defendants' objection that they had been struck by the government because of their race. See Batson v. Kentucky, 476 U.S. 79 (1986).

After accepting extensive evidence and considering lengthy briefs, Judge Boyd entered a recommendation in which she found that the district's jury plan had been violated, but nonetheless urged the court to deny the relief sought on the grounds that the composition and method of selection of the jury venires did not substantially violate the JSSA, nor constitute violations

of the Fifth and Sixth Amendments.  She did, however,
note "a compelling need for the Middle District of
Alabama to examine, and undertake to remedy,
administrative inaction and operational deficiencies
which may undermine the integrity of, and public
confidence in, the District's Jury Plan."  Report and
Recommendations of the Magistrate Judge (doc. no. 737)
("magistrate judge recommendation"), at 100 n.147. Both
the defendants and the government have filed objections
to the magistrate judge's recommendation.


## II. STANDARD OF REVIEW

The district court "shall make a de novo
determination of those portions of the report or
specified proposed findings or recommendations to which
objection is made."  28 U.S.C. § 636(b)(1).  The court
"may accept, reject, or modify, in whole or in part, the
findings or recommendations made by the magistrate
judge."  Id.

4

### III. FACTS

### A. Jury-Selection Plan

The clerk of the court is responsible for implementing the jury plan in the Middle District of Alabama. She is assisted by the systems manager and the jury administrator. The systems manager maintains the district's computer facilities, including the programs that assist in jury selection. The jury administrator is responsible for evaluating completed preliminary-juror-qualification questionnaires, constructing a summons list for terms of court, issuing summonses for jury duty, and processing requests for temporary deferment of jury duty. The district's current written jury plan, adopted in 2001 in accordance with 28 U.S.C. § 1863(a), incorporates changes to the district's method of selecting criminal petit jurors intended to remedy substantial violations of the JSSA revealed by a successful challenge to the district's 1997 jury plan. United States v. Clay, 159 F.Supp.2d 1357 (M.D. Ala. 2001) (Thompson, J.).

5

The district covers 23 counties and is divided into three divisions: the Northern Division, the Eastern Division, and the Southern Division.  The 2001 plan at issue here provides, as did the 1997 plan before it, for the construction, every four years, of a master jury wheel by random selection of at least 5 % of the registered voters of each of the counties in the district.  Once this master jury wheel is constructed, the clerk of the court selects randomly from the master wheel a sufficient number of persons to maintain an adequate number of names in the qualified jury wheel, drawing from each of the district's divisions.  Because jurors are identified by division, the qualified wheel can be understood as comprising three divisional qualified wheels.

Under both the 1997 and 2001 plans, the court clerk mails preliminary-juror-qualification questionnaires to each person whose name is drawn from the master wheel. When the questionnaires are returned, the plan requires

6

the chief judge of the district, or his designee, to
determine whether an individual is qualified, exempt, or
excused from jury service. Under the plan, and in
conformity with 28 U.S.C. § 1865(b), a person is presumed
to be qualified unless she or he fits into one or more of
five enumerated exceptions.[1] However, the jury plan
exempts certain otherwise qualified individuals from jury
service pursuant to 28 U.S.C. § 1863(b)(6).[2]

---

1. Under both the statute and the district's jury
plan, a person is excepted from service if she or he: (1)
is not a citizen of the United States, is under 18 years
of age, or has not resided for one year within the
district; (2) is unable to read, write, and understand
the English language with the degree of proficiency to
fill out the juror qualification questionnaire
satisfactorily; (3) is unable to speak the English
language; (4) is incapable by reason of mental or
physical infirmity to render satisfactory service; or (5)
has a charge pending against her or him for the
commission of, or has been convicted in a state or
federal court of record of, a crime punishable by
imprisonment for more than one year and her or his civil
rights have not been restored.

2. 28 U.S.C. § 1863(b)(6) and the district's jury
plan specify that members in active service in the United
States armed forces, state and municipal fire or police
departments, and public officers in the legislative,
executive, or judicial branches of federal, state, or
local government actively engaged in the performance of
official duties are exempt from jury service.

7

Criminal trials are held in Montgomery (the seat of the Northern Division of the district) unless otherwise ordered, no matter where the alleged offense occurred within the district.  When jurors are needed for a criminal term of court, the plan (both in 1997 and in 2001) requires the clerk to create a 'jury pool' by selecting names randomly from the qualified wheel and creating a summons list.  Because each criminal jury is composed of persons selected from the district at large (that is, from all three divisions), the clerk is required to draw names from each of the three divisions in approximately the same proportion to the total number drawn as the number of names in the divisional wheel bears to the number of names in the master wheel.  In other words, each division should be represented proportionately in each jury pool from the initial summons list.  For the 2001 qualified wheel, this meant that the clerk was to draw 49 % of jurors in each pool

from the Northern Division, 20 % from the Southern Division, and 31 % from the Eastern Division.

Before each term of court, jury packets and summonses are mailed to the individuals on the summons list. At this stage, individuals summoned for jury service may request to be excused or deferred from service upon a showing of undue hardship or extreme inconvenience pursuant to 28 U.S.C. § 1866(c). Certain individuals are presumed to have established undue hardship or extreme inconvenience, and are presumptively granted an excuse or deferral based on age, work, study, or custodial responsibilities.[3] Individuals who request and are granted deferrals are removed from the summons list and placed into a deferred jury pool, separate from the

---

[3]. The plan identifies these persons as those who are over age 70; are actively engaged in a full-time professional occupation (doctors, nurses, lawyers, teachers, clergy, and members of religious orders); are full-time students; have served as grand or petit jurors within two years; provide essential services to a business or agricultural organization; actively care for and have custody of an infirm person or child under age ten; or work for agencies that provide fire-fighting, rescue, or ambulance services.

9

qualified wheel.  The names that remain on the summons list are randomly ordered in a venire, or jury panel, list, which is provided to attorneys before jury selection.

## B. The Clay Challenge and Reform

In United States v. Clay, 159 F.Supp.2d 1357 (M.D. Ala. 2001) (Thompson, J.), the defendant there challenged the process of granting deferrals and the way deferred jurors were reintegrated into the jury-selection process once their deferral period expired.  Up to and through the selection of Clay's petit, or trial, jury, the clerk's office almost always granted temporary deferrals of jury service to individuals who claimed that jury service would create undue hardship or inconvenience. The jury administrator removed their names from the summons list, and those individuals became available for service at the end of their deferral period.

10

The court found that a combination of three factors in the pre-<u>Clay</u> system resulted in a non-random selection process that substantially violated the JSSA, <u>Clay</u>, 159 F.Supp.2d at 1367: first, because the clerk granted nearly every request for a deferral, deferred jurors were essentially self-selecting; second, the number of eligible deferred jurors to be used in any given venire was left to the discretion of the jury administrator; and, third, the jury administrator grouped deferred jurors together at the top of the summons lists, a preferential position that ensured their inclusion in the final venires. Because white jurors requested deferrals at twice the rate of black jurors, the deferred jurors were disproportionately white. The system, therefore, in addition to being non-random, provided an increased opportunity to discriminate racially. <u>Id</u>. at 1368.

In response to the violations found in <u>Clay</u>, the district court reformed its jury plan in two key ways for the creation of the 2001 wheel: first, the number of

11

previously deferred jurors called for service in any particular jury pool may not exceed 15 % of the total number of jurors called; and, second, deferred jurors are not to be given preference over other individuals in the compilation of the jury summons lists.

### C. Implementation of the 2001 Plan

In order to create the post-<u>Clay</u> master jury wheel in 2001, the clerk obtained a list of all registered voters in the district's 23 counties as of the general presidential election on November 7, 2000.  A company was hired to select randomly from that list a total of 99,604 people for inclusion in the master wheel.  The parties do not dispute that the selection of names from the voter lists for the master wheel was random and that the racial composition of the master wheel was not measured.

In order to create the 2001 qualified wheel, the jury administrator[4] supervised the mailing of jury-

---

4.  The jury administrator throughout most of the (continued...)

qualification questionnaires to 25,000 persons randomly
selected from the master wheel by the court's
computerized jury-management system.  Those individuals
who returned questionnaires and who were determined
qualified to serve made up the qualified wheel, which was
supplemented several times through additional mailings
over the course of the 2001 master wheel's life.[5]  The
parties agree that, at the beginning of the life of the
2001 wheel, 20.74 % of the individuals in the qualified
wheel were African-American, while African-Americans

---

    4.  (...continued)
life of the 2001 wheel was promoted and replaced in March
2005 by a new jury administrator.  Actions of both
administrators are challenged in this litigation.
Because it is not alleged that either jury administrator
intended to discriminate against African-Americans in the
jury-selection process, the court does not find it
necessary to identify them individually.

    5.  Of the original 25,000 questionnaires, 14,324
were completed and returned.  The post office returned
3,766 as undeliverable, and 6,910 were not returned.  All
told, 47,229 questionnaires were mailed over the life of
the 2001 master wheel.

constituted 30.466 % of the general population, age 18
and over.[6]

In other words, before any of the affirmative errors
alleged in this challenge might have taken place, the
Middle District's jury-selection process for the 2001
wheel resulted in a 9.7 % "absolute disparity," that is,
the difference between the percentage of African-
Americans on the qualified wheel and their percentage in

_____

6.  It is undisputed that census data for the year
2000 show that African-Americans constituted 30.446 % of
the district's population, age 18 and over.  The
government objects to the magistrate's finding that
citizens age 18 and over represent the proper benchmark
community against which to measure the disparity in the
percentage of African-Americans in the jury wheel and
pools in the context of the defendants' fair-cross-
section challenge under the JSSA and the sixth amendment.
The court will address this objection in the discussion
below.

While the makeup of the master wheel is not
challenged, the parties have introduced competing
evidence as to the representation of African-Americans in
the voter registration lists, which, in theory, would
correspond to the baseline representation of African-
Americans in the master wheel.  The government's evidence
suggests that 25.48 % of the voting population in the
Middle District of Alabama is African-American.
Government's hearing exhibit 1, expert report of Stephen
A. Elmore, at 13.  The defendants' expert testified that
29.399 % of the voting population is African-American.
Evidentiary Hearing Transcript, Volume IV, testimony of
Dr. James H. Gundlach ("Gundlach testimony"), at 21.

14

the general population, age 18 and over.  The 1997 qualified wheel challenged in the Clay litigation, by contrast, showed an absolute disparity of 6.4 % in the representation of African-Americans as compared to the general population, meaning that the 2001 wheel was a less accurate reflection of the community than its predecessor.[7]

As noted above, the qualified wheel was supplemented over time through additional mailings of juror questionnaires to individuals selected from the master wheel.  A report produced near the end of the life of the wheel, in August 2005, revealed that of all the individuals who had ever been selected for the 2001 qualified wheel, 20.66 % were African-American.  In this period, from June 2001 through September 2005, the clerk drew 92 criminal jury pools from the qualified wheel.[8]

_____

7.  Evidentiary Hearing Transcript, Volume III, Gundlach testimony, at 106.  In Clay, the percentage of African-Americans in the 1997 qualified wheel was found to be 25.02 %.  Clay, 159 F.Supp.2d at 1363.

8.  Due to a difference in data collection, the
(continued...)

15

## D. Alleged Violations of the Plan

The defendants allege that a number of acts, practices, and failures, individually and cumulatively, violated the jury plan, the JSSA, and the U.S. Constitution. The allegations relate to: (1) configuration and use of jury-management software; (2) training and supervision of jury administrators; (3) absence of quality control of selected jury pools; (4) failure to empty entirely the 1997 qualified wheel; (5) failure to supplement the voter registration lists in creating the 2001 qualified wheel; (6) failure to update juror addresses and followup with non-responders; (7) violation of proportionate representation with respect to the three geographical divisions in drawing the pools; (8) granting of almost all requests for deferrals; (9) violation of the jury plan's one-year excusal period for summoned jurors not selected to serve on a jury; (10)

_____

8.   (...continued)
defendants' expert analyzed 91 pools, omitting the first pool drawn, while the government's expert analyzed all 92 pools.

impermissible grouping of deferred jurors in three double-draw jury pools; (11) scattering of deferred jurors in the jury pools; and (12) impermissible transfers and drawing of jurors in violation of the 15 % limit on deferred jurors in any given pool.

Several of the allegations are undisputed violations of the jury plan. For example, on five occasions over the life of the wheel, the jury administrator manually transferred persons from the deferred-maintenance pool (from which they could have been randomly selected for a jury pool, once their deferment period expired, in accordance with the 15 % limit imposed after <u>Clay</u>) into the general-qualified wheel, from which they could be summoned for jury pools without regard for the 15 % limit. In total, the jury administrator manually transferred 1,093 deferred jurors into the qualified wheel, of which approximately 460 were ultimately summoned for jury pools, including seven who were selected for the pool from which the petit jury that

17

tried the defendants was selected.[9]   These previously deferred jurors drawn directly from the qualified pool, where they had been transferred, were drawn in addition to those deferred jurors properly selected by the computerized system from the deferred-maintenance pool.

A new jury administrator, who took the position in March 2005, violated the 15 % limit in four of the last five jury pools drawn in the 2001 cycle, including the pool drawn for the trial of the defendants.   While the new administrator properly included previously deferred jurors on the summons lists by drawing them from only the deferred juror pool, she did so without respecting the 15 % limit.   The percentage of deferred jurors drawn for these four pools ranged from 20.89 % to 24.5 %.   As a result of the undisputed combined errors of the jury administrators, the percentage of deferred jurors drawn for the defendants' pool was 26.667 % of the total number

---

9.   The parties dispute the exact number of impermissibly transferred jurors who were called for service:   469 according to the defendants, and 453 according to the government.

of jurors drawn (60 of 225 jurors).[10]  African-Americans
constituted only 16 % of the jurors in the defendants'
pool.

Other undisputed violations of the jury plan,
discussed in more detail below, are the failure to empty
entirely the 1997 qualified wheel; violation of the jury
plan's one-year excusal period for summoned jurors not
selected to serve on a jury; and impermissible grouping
of deferred jurors in three double-draw jury pools.
Finally, the parties do not dispute that the clerk grants
almost all requests for deferrals, although they disagree
about the import of this policy in this litigation.

_____

    10. The government disputes this number, instead
claiming it to be 24 %, based on their preferred
understanding of which jurors should be counted as
previously deferred.  Either way, the percentage is well
above the limit prescribed by the jury plan.

## IV. DISCUSSION

Challenges to federal jury selection in criminal trials may be based on the fair-cross-section guarantee of the Sixth Amendment, <u>Duren v. Missouri</u>, 439 U.S. 357 (1979), the equal protection and due process clauses of the Fifth Amendment, <u>Castaneda v. Partida</u>, 430 U.S. 482 (1977) (equal protection); <u>Peters v. Kiff</u>, 407 U.S. 493 (1972) (due process), or a substantial failure to comply with the provisions of the JSSA, <u>United States v. Paradies</u>, 98 F.3d 1266, 1279 (11th Cir. 1996).[11]  The right to a jury chosen at random is a "statutory creation" of the JSSA.  <u>United States v. Hawkins</u>, 566 F.2d 1006, 1012 (5th Cir. 1978).[12]

---

11. It is not disputed in this case that the district's written jury plan has been violated. Violations of the jury plan are impermissible to the extent they violate statutory or constitutional requirements.

12. In <u>Bonner v. Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

As stated, the defendants claim violations of the Middle District's jury plan and the JSSA, violations of the Fifth Amendment guarantees of due process and equal protection, and a violation of the Sixth Amendment guarantee of a jury drawn from a fair cross-section of the community.  As the magistrate judge notes, the defendants' "overarching theme is that the 'end result of the actions and inactions [of the clerk and jury administrators] was a jury system in the District that employed and perpetuated procedures, the effects of which were deliberately ignored, which yielded a jury-selection process that systematically underrepresented African-Americans in the 2001 qualified wheel and the pools of jurors selected from this [qualified wheel].'" Magistrate judge recommendation, at 26 (quoting defendants' post-hearing brief).

## A. The Jury Selection and Service Act

The JSSA provides that "all litigants in Federal courts entitled to a trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes."  28 U.S.C. § 1861. The JSSA provides a remedy, however, for only 'substantial' failures to comply with its requirements. Paradies, 98 F.3d at 1279; see also United States v. Gregory, 730 F.2d 692, 698-700 (11th Cir. 1984).  When the JSSA's goals of random selection of juror names, or the use of objective criteria for determination of disqualifications, excuses, exemptions, or exclusions, are frustrated, the court may find that a substantial violation of the Act has taken place.  Gregory, 730 F.2d at 699.  However, "mere 'technical' deviations from the Act or even a number of them are insufficient" to constitute a substantial violation of the JSSA that warrants relief.  Id.; Clay, 159 F.Supp.2d at 1365.

22

The defendants claim, according to the magistrate judge, that "evidence establishes a dozen acts, practices, or failures which constitute, individually and cumulatively, a substantial violation of the M.D. Jury Plan and the JSSA." Magistrate judge recommendation, at 29-30. The pleadings before the court poorly, and in many instances fail completely to, identify which JSSA goals are alleged to be violated by the various acts challenged in this case. However, because the JSSA can be violated by a frustration of the goals of randomness, objectivity, or selection from a fair cross-section of the community, the court will attempt to analyze the alleged violations under these three frameworks where it appears they could apply.

### 1. Use of objective criteria for granting deferrals

The defendants argue that the court clerk's deferral practice, which is admittedly unchanged since the Clay decision, constitutes a substantial violation of the

23

JSSA.[13]  There are at least three different ways in which
a deferral policy could violate the JSSA.  First, a
policy that permits jurors essentially to 'opt-out' of
jury service may implicate the random-selection principle
of the statute.  Second, evidence that the policy has a
direct impact on the underrepresentation of a distinct
group in jury pools may implicate the fair-cross-section
principle.  Both of these possibilities are analyzed in
the discussion of those principles below.  Here, however,
the court addresses the district's deferral policy as it
relates to a third principle: the "use of objective

_____

        13. During supplemental oral argument held on August
28, 2006, the court asked the attorneys for defendants
whether any alleged violation other than the granting of
almost all deferral requests should be understood to
implicate the objectivity goal of the JSSA.  The
attorneys for defendants asserted that the violations of
the 15 % limit on previously deferred jurors and the
violation of the one-year excusal period for summoned
jurors not selected to serve on a jury might be
understood to implicate objectivity.  However, neither of
these admitted violations of the jury plan involves the
criteria used in granting deferrals or excuses.
Consequently, the court will discuss the JSSA's
requirement that objective criteria be used in granting
deferrals in only the context of the clerk's practice of
granting almost all requests for such deferrals.

24

criteria for determination of disqualifications, excuses, exemptions, and exclusions." <u>Gregory</u>, 730 F.2d at 699.[14]

### a. Factual findings with respect to deferrals

The district jury plan, based upon the mandates of the JSSA, grants the clerk discretionary authority to grant excuses and deferrals to persons summoned for jury service upon a showing of undue hardship or extreme inconvenience. The magistrate judge, based on undisputed evidence, found that the clerk's deferral practice has not changed since <u>Clay</u>: there are no written guidelines or criteria for determining undue hardship or extreme inconvenience; the clerk does not look at the requesting juror's history file to determine how many deferments have previously been obtained; and almost all requests are granted.

---

14. The term 'deferral' is not found in the text of the JSSA itself.

Over the life of the 2001 wheel, the clerk and the jury administrators granted deferrals to 3,427 jurors, of whom 803 were granted two or more deferrals.[15]  The clerk could not give any estimate of how many deferrals were denied, although she conceded that requests were granted most of the time.  Indeed, of a random sample of 500 deferral requests generated by the defendants' expert, Dr. James Gundlach, all were granted.  Moreover, testimony of the clerk and the jury administrators confirms that they employed a standard of 'reasonableness' or 'everyday commonsense judgment' in granting requests for deferral or excuse from jury service.

_____

15. The defendants incorrectly state that 3,427 deferrals were granted, defendants' post-hearing brief (doc. no. 689), at 13, an error repeated in the magistrate judge's recommendation, at 45.  While no party objected to this finding, the record makes clear that both the defendants and the magistrate judge intended to communicate that 3,427 jurors were granted deferrals, some multiple times, meaning that more than 3,427 deferrals were granted during the life of the 2001 wheel.  Defendants' hearing exhibit 156.

Finally, as was the case in <u>Clay</u>, although whites and blacks are granted deferrals at the same rate (that is, the clerk does not, and is not alleged to, consider race in granting deferrals), whites remain almost twice as likely as blacks to request a deferral from jury service.[16]   Because of this fact and because almost all requests are granted, the pool of previously deferred jurors becomes increasingly white over time.   This 'whitening' of the deferred pool has a documented effect on the racial composition of the venire lists as deferred jurors become eligible for service over time: if the rate of granting deferrals were reduced by half, the representation of African-Americans in the jury pools would increase by between 0.6 and 0.7 %.[17]

---

16.  Approximately 11 % of the African American jurors summoned for service requested deferrals.   Evidentiary Hearing Transcript, Volume IV, Gundlach testimony, at 57. Dr. Gundlach established that "6.08 percent of all juror history transactions involving whites are requests for deferrals compared to 3.20 percent for African-Americans."   Defendants' evidentiary hearing exhibit 3, expert report of Dr. Gundlach ("Gundlach report"), at 15.

17. While the parties' experts agreed, and the magistrate judge accepted, that reducing by half the rate
(continued...)

###### b.  Analysis of deferral practice under objective criteria standard

The magistrate judge concluded that the clerk's deferral policy did not substantially violate the JSSA's objectivity principle, and the court adopts her recommendation.  It is clear both that citizens "have an obligation to serve as jurors when summoned for that purpose," 28 U.S.C. § 1861, and that the district's jury plan permits the clerk to excuse or defer jurors for "undue hardship or extreme inconvenience."

The statutory definition of those terms, which the district's plan incorporates, enumerates the following situations as warranting excuse from service: (1) great distance, either in miles or travel time, from the place of holding court; (2) grave illness in the family or any other emergency which outweighs in immediacy and urgency

---

17.  (...continued)
of granting deferrals would increase the representation of African-Americans in the jury pools by between 0.6 and 0.7 %, there was nothing in the record to support this conclusion, and the court could not, by itself, divine why this would be so.  The defendants, therefore, submitted additional evidence to explain this conclusion. Supplemental report of Dr. Gundlach (doc. no. 794).

28

the obligation to serve as a juror when summoned; and (3)
severe economic hardship to an employer which would
result from the absence of a key employee during a period
of service anticipated to last more than 30 days.   28
U.S.C. § 1869(j).[18]  While the statute does not foreclose
deferrals based on "any other factor which the court
determines to constitute undue hardship or create an

_____

18. The jury plan recites in full the text of 28
U.S.C. § 1869(j), which reads:

> "'Undue hardship or extreme
> inconvenience,' as a basis for excuse
> from immediate jury service under
> section 1866(c)(1) of this chapter [28
> USCS § 1866(c)(1)], shall mean great
> distance, either in miles or traveltime,
> from the place of holding court, grave
> illness in the family or any other
> emergency which outweighs in immediacy
> and urgency the obligation to serve as
> a juror when summoned, or any other
> factor which the court determines to
> constitute an undue hardship or to
> create an extreme inconvenience to the
> juror; and in addition, in situations
> where it is anticipated that a trial or
> grand jury proceeding may require more
> than thirty days of service, the court
> may consider, as a further basis for
> temporary excuse, severe economic
> hardship to an employer which would
> result from the absence of a key
> employee during the period of such
> service."

29

extreme inconvenience to the juror," id., the specificity

and severity of the enumerated examples suggest that the

clerk's discretion in this realm is limited.

In United States v. Bearden, 659 F.2d 590 (5th Cir.

Unit B Oct. 19, 1981), the former Fifth Circuit Court of

Appeals upheld a district court's finding that the clerk

had wrongfully excluded 495 jurors from service based on

misinterpretations of the statutory criteria for

exclusion, including criteria based on age, occupation,

intradistrict moves, or prior jury service.[19]  659 F. 2d

at 606.   The Bearden court analyzed the errors

quantitatively, finding that "a substantial violation

generally will not be found if the number of errors is

small," but also qualitatively:

> "Qualitatively, the inquiry is whether
> there has been a frustration of the
> Act's underlying principle of exclusions
> on the basis of objective criteria only.

_____

19. After October 1, 1981, only the decisions of the
continuing Fifth Circuit's Administrative Unit B are
binding in the Eleventh Circuit, while Unit A decisions
are merely persuasive.  Stein v. Reynolds Sec., Inc., 667
F.2d 33, 34 (11th Cir. 1982).

> The application of extrastatutory,
> subjective criteria in the selection
> process in contravention of this
> principle may require a finding of a
> substantial violation even though the
> number of errors is relatively small."

Id. at 607 (internal citations omitted).

Citing legislative history, the appellate court went on to note, however, that the type of subjective criteria rejected by the JSSA "are those which, intentionally or not, result or are likely to result in discrimination, or which fail to produce juries representing a fair cross section of the community."[20]  Id. at 608.  While the exclusions challenged in Bearden were errors, they were "the result of an occasional misinterpretation or misapplication of technical statutory criteria," (including age, prior service, occupation, and intradistrict moves), and not the result of the use of subjective criteria that might have produced discriminatory results.  Id.

---

20. The effect in this case of the district's liberal deferral policy, in general, on the fair-cross-section requirement will be discussed below.

In this case, the defendants' expert highlights seven jurors who received deferrals for such reasons as watching a child's school performance, work schedule conflicts (with no explanation or even statement of what those conflicts might be), out-of-town visitors, and a "demanding" work schedule.[21]   The defense exhibits included 55 'excuse' files containing requests that could seem spurious if evaluated under a standard that does not

---

21. Gundlach report, at 18-19.

"ignore the adjectives 'undue' and 'extreme.'"[22] Magistrate judge recommendation, at 54.

In other words, the defendants have shown a small number of deferrals (at most, 55 out of well over 4,000) that were granted according to a standard arguably "at odds with the statutory policy encouraging jury service [and] the narrowly phrased statutory definition [of undue hardship and extreme inconvenience]." Magistrate judge

---

22. The court emphasizes "could seem spurious." As an example of an impermissibly granted deferral, the defendants' expert, Dr. Gundlach, discusses in his expert report the case of a juror who received a deferral based on a request to accompany a child on a school field trip. Parents will recognize that accompanying a child on a field trip may well be an optional pursuit that jury service should properly trump, and, indeed, that may have been the case here. It is also true, however, that a school may require a parent's presence when, for example, a child has a severe disciplinary problem. If the parent of such a child is unable to accompany a trip, then the child will not be permitted to go on a trip that might be considered important to his or her education and the parent may have to make alternative child-care arrangements that may, in turn, be costly. Depending on the circumstances of the case, in other words, the court can envision a situation in which the inability to accompany a school field trip does indeed pose a difficulty comparable to an emergency requiring the parent's presence, and that may rise to the level of extreme hardship. Whether the reason is recognized as such will depend on the life experiences of the person reviewing the request and how convincingly the juror frames the request.

recommendation, at 54.  Even if the defendants could show
that the small number of deferrals that they specifically
challenge    should    be    considered    quantitatively
significant, they have made no showing that the reasons
for those deferrals should be understood as subjective in
a way that could result in discrimination.

Indeed, the clerk's policy of granting almost all
deferrals is almost definitionally objective, in that it
does not favor one applicant over any other.  Therefore,
the court finds that the defendants have not met their
burden of showing that the district's liberal deferral
standard, as implemented, violates the requirement that
jurors be excluded only on the basis of objective
criteria.

However, the magistrate judge recommends "a
re-evaluation by this court of a finding in Clay that the
JSSA's definition of 'undue hardship or extreme
inconvenience' establishes a 'liberal standard' for the
granting of excuses from jury service." Magistrate judge

recommendation, at 49.  "Indeed," the magistrate judge

continues, "this finding may be responsible for admitted

practices since Clay which, if nothing more, provide the

appearance that jury service within the Middle District

is a strictly optional civic duty."[23]  Id.

The court recognizes that a deferral standard as

liberal as the one undisputably employed in the Middle

District, while objective, is vulnerable to the charge

that it is not in compliance with the statutory

requirement that exclusions be permitted only on the

basis of undue hardship or extreme inconvenience.  See,

e.g., United States v. Kennedy, 548 F.2d 608, 612 n. 6

_____

23. While the magistrate judge's point about the
perception that jury service is optional is well-taken,
no re-evaluation of Clay is necessary, for the simple
reason that the Clay opinion did not address whether the
JSSA's standard for the granting of excuses or deferrals
is a liberal one: the 'finding' referenced in the
magistrate judge's recommendation was in fact language
from the Clay magistrate judge's recommendation that was
not incorporated into the court's opinion.  Magistrate
judge recommendation, at 49 ( citing the magistrate
judge's recommendation in   Clay, at 21).   Clay's
discussion of deferrals was limited to an analysis of the
effects of this district's admittedly liberal standard on
the randomness prong of a JSSA challenge, not whether the
standard was itself non-objective.

(5th Cir. 1977) (discussing the category of extreme inconvenience as a "strict standard" for the granting of excuses).  For example, granting multiple deferrals without examination of prior requests and granting excuses or deferrals simply because the juror prefers to be elsewhere are practices that do not pass muster under a plain reading of the JSSA and the district's jury plan.

However, the court also notes that insisting upon a more rigorous review of deferral requests has the potential, paradoxically, to undermine objectivity in granting those requests.  As noted, the clerk's current policy, while perhaps too liberal in granting nearly all requests, is, for the same reason, objective.  By insisting that the clerk review the requests more rigorously, the court grants her a measure of discretion that is not currently exercised, and with discretion comes the potential for disparate treatment, whether intended or not.  In other words, the more the clerk attempts to cure the problem of the too-liberal standard,

the more likely it will be that her decision-making could be challenged under the JSSA for a real or perceived lack of objectivity.

The JSSA and jury plan's specification of groups who are presumptively excused from service, along with the requirement that other excuses be grounded in undue hardship or extreme inconvenience, was meant to level the playing field by making it difficult to avoid jury service on spurious grounds:

> "Many professional and business people now easily avoid service on the ground that they are 'busy people.' Some will still be able to obtain individual excuses when they are under genuine hardship. But the casual granting of excuses to these presumably more intelligent members of the community will no longer be possible. Enhanced jury performance, as well as an enhanced community cross section, will be the result."

H.R. Rep. No. 1076, 90th Cong., 2d Sess.(1968), reprinted in 1968 U.S.C.C.A.N. 1792, 1797. However, it is precisely these "professional and business people" who, because of their knowledge of the system, are likely to

37

frame their requests for deferrals in such a way as to make it seem, correctly or incorrectly, that their conflict qualifies as an undue hardship or extreme inconvenience as understood by the clerk.

Inevitably, because fallible humans must decide who is, and is not, to get a deferment, some valid requests will be denied, and invalid ones granted.  The clerk must be wary of excluding jurors for reasons that do not rise to the level of undue hardship or extreme inconvenience, while also guarding against inconsistency in the granting of exclusions, which could lead to the perception or reality of non-objectivity.  In guiding the clerk's practices between these two dangers, the court must be vigilant not to prescribe a course of permissible action so narrow as to be unnavigable.


## 2. The randomness prong of the JSSA

The JSSA requires that jury selection be random; but it does not define randomness as statistical randomness.

38

Bearden, 659 F.2d at 602; cf. United States v. Rioux, 97 F.3d 648, 655 (2d Cir. 1996) ("It is illogical to apply a theory based on random selection when assessing the constitutionality of a qualified wheel.  By definition, the qualified wheel is not the product of random selection;  it entails reasoned disqualifications based on numerous factors.  It is irrational to gauge the qualified wheel--an inherently non-random sample--by its potential for randomness.").  Congress considered that, "It is sufficient for the purpose of this legislation if the plan adopts some system of selection that affords no room for impermissible discrimination against individuals or groups."  Id. at 602 (quoting S. Rep. No. 891, 90th Cong., 1st Sess. 16 n.9 (1967)).  The law's underlying concern "is that the methods used must not result or have the potential to result in discrimination among cognizable groups of prospective jurors."  Id.

The defendants identify a number of "acts, practices, or failures which constitute, individually and

39

cumulatively, a substantial violation" of the district's jury plan and the JSSA. Magistrate judge recommendation, at 29-30. The defendants do not allege that each of these practices, individually or cumulatively, implicates the randomness principle of the JSSA. Indeed, as stated, neither the defendants nor the magistrate judge carefully distinguishes between practices alleged to violate randomness, practices alleged to violate the fair-cross-section principle, and practices alleged to violate both. The court will therefore outline each contention in the context of the JSSA's requirement that jurors be selected randomly, postponing discussion where appropriate for analysis under the fair-cross-section principle.

### a. Management and supervision allegations

The defendants allege three violations that can fairly be categorized as failures in administrative management and supervision: (1) configuration and use of jury management software; (2) training and supervision of

jury administrators; and (3) absence of quality control of selected jury pools.

Specifically, the defendants allege that the jury management software used to select jurors in the Middle District of Alabama is not specifically configured to prohibit practices, including the use of deferred jurors in numbers constituting more than 15 % of any given jury pool, that are disallowed in this district.   It is undisputed that the software, which is a nationwide program deployed in 88 district courts, is not custom-designed for each district's particular jury plan.[24]   It is also undisputed that the company that designed and installed the software was not notified of the changes to this district's plan after <u>Clay</u>.   The defendants concede that the software permits for the proper implementation of the district's plan, and complain only that it "leaves

_____

24. Defendants' hearing exhibit 11, Deposition of Steven Andrews, Affiliated Computer Services Project Manager, at 22-23.

the door open" to violations by not rendering impossible the violations alleged in this litigation.

The defendants also allege, accurately, that there were serious deficiencies in the training of the jury administrators, including the failure to instruct them about the requirements of Clay.  In fact, it appears that in the context of recalling jurors summoned for a pool but not needed for a petit jury, one administrator was affirmatively trained to violate the jury plan by excusing such jurors for two years, rather than one, as called for by the plan.  Finally, the defendants complain that an absence of quality control resulted in a situation in which no one ever checked the jury pools for potential errors--for example, the inclusion of previously deferred jurors in excess of 15 % or the inclusion of the correct percentage of jurors from each of the district's three divisions.

The defendants concede, however, that, while the three alleged management and supervision failings

**42**

contributed to violations of the district's plan and the
JSSA, they are not themselves direct violations, and do
not independently support a basis for relief.[25]  The court
therefore has no difficulty in adopting the magistrate
judge's conclusion that these three allegations do not
violate the JSSA, whether in the context of random
selection of jurors or otherwise.


### b. Allegations related to the creation of the jury wheels

Three of the defendants' allegations relate to the
creation of the 2001 qualified wheel: (1) failure to
empty the 1997 qualified wheel entirely; (2) failure to
supplement the voter-registration lists in creating the
qualified wheel; and (3) a failure to update juror
addresses and follow up with non-responders.

Of these, only the first directly implicates the
randomness prong of a JSSA analysis.  The district's jury
plan calls for the master jury wheel to be emptied and

---

25. Defendants' post-hearing brief, at 74.

refilled every four years, with the qualified wheel to be refilled from the new master wheel. The clerk has identified five or six jurors who were carried over from the 1997 wheel to the 2001 wheel. These jurors, then, were not randomly selected from the new master wheel, and their unexplained presence in the 2001 qualified wheel is clearly the result of some error or oversight. While none of these jurors was ever called for service on a petit jury, "a departure from the statutory scheme that directly affects the random nature of selection establishes a substantial violation independently of the departure's consequences in a particular case." Kennedy, 548 F.2d at 612.[26]

---

26. Much of the discussion in Kennedy is not binding former Fifth Circuit precedent. Although the Court of Appeals found a substantial violation of the JSSA in the use of volunteer jurors from the prior month's jury pool to make up the number needed for the challenged pool, it determined that the defendant had not complied with the strict procedural requirements for raising a statutory challenge to the jury selection in his case. It was the procedural issue and not the substantive issue that was dispositive of the case; the court's discussion of the violation of the statute was, accordingly, dictum. See, e.g., Hamilton ex rel. Hamilton v. Cannon, 80 F.3d 1525, 1530 (11th Cir. 1996) (defining dictum as those parts of (continued...)

However, the statutory requirement that an error be substantial to state a claim under the JSSA "[allows] room for the doctrine of harmless error," Bearden, 659 F.2d at 600, and "where the procedural errors made by those in charge of selecting juries do not raise the possibility of frustrating [the goal of preventing discrimination], a court should be hesitant to order the drastic remedy of the dismissal of indictments," id. at 609, or, in this case, the setting aside of a jury verdict. Here, because the number of jurors improperly transferred was minuscule, and because their presence in the qualified wheel did not significantly affect the random selection of jurors for jury pools, the court finds that the error falls squarely within the category of violations that do not substantially violate the JSSA.

As for the other two allegations relating to the creation of the qualified wheel, the defendants do not allege that the JSSA's randomness principle was violated

---

26. (...continued)
a decision that are not essential to the holding).

45

by the failure to supplement the voter registration lists in creating the qualified wheel or by the failure to update juror addresses.  The court postpones discussion of these allegations for analysis under the fair-cross-section requirement.

### c. Violation of proportionate divisional representation

As explained above, when jurors are needed for a criminal term of court, the district's jury plan instructs the clerk to select names from each of the three divisional wheels in approximately the same proportion to the total number drawn as the number of names in each divisional wheel bears to the number of names in the master wheel.  For the 2001 qualified wheel, the prescribed divisional percentages were 49 % for the Northern Division, 20 % for the Southern Division, and 31 % for the Eastern Division.

The defendants presented undisputed evidence that of the 225 jurors called for the jury pool from which their

46

petit jury was selected, 106 were from the Northern
Division (47 %), 59 were from the Southern Division
(26 %), and 60 were from the Eastern Division (26 %).  In
other words, there was a 2 % diminution from the
prescribed percentage of jurors from the Northern
Division, and the prescribed 11 % differential between
the Southern and Eastern Divisions evaporated.

The jury administrator could not account for the
discrepancies in the proportional representation of the
district's three divisions in the defendants' jury pool.
Although the administrator testified that she entered the
correct percentages into the software program before
drawing the pool, she acknowledged that she did not make
a practice of examining the pool selection report to
confirm that the correct percentages had, in fact, been
employed.

However, even if the violation of the plan's
proportional representation requirements introduced a
non-random element into jury selection, the practice,

standing alone, did not frustrate the randomness principle of the JSSA by making it substantially more likely that any one juror would be selected for service.[27]

### d. Deferral practices as violations of the randomness principle

While the court has found that the clerk's practice of granting almost all deferral requests did not violate the JSSA's requirement that such requests be decided objectively, the defendants allege that the principle of random selection is violated by the following five practices related to deferrals: (1) granting almost all requests for deferrals; (2) violation of the plan's one-year excusal period for summoned jurors not selected to

---

27. The defendants also allege that the practice violates the fair-cross-section principle, as evidence shows that the Northern Division contains a higher percentage of African-Americans. As will be discussed below, because the defendants present evidence related to only their own jury wheel, it is insufficient to sustain analysis under the fair-cross-section principle, which requires that disproportionate representation not be a fluke and instead "reflect the true overall representation in jury venires." United States v. Holstick, 875 F. Supp. 795, 798 (M.D. Ala. 1994) (Thompson, J.).

serve on a jury; (3) violations in the double-draw jury pools; (4) scattering of deferred jurors in the jury pools; and (5) transfers of jurors resulting in pools with more than 15 % previously deferred jurors.  Each allegation is discussed in turn.

### i. Granting of nearly all deferral deferral requests as a randomness violation

In Clay, the court noted: "arguably ... when the clerk almost always granted deferrals to jurors, essentially permitting selected jurors to opt in or out of a trial term at will, the practice introduced a non-random element into the jury-selection process." 159 F.Supp.2d at 1367-68.  While the practice of granting nearly all deferral requests was held to be one of three factors contributing to a substantial violation of the JSSA in Clay, the court found "no evidence that, by itself, [the practice] caused juries to consist of something other than a fair cross-section of the community, or that it provided opportunity to

**49**

discriminate against any cognizable group or any individuals in the selection process." Id. at 1368. Consequently, the practice of granting nearly all deferral requests, by itself, was not a substantial violation of the JSSA.

Whether the defendants here, unlike Clay, have presented evidence that the clerk's deferral practice causes juries to consist of something other than a fair cross-section of the community is a matter taken up below. Here, the focus is properly on whether "the substantial element of voluntariness" introduced by a liberal deferral policy has implicated the randomness of the selection process. Id. In Clay, the court admonished: "If the jurors in this case were aware that they had [control over when they served], the court would be confronted with the possibly more substantial claim that the practice of granting deferrals itself was a substantial violation of the statute." Id. The former Fifth Circuit has explained:

> "That the introduction of predilections
> of prospective jurors affects the random
> nature of the selection process cannot
> be gainsaid.  Surely a district would be
> in substantial violation of the statute
> [JSSA] if it selected all its jurors by
> randomly drawing names from the
> qualified wheel and allowing those
> selected to opt in or out at will."

Kennedy, 548 F.2d at 612; see also United States v.
Branscome, 682 F.2d 484, 485 (4th Cir. 1982) (holding
that use of volunteer jurors introduced an impermissible
subjective element into jury selection).

The defendants argue that the clerk's unabated policy
of granting nearly all requests for deferrals must have
communicated to jurors that they have the power to
control when, and if, they serve on a jury, thus
implicating this court's admonition in Clay.  The
magistrate judge rejects this argument "because it is
grounded solely on speculation and conjecture rather than
evidence that any, most, or all of the beneficiaries of
the liberal deferral practice had notice of their likely
success in avoiding jury service, temporarily or

51

altogether, in response to a jury summons from the Middle District."  Magistrate judge recommendation, at 47.

The defendants do not specifically object to this finding or the legal assumption underlying it--that they must show jurors' subjective awareness of the power to avoid service--and instead disagree with the magistrate judge's analysis of the clerk's deferral practice as it relates to the fair-cross-section requirement of the JSSA and the Sixth Amendment.[28]  The court concludes that, as in Clay, while the liberal deferral policy introduces voluntariness and, consequentially, the potential for a non-random element, into the jury-selection process, the evidence currently before the court does not establish that the practice, standing alone and to the degree present here, substantially violated the randomness prong of the JSSA.

---

28. Defendants' objections to the magistrate's report and recommendations (doc. no. 743), at 26-30.

### ii. Violation of the one-year excusal period

Paragraph 16(e) of the Middle District's jury plan provides that jurors who are called but who are not needed or not chosen for actual service are to be excused for one year and then placed back into the qualified wheel.  It is undisputed that instead of excusing such jurors from service for one year, the jury administrators were trained to, and did, excuse them for two years, in clear violation of the plan.  By contrast, those jurors who affirmatively requested a deferral became eligible for service after shorter periods of time.

It has been shown that, because deferred jurors become re-eligible for service more quickly, they are also summoned for service more often than those jurors who are excused for two years in contravention of the plan.  For example, working with data from the subset of jurors called to service in 2005, the defendants' expert showed that the average time between summonses of jurors

who requested deferrals was seven months, whereas the average time between summonses of jurors who had been excused was 31 months.[29]   Because jurors who request deferrals are disproportionately white, the defendants' expert theorized that excusing unneeded jurors for two years, rather than one (meaning that deferred jurors are called more quickly and more often over the life of the wheel) would affect the racial composition of the jury pools, especially late in the life of the wheel.

To test this theory, the defendants' expert ran a regression analysis of the last 16 pools drawn from the 2001 qualified wheel, using the percentage of African-Americans in the pools as the dependant variable, and the percentage of deferred jurors as the independent variable (or cause).   The test established that there was, in fact, a statistically significant relationship between the percentage of deferred jurors in a given pool and the percentage of African-Americans in that pool.   For

_____

29. Evidentiary Hearing Transcript, Volume III, Gundlach testimony, at 125.

example, when the percentage of deferred jurors is low, the percentage of African-Americans in the pool can be expected to be around 23 %, but when the percentage of deferred jurors approaches 25 % of the pool, the percentage of African-Americans in the pool decreases to around 17 %.[30]

Although the defendants challenge the admitted violation of the one-year excusal period under both the randomness and the fair-cross-section principles, the evidence presented does not truly implicate the random-selection process. A two-year excusal period of unneeded jurors, in and of itself, has not been shown to make the selection of any given juror more or less likely in a way that could create a potential for discrimination. The evidence of the practice's impact on the racial composition of the pools will be revisited in the context of the fair-cross-section claim.

------------

30. Evidentiary Hearing Transcript, Volume III, Gundlach testimony, at 127-29, 170-71. <u>See also</u> Defendants' hearing exhibit 101.

### iii.   Violation of the non-preference rule for deferred jurors in double-draw jury pools

In <u>Clay</u>, the third factor in the court's conclusion that the district's jury-selection process was not random was the grouping of previously deferred jurors called for service at the beginning of the summons list, a preferential position that assured them of inclusion in the final venires.  <u>Clay</u>, 159 F.Supp.2d at 1367.  In response, the jury-selection process was amended to ensure that previously deferred jurors are not given preference over other individuals in the compilation of the jury summons lists.  To accomplish this result, the district's software is configured to randomly disperse eligible jurors from the deferred juror pool throughout the pool summoned for service.

It is undisputed, however, that this dispersal of previously deferred jurors failed on three occasions during the life of the 2001 wheel when a need for additional jurors was identified after a pool had been drawn for a particular term, resulting in a second draw.

One of these 'double draw' pools was used to select the petit jury that tried the defendants in this case.   In each of the three instances when an additional pool of jurors was drawn and added on to the original pool, the software grouped previously deferred jurors at the beginning of the summons list for the second pool.

For example, to select the jury that would try the defendants here, the jury administrator originally drew a pool of 150 jurors, with previously deferred jurors presumably distributed randomly throughout the list. When a potential need for more jurors was identified, 75 additional jurors were summoned in a second draw. However, the 11 previously deferred jurors included in the second draw were grouped together at the top of the second list.

The government concedes that this preferential grouping, in addition to violating the district's plan, contravenes one of the primary goals set forth in Clay: to ensure that deferred jurors, who differ as a group in

their racial composition from the potential jurors in the
qualified wheel, are randomly dispersed and not
preferentially grouped in the summons lists.  That such
preferential grouping of a racially distinct subgroup of
jurors violates the random-selection process is plain.
The government, however, considers the admitted error
harmless, because two of the double-draw pools were not
ultimately used in the jury-selection process, and the
defendants' petit jury was selected before reaching the
impermissibly grouped jurors on the summons list.

The settled law of the Eleventh Circuit is that "A
litigant need not show prejudice to establish a
'substantial failure to comply' with the Act. ... A
departure from the statutory scheme that directly affects
the random nature of selection establishes a substantial
violation independently of the departure's consequences
in a particular case."  Kennedy, 548 F.2d at 612; see
also Clay, 159 F.Supp.2d at 1370 ("Whether the error was
harmless is not pertinent once the court has concluded

that a jury-selection practice that directly affects the random nature of the selection process was a substantial violation of the JSSA.").

While litigants are not required to show that they were prejudiced by an impermissible jury-selection practice, and while the preferential grouping of the deferred jurors in the double-draw pools is certainly a violation of the random nature of the selection process, the court concludes that the violation, in the specific factual context of this challenge, was a technical one. The district's jury selection software is configured to prohibit the violation in question--the preferential grouping of deferred jurors--and the fact that such grouping nonetheless occurred three times is the result of a software glitch that has now reportedly been corrected.  That the jury administrator specifically intended for this error not to occur does not make the violation less troublesome.  However, the intent of the jury administrator to prevent the error, the fact that

the error had no impact on any jury selected during the 2001 wheel, and the fact that the error has now been corrected are all factors that lead the court to conclude that the violation was a technical one and was not substantial.   In another factual context, the court's conclusion might well be different.

### iv.  Non-random scattering of previously deferred jurors

The post-<u>Clay</u> jury plan forbids preferential placement of previously deferred jurors on the jury-pool lists.   The '<u>Clay</u> effect' of preferential grouping of previously deferred jurors at the top of the summons lists is not alleged in this case, with the exception of the three double-draw pools discussed above.   However, the defendants' expert performed statistical analyses showing "a significant violation of random distribution" of previously deferred jurors in pools drawn from the 2001 wheel, based on the statistical improbability of the names appearing in the configurations shown on the jury

pool lists.  For example, in the defendants' pool, of the
first 32 jurors on the pool list, 16 or 17[31] had
previously been deferred.  This effect is in addition to
the clustering of the previously deferred jurors at the
top of the second draw, as discussed in the preceding
subsection.

The court has no reason not to accept the expert
opinion that the configurations of previously deferred
jurors seen in the jury pools is highly unlikely to
result from a statistically random dispersal of those
jurors.  However, the JSSA "does not insist upon
randomness in the sense in which that term might be

_____

31.  In its definition of 'previously deferred juror,'
the government includes jurors drawn directly from the
deferred juror pool, as well as those jurors transferred
manually from the deferred pool to the qualified wheel by
the jury administrators, but not those jurors who were
deferred but then served on a jury and were subsequently
returned to the qualified wheel after completing their
service.  The defendants include this last category of
jurors in their definition of 'previously deferred.'
This factual dispute is the reason why the government
acknowledges only 16 previously deferred jurors among the
first 32 on the list for the defendants' pool, whereas
the defendants claim that there were 17 such jurors.  The
difference does not affect the court's analysis of the
alleged scattering violation.

understood by statisticians." <u>Bearden</u>, 659 F.2d at 602
(quoting S. Rep. No. 891, 90th Cong., 1st Sess. 16 n.9
(1967)).

The software relied upon by this district is
apparently not dispersing previously deferred jurors in
a statistically random way, and this court, acting
through all its active district judges, could reasonably
join Congress in encouraging such statistically random
dispersal: "Many districts may seek the aid of
statisticians in developing systems of selection that do
meet the standards of that profession, and they are
encouraged to do so." <u>Id</u>. However, the defendants have
not presented evidence that the statistically non-random
scattering of previously deferred jurors has created the
potential for impermissible discrimination or
manipulation, or in any way gave such jurors "an unfair
advantage over non-deferred jurors for selection to a
panel from which the petit jury would be picked."
Magistrate judge recommendation, at 75. The court

therefore adopts the magistrate judge's conclusion that the evidence of some non-random scattering does not constitute a substantial violation of the JSSA, either under the randomness principle or in any other way.

### v.  Violations of the 15 % limit on previously deferred jurors in any given pool

Finally, it is undisputed that jury administrators violated the remedy imposed after Clay limiting the percentage of previously deferred jurors in any given pool to not more than 15 %, as set forth in the district's jury plan.

As described above, on five occasions over the life of the 2001 qualified wheel, the jury administrator manually transferred individuals whose deferment period had expired from the deferred-maintenance pool (from which they could have been randomly selected for a jury pool in accordance with the 15 % limit) into the general qualified wheel, from which they could be selected without regard for the 15 % limit, and in addition to

63

those deferred jurors properly selected from the deferred maintenance pool.  In total, 1093 deferred jurors were manually transferred into the general wheel, of which approximately 460 were ultimately selected for jury pools, including seven who were selected for the defendants' pool.[32]

A second jury administrator violated the 15 % limit in four of the last five jury pools drawn in the 2001 cycle, including the pool drawn for the trial of the defendants.  In these four pools, the percentage of deferred jurors drawn from the deferred juror pool ranged

_____

32. Because of the parties' dispute over whether jurors who were deferred but then served on a jury and were subsequently returned to the qualified wheel after completing their service may be counted as 'previously deferred jurors,' the defendants count 469 jurors who were selected to serve after having been manually transferred by the jury administrator, while the government counts 453.  In total, the dispute affects the classification of 171 of the 3,427 jurors who were granted deferrals during the life of the 2001 wheel.  The magistrate judge did not find it necessary to resolve the parties' dispute about the definition of deferred jurors in order to conduct her analysis, and the parties did not object to this finding.  The court agrees that the analysis leads to same result regardless of which definition of deferred jurors is employed, and consequently will use the defendants' numbers, where appropriate.

from 20.89 % to 24.5 %, an error for which no explanation has been offered.  Because of the combined errors of the jury administrators, the percentage of deferred jurors drawn for the defendants' pool was 26.67% (60 of 225 jurors), using the defendants' numbers.  The magistrate judge found that the combined result of these violations is that a clear majority of the last 44 jury pools drawn from the 2001 qualified jury wheel included previously deferred jurors in excess of 15 % and in violation of the jury plan.

On this point, the court cannot agree with the magistrate judge's figures.  The defendants' expert now agrees that, in his testimony before the magistrate judge, he incorrectly inflated the number of deferred jurors for many of the 44 pools at issue because he incorrectly assumed that any juror that had been deferred earlier was still deferred when considered later.  As the government expert correctly explains, if a juror is deferred, then later is selected as part of the 15 %,

serves on a jury, and then selected for another pool
after two years, that juror is no longer deferred.  If
these jurors are deleted, the 44 pools averaged only
17.81 % deferral participants, and thus exceed the 15 %
limit by only 2.81 %, and, if all 91 pools are included
(only 91 of the 92 pools are relevant because there could
be no impact on the first pool), the average of the
percentage of deferrals (even with the jury
administrators' violations of the 15 % limit) is 13 %,
two points below the limit.  In addition, as a result, 88
of the 99 pools met the 15 % limit.  Nevertheless, while
not of the dimension found by the magistrate judge, there
was still a violation, which the court now addresses.

This admitted violation of the jury plan is analogous
to the second element of the JSSA violation found in
Clay: the jury administrator arbitrarily selected the
number of deferred jurors to include on summons sheets.
In fact, the uncontested evidence in this case
establishes that two of the three Clay violation elements

66

persist, since the clerk also continues to grant nearly all requested deferrals.  Moreover, the pool of deferred jurors continues to differ in its racial makeup from the qualified wheel, with the result that the defendants have been able to demonstrate a direct link between the inclusion of too many deferred jurors and the underrepresentation of African-American jurors in the pools.

Finally, while the government is correct to point out that the 15 % limit is imposed by the jury plan, not the statute, the violation of that limit is all the more troubling since it occurred in open contradiction to the jury plan and to the court's holding in <u>Clay</u>.  By contrast, the pre-<u>Clay</u> jury administrator included arbitrary numbers of previously deferred jurors on summons lists in the absence of guidance either from the jury plan or from the court.  It is significant that the plain violation of the 15 % limit has contributed to the precise outcome that the limit was devised to guard

against--increased underrepresentation of African-Americans in the jury pools.

The question before the court, then, is whether the admitted violations, taken together, are 'substantial' in the absence of the third <u>Clay</u> element: the preferential grouping of jurors at the top of the summons lists.  Put more precisely, the violations of the random selection process will be substantial if, as in <u>Clay</u>, the jury administrators could, "with substantial probability, lower the number of African-Americans on a venire" through their actions.  <u>Clay</u>, 159 F.Supp.2d at 1368.

The magistrate judge holds that the violations are not substantial in the absence of the third <u>Clay</u> factor because it is undisputed that the jury administrators made the impermissible transfers without regard to race (using only participant numbers) and because the impermissibly transferred jurors were ultimately selected for service randomly by the jury selection software, and dispersed (relatively) randomly on the summons lists.

The question is a close one.  Here, as in Clay, "The jury administrator would not need to know the race of any of the individual jurors on the summons list or in the [deferred juror] pool to ... discriminate.  It would be enough to notice that non-African-American jurors requested deferrals of service disproportionately." Clay, 159 F.Supp.2d at 1369.  It is clear, however, that the jury administrators' control over the process is less egregious here than it was in Clay, when the administrators could ensure that previously deferred jurors would actually be included in the venires as a result of their preferential placement.

The defendants concede that the jury administrator could not control whether any given juror--previously deferred or not--would ultimately be placed on the summons list in a position that would ensure that juror's inclusion in a venire.  In fact, the defendants can be understood as arguing that the administrators' actions resulted in a non-random selection process not because

69

the actual act of selecting jurors for service (through the software program) was non-random, but because the pool from which those jurors were selected by the software had been skewed by error such that no selection from it could be considered random.  An illustration of the argument: it is possible to pick a given number of differently colored jellybeans out of a jar randomly, but the colors of the jellybeans selected will not reflect a truly random process if there are too many of one color in the jar to begin with.

In <u>Kennedy</u>, the court of appeals noted that "Nonrandom selection of a subgroup from a randomly selected group does not make for a randomly selected subgroup.  Former purity cannot randomize what has become unrandom."  <u>Kennedy</u>, 548 F.2d at 612.  The defendants here can be understood as asserting the converse: selection of jurors from a pool created non-randomly cannot be random.  The reason this argument must fail in the factual context of this case is that it is simply a

restatement of the fair-cross-section allegation: that the actions of the jury administrators resulted in the underrepresentation of African-Americans in the jury-selection process.  To find a violation of randomness from these facts would be to create an end run around the doctrinal hurdles of a fair-cross-section challenge.

The court concludes, therefore, that the absence of the third Clay element in this case--the preferential grouping of previously deferred jurors--means that the undisputed violations in the juror selection process do not substantially violate the randomness requirement of the JSSA.  The court adopts the magistrate judge's recommendation to the extent that it finds no violation of the JSSA's randomness requirement.

### B. The Fair-Cross-Section Requirement of the JSSA and the Sixth Amendment

The "overarching theme" of the defendants' jury challenge is that African-Americans are systematically underrepresented in the 2001 qualified wheel and the jury

pools selected from that wheel.  Magistrate judge recommendation, at 26.  The heart of their challenge, then, is that the qualified wheel and jury venires do not represent a fair cross-section of the community, as required by the JSSA and the Sixth Amendment.

Of the various violations alleged by the defendants in this litigation, the following are alleged to diminish the representation of African-Americans in the qualified wheel and venires and, consequently, are relevant to the fair-cross-section analysis: (1) the failure to supplement the wheel with jurors drawn from sources other than the list of registered voters; (2) the use of outdated mailing lists to summon jurors and the failure to follow up with non-responders; (3) the clerk's liberal deferral policy; (4) the violation of the one-year deferral period for summoned jurors not selected to serve on a jury; and (5) the violations of the 15 % limit on deferred jurors in any given pool.[33]

---

33. Six of the defendants' allegations in this case
(continued...)

72

To review the uncontested evidence as it relates to the fair-cross-section contention, African-Americans constituted 30.466 % of the general population, age 18 and over, at the beginning of the life of the 2001 master wheel, but only 20.74 % of the individuals originally placed in the qualified wheel. Of all the individuals ever placed the 2001 qualified wheel, a slightly smaller percentage, 20.66 %, were African-American. Of all the individuals ever summoned from the qualified wheel to serve on the 92 jury pools drawn over the life of the

---

    33. (...continued)
do not implicate the fair-cross-section analysis: the three alleged supervisory and administrative failings that the court has found not to be actionable under the JSSA or the Sixth Amendment; the failure to empty the 1997 pool of five juror names; the statistically non-random scattering of deferred juror names; and the non-random grouping of previously deferred jurors in the three double-draw jury pools. The alleged violation of proportionate divisional representation in drawing the pools (in particular the allegation of underrepresentation of the Northern Division, which is alleged to have a higher percentage of African-Americans in the population) does implicate the guarantee of a jury selected from a fair cross-section of the community. However, because the defendants have presented evidence of this disproportionate divisional representation relating to only their own jury pool, the court will not include this violation in the discussion to follow.

wheel, the parties agreed that African-Americans
constituted 19.988 %, although the court will address
problems with this conclusion below.  The jury that tried
the defendants was drawn from a jury pool consisting of
16 % African-Americans.  Based on these facts, the
defendants charge that the process leading to the
selection of jurors for jury pools systematically
excluded African-Americans.

     As a preliminary matter, the defendants object to the
magistrate judge's failure to consider their allegations
in the light of the JSSA's fair-cross-section
requirement: "all litigants in federal courts entitled to
a trial by jury shall have the right to grand and petit
juries selected at random <u>from a fair cross section of
the community</u> in the district or division wherein the
court convenes."  28 U.S.C. § 1861 (emphasis added).
However, the magistrate judge does analyze the violations
alleged in this case under the Sixth Amendment, and
"[t]he standard for determining a violation of the

**74**

statutory fair cross-section requirement is the same as
that applied in assessing a sixth amendment fair
cross-section violation." United States v. Rodriguez,
776 F.2d 1509, 1510 n.1 (11th Cir. 1985); see also United
States v. Pepe, 747 F.2d 632, 648 n.17 (11th Cir. 1984);
United States v. Perez-Hernandez, 672 F.2d 1380 (11th
Cir. 1982). Because the analytical framework is the
same, the court's fair-cross-section analysis applies to
both the statutory and the constitutional claim. The
defendants' objection to the structure of the magistrate
judge's fair-cross-section analysis (as opposed to her
conclusions) is immaterial.

A party claiming disproportionate representation of
a particular group in a jury-selection process must show
the following in order to establish a prima-facie case
under the JSSA or the Sixth Amendment: "(1) that the
group alleged to be excluded is a 'distinctive' group in
the community; (2) that the representation of this group
in venires from which juries are selected is not fair and

reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." <u>Duren v. Missouri</u>, 439 U.S. 357, 364 (1979); <u>see</u> <u>also</u> <u>Cunningham v. Zant</u>, 928 F.2d 1006, 1013 (11th Cir. 1991).  Failure on any element of the prima-facie case ends a challenge.  <u>Pepe</u>, 747 F.2d at 649.  If a defendant does succeed in establishing all three elements, "it is the State that bears the burden of justifying this infringement by showing attainment of a fair cross-section to be incompatible with a significant state interest."  <u>Duren</u>, 439 U.S. at 368.[34]

There is no dispute in this case as to the first element of the <u>Duren</u> test: African-Americans are a distinct group within the community.  <u>Cunningham</u>, 928 F. 2d at 1013.  The court will therefore address the second and third elements of the test: whether the

---

34. <u>Duren</u> involved a challenge to the State of Missouri's jury selection practices.  Here, of course, it is the federal government that must rebut any prima-facie case.

representation of African-Americans in the jury selection

was    fair    and    reasonable    and    whether    any

underrepresentation is due to systematic exclusion.

### 1. <u>Fair and reasonable representation</u>

To establish the second element of the <u>Duren</u> test,

the Eleventh Circuit Court of Appeals has held that the

relevant  comparison  is  the  difference  between  the

percentage of the distinct group among the population

eligible for jury service and the percentage of the

distinct group in the appropriately challenged portion of

the jury-selection process.[35]   <u>Pepe</u>, 747 F.2d at 649.

This  difference  between  the  distinct  group's

representation  in  the  benchmark  community  and  its

representation  in  the  qualified  wheel  or  venires  is

_____

35. The relevant comparison will depend on the part
of the jury-selection process being challenged.   For
example, when a defendant challenges the processes
leading to the formation of the qualified wheel, then the
percentage of the distinct group eligible for jury
service will be compared to the percentage of that group
in the qualified wheel.  <u>Pepe</u>, 747 F.2d at 649.

termed 'absolute disparity.'[36]  The Eleventh Circuit has consistently required an absolute disparity of greater than 10 % in order to show unfair representation sufficient to satisfy the second element of the Duren test.  E.g., United States v. Tuttle, 729 F.2d 1325, 1327 (11th Cir. 1984).

## a. The benchmark community

The parties dispute how to define the benchmark community from which disparity in the jury-selection process should be measured, that is, the population eligible for jury service.  The government objects to the magistrate judge's finding that the proper benchmark community can be identified in this case by census data of African-Americans in the general population, refined to include only U.S. citizens over age 18 and thus

---

36. While the absolute disparity method of measuring representation "is not the sole means of establishing unlawful jury discrimination," Rodriguez, 776 F.2d at 1511 n. 4, the court sees no need to consider other methods of calculating disparity in this case, where absolute disparity sufficient to establish unfair representation will be shown.

qualified by age and citizenship for jury service. The government argues instead that voter registration lists provide the most accurate benchmark community.

The court agrees with the magistrate judge's resolution of this dispute, as it is clear that the community "qualified for jury service" for the purposes of a fair-cross-section challenge is not necessarily synonymous with the community registered to vote, and courts have regularly relied on census data, especially when refined to exclude certain categories of ineligible persons, to establish the benchmark community qualified for jury service. "[T]he fair cross-section requirement involves a comparison of the makeup of the jury venires or other sources from which jurors are drawn with the makeup of the <u>community</u>, not of voter registration lists." <u>Duren</u>, 439 U.S. at 365 n.23. <u>See, e.g.</u>, <u>Cunningham</u>, 928 F.2d at 1013 n.6 (absolute disparity calculation based on percentage of women and African-Americans above the age of 18 in the general population

and on the venire); <u>Gibson v. Zant</u>, 705 F.2d 1543, 1546 n.2 (11th Cir. 1983) (absolute disparity calculation based on five-year-old census data appropriate where no evidence that census data distorted percentage of women in county); <u>Machetti v. Linahan</u>, 679 F.2d 236, 240 n.5 (11th Cir. 1982) (same); <u>see also</u> <u>United States v. Shinault</u>, 147 F.3d 1266, 1272 (10th Cir. 1998) (entire voting-age population acceptable as benchmark where more detailed figures are unavailable).[37]

It is certainly true, as the government argues, that census data may overrepresent eligible jurors to the

---

37. It is instructive that the Administrative Office of Courts requires federal courts to make statistical comparisons of jury wheel samples "against general population data, age 18 or over, by racial, ethnic and sex classifications," presumably to document and guard against Sixth Amendment violations.  Also, contrary to the government's argument, the fact that the Middle District uses voter registration lists to create the master jury wheel has no bearing on whether the voter lists are the correct benchmark measure of the community. Indeed, "if the use of voter registration lists as the origin for jury venires were to result in a sizeable underrepresentation of a particular class or group on the jury venires, then this could constitute a violation of a defendant's 'fair cross-section' rights under the sixth amendment."  <u>Bryant v. Wainwright</u>, 686 F.2d 1373, 1378 n.4 (11th Cir. 1982).

extent that the data, even when refined to control for citizenship and age, as has been done here, still include persons ineligible for service on account of residency, literacy, disability, or status as a felon or felony defendant, as set forth in 18 U.S.C. § 1865. It is equally true, of course, that voter registration lists may underrepresent eligible jurors by excluding anyone who has failed to register to vote, for whatever reason. Regardless, no admissible evidence has been presented in this case to suggest whether and how census data, refined for age and citizenship, does or does not distort the jury-eligible population in the Middle District of Alabama.[38]

_____

38. In its objection to the magistrate judge's report and recommendation (doc. no. 746), at 6 n.10, the government makes reference to a state-wide study of felon disenfranchisement in Alabama and a national study indicating higher illiteracy rates among African-Americans than among whites. These studies were not submitted into evidence, and no expert was called to provide testimony (and undergo cross-examination) as to the reliability of their reasoning or methodology, or even how the conclusions might be applied to the geographically limited population at issue here. Nor do the facts of this case implicate the Eleventh Circuit's admonition in Rodriguez, where the use of Hispanic
(continued...)

The court therefore finds that the census data, refined for age and citizenship, establishes the proper benchmark community in this case.

## b. Absolute disparity of over 10 %

Because the defendants challenge practices that occurred both before and after the formation of the qualified wheel, the magistrate judge correctly found that jurors summoned for the jury pools drawn from the 2001 qualified wheel constitute the appropriate population for comparison with the total jury-eligible population in calculating absolute disparity.  This is so

---

38.  (...continued)
surnames drawn from age- and citizenship-refined census data to show underrepresentation of Hispanic jurors in the Southern District of Florida was criticized because (1) Hispanic surnames "may not accurately represent the group of Hispanics alleged to be distinctive" and (2) no attempt was made to further refine the census data to exclude people who do not understand the English language.  776 F.2d at 1512 n.6.  Regardless of how such concerns should properly affect the weighing of evidence regarding underrepresentation of the diverse Hispanic community in the jury systems of various jurisdictions, they are not alleged to impact the jury-eligibility of the African-American population of the Middle District of Alabama.

because the makeup of the jury pools will reflect the racial effects, if any, of processes occurring between the creation of the qualified wheel and the issuance of summonses for the pools, including the deferral practices and violations of the jury plan challenged in this case.

As has been noted, the parties agreed that the total number of African-Americans summoned to the 92 jury pools drawn from the 2001 wheel is 19.988 % of the total number of jurors summoned.  If this percentage is compared to the 30.466 % African-American representation in the relevant benchmark community--individuals age- and citizenship-qualified for jury service in the 2000 census--then the underrepresentation of African-Americans in the venires is 10.478 %, above the 10 % threshold, and, indeed, the magistrate so found.

However, this calculation by the parties and the magistrate judge depends upon a fundamental and impermissible assumption.  Among the jurors summoned to

the jury pools are 546 who did not report their race.[39] In determining the percentage of African-Americans summoned to the pools, the defendants' expert divided the number of self-identified black jurors (the numerator--2615, in his count) by the number of all jurors (the denominator--13,097, again in his count), including those who did not report race. In other words, the expert treated all racially non-identifying jurors as if they were not black in order to find an absolute disparity of over 10 % in the representation of African-Americans.

If the court does not assume that all non-identifying jurors are not black, there will be an absolute disparity of over 10 % in the representation of African-Americans in the jury pools only if 65 or fewer of the 546 non-identifying jurors are black. The court calculates this figure in the following way. If the representation in the benchmark community is 30.466 %, then the

---

39. Gundlach report, at 6.

84

representation in the jury pools must be less than 20.466 % to show an absolute disparity of over 10 %. 20.466 % of 13,097 (the total number of jurors summoned) is 2,680.43.   Therefore, no more than 2,680 jurors (rounded down, since the number represents individuals) can be black for absolute disparity over 10 % to be shown.   2,615 jurors identified themselves as black. 2,615 subtracted from 2,680 is 65.   Of the non-identifying jurors, then, if more than 65 are black, the defendants cannot show more than 10 % absolute disparity in the representation of African-Americans in the jury pools.

The court appointed an expert to address what assumptions, if any, might be made about the race of the unknown jurors.[40]  One option is simply not to include the

---

40. Pursuant to Rule 706 of the Federal Rules of Evidence, the court appointed as an expert a statistician employed by the Administrative Office of Courts, and held a supplemental hearing on August 30, 2006, during which the court posed questions to the court-appointed expert as well as the defendants' expert.   Both experts were subject to cross-examination by the attorneys for the government and for the defendants.

unknown jurors in the disparity calculation.  If this is done, then the total number of jurors is reduced to 12,551.  Using this number as the denominator, the percentage of black jurors (2,615 total) in the pools is 20.83 %, slightly less than 10 % absolute disparity when compared to the benchmark population.  Another option would be to apply the percentages representing the racial makeup of the identifying jurors to the non-identifying jurors.  Even assuming that the correct percentage of African-Americans among the identifying jurors is 19.966 % (a figure calculated by assuming the non-identifying jurors are not black), when this percentage is applied to the non-identifying jurors it indicates that 109 of the non-identifying jurors might be expected to be black (19.966 % of the 546 unknown jurors is 109).  Again this number reduces the absolute disparity to below 10 %.

However, the court-appointed expert cautioned that neither of these methods of estimating the number of

blacks among the non-identifying 546 jurors would lead to a statistically defensible result.  Instead, he suggested two options: the first option would be simply to contact the non-identifying jurors and ask them their race, and the second option would be to obtain census-tract data and deduce the race of the non-identifying jurors from the racial makeup of the neighborhoods in which they live.[41]  However, it is now far too late to go and gather new evidence in this case.

The question then is, What to do?  The law is clear that the defendants bear the burden of establishing a prima-facie case, <u>Duren</u>, 439 U.S. at 364, and without clarification of the racial makeup of the non-identifying jurors, the defendants cannot meet their burden.

---

41. The second option suggested by the court-appointed expert is similar to the practice of the Census Bureau when it "imputes [] relevant information by inferring that the address or unit about which it is uncertain has the same population characteristics as those of a nearby sample or 'donor' address or unit." <u>Utah v. Evans</u>, 536 U.S. 452, 458 (2002) (internal quotations omitted).

The court recognizes that the Eleventh Circuit's greater-than-10 % rule has been severely criticized as legally as well as statistically insupportable.  <u>E.g.</u>, Note, <u>A Proposal for Measuring Underrepresentation in the Composition of the Jury</u>, 103 Yale L.J. 1913 (1994). However, the greater-than-10 % absolute disparity threshold has for all practical purposes become a bright-line rule in the Eleventh Circuit in cases with comparable percentages of African-Americans in the overall the population, age 18 and over.  <u>See, e.g.</u>, <u>United States v. Grisham</u>, 63 F.3d 1074, 1079 (11th Cir. 1995) ("If the absolute disparity ... is 10 percent or less, the second [<u>Duren</u>] element is not satisfied."). In fact, the only time the Eleventh Circuit has varied from the rule is when it found that an absolute disparity of <u>over</u> 10 % in the representation of a distinct group in the jury-selection process did not warrant relief. <u>Thompson v. Sheppard</u>, 490 F.2d 830 (5th Cir. 1974) (absolute disparity of 11 % resulting from the user of

88

voter registration lists did not require compilation of new jury list).[42]

The court therefore concludes that the defendants have failed to meet the second <u>Duren</u> prong and thus have failed to establish a prima-facie case.


## 2. <u>Systematic exclusion</u>

While the defendants have failed to satisfy the second <u>Duren</u> factor, the court will still address the third <u>Duren</u> factor so as to provide a complete record should there be appellate review of the issues raised here.

---

42. Admittedly, <u>Thompson</u>, brought under 42 U.S.C. § 1983, was decided before the Supreme Court established separate three-prong analyses for equal protection and fair-cross-section challenges to jury-selection processes in <u>Castaneda v. Partida</u>, 430 U.S. 482 (1977) (equal protection) and <u>Duren</u> (fair-cross-section). Nowhere does the <u>Thompson</u> court explicitly acknowledge which provision or provisions of the Constitution are implicated in the analysis, and in finding that the plaintiffs failed to establish racial discrimination, it employs language that today would be relevant only to an equal-protection challenge.

In addressing the third <u>Duren</u> prong, the court begins with the obvious, the language the Supreme Court used in explaining this prong:  the "underrepresentation is due to systematic exclusion of the group in the jury-selection process."  <u>Duren</u>, 439 U.S. at 364. The critical word here is "systematic."  In deciding how to apply that word here, this court will look first to its dictionary definitions and then to how other courts have applied it.  According to <u>Webster's Third New International Dictionary of the English Language Unabridged</u> 2322 (2002), systematic's meanings include "methodical," "regular," and "formulated as a coherent body."

Courts have applied the term in a number of instances.  In <u>Duren</u>, the Supreme Court found that a Missouri statute providing an automatic exemption to any woman who requested not to serve led to systematic underrepresentation of women in the state's jury-selection process.  In addition to the statute, the Court

identified practices and procedures unauthorized by statute that contributed to the systematic underrepresentation found in that case, including the practice of exempting women who failed to report for jury service even when they did not request an exemption. Duren, 439 U.S. at 362. The Court also found that the cause of the underrepresentation was systematic because "a large discrepancy occurred not just occasionally, but in every weekly venire for a period of nearly a year." Id. at 366. Therefore, the Duren Court contemplates formal as well as informal practices that result "in a large discrepancy," id., and practices that occurred fairly often and on a regular basis, indeed, so often that they are, in the words of the Court, "inherent in the particular jury-selection process utilized." Id.

In Gibson v. Zant, a habeas petitioner brought Sixth and Fourteenth Amendment challenges to the makeup of his jury under a system in which jury commissioners used voter lists identifying individuals by race and gender in

order to select jurors.  In the Sixth Amendment context, the Eleventh Circuit found that the demonstrated underrepresentation of blacks and women was "'inherent in the particular jury-selection process utilized' because it was a system easily capable of being manipulated." 705 F.2d at 1549 (quoting <u>Duren</u>, 439 U.S. at 366).  That is, the ability of human actors to manipulate a jury selection system, intentionally or not, may lead to "inherent" underrepresentation.

In <u>United States v. Osorio</u>, 801 F.Supp. 966 (D. Conn. 1992) (Daly, J.), the district court found a violation of the fair-cross-section requirement of the Sixth Amendment when residents of two cities with large populations of African-American and Hispanic voters were inadvertently excluded from the qualified wheel.  Evidence showed that the list of potential jurors from one of the cities had never been entered into the computerized jury system. Names from the second city had been entered into the master wheel, but no qualifying questionnaire had ever

**92**

been mailed to a resident of that city.  Although there
was no evidence of intentional manipulation, the court
determined that the situation could not have come about
by "random chance."  801 F.Supp. at 973.  Discovery in
subsequent litigation in the district revealed that the
failure to send questionnaires to any resident of the
second city was the result of a computer programming
error.[43]

In Osorio, the government argued that the exclusion
of jurors could not be systematic because the error was
not contemplated in the jury plan, and because it was a
correctable mechanical error.  801 F.Supp. at 980.  The
court rejected these arguments for two reasons: First,
"as in Duren, the system need not require the exclusion
of the underrepresented group; rather, if the effect of

---

43.  "At the time of the decision in Osorio, there was
no explanation for the omission of Hartford and New
Britain residents from the jury pool. Subsequently, it
was discovered that no jury questionnaires were sent to
Hartford residents because a computer programming error
had caused the letter 'd' in 'Hartford' to communicate to
the computer that all potential jurors from Hartford were
deceased and thus unavailable for jury service."  United
States v. Jackman, 46 F.3d 1240, 1243 (2d Cir. 1995).

implementing the plan leads to systematic (i.e., not occasional) exclusion, [the third] prong is satisfied." Id. Second, there was an "exclusion of approximately two-thirds of blacks and Hispanics in the Division as a source of names for jury selection." Id.

The Osorio court was careful to note, however, that whether the cause of the exclusion of a racial group was internal or external to the court's jury-selection plan was critical to the determination of whether the cause was constitutionally suspect. For example, according to the court, "A jury selection system that relies on voter registration lists does not systematically exclude blacks and Hispanics as long as there is no discrimination in the compilation of the voter registration lists and all parts of the process are done by random selection." Id. (internal quotation marks and citation omitted).

In United States v. Jackman, 46 F.3d 1240, 1244 (2d Cir. 1995), the Second Circuit found that the interim jury plan implemented by the District of Connecticut in

**94**

response to the successful <u>Osorio</u> challenge continued to violate the Sixth Amendment's fair-cross-section requirement.  The interim plan called for the inclusion of all eligible names in the master wheel and a re-mailing of questionnaires to names drawn randomly from the corrected wheel.  However, the new qualified wheel did not become the exclusive source of names for new jurors.  Instead, when jurors were needed for a venire, the clerk used names already drawn from the old wheel and supplemented them with names drawn from the new wheel that included jurors from the two previously excluded cities.  The Second Circuit found that this process constituted "systematic--though perhaps unintentional--exclusion" for two reasons:  First, "by making minimal use of the new list, the clerk assured that the underrepresentativeness of the old list would significantly taint each 'picking list.'" 46 F.3d at 1245.  Second, "[s]ince the inadequacy of the procedure used was plainly accomplished by action within the Court,

what occurred presents a cognizable constitutional claim." Id.  The Jackman court's descriptions of the clerk's actions as being "within the court" echoed again the need that the cause of the racial exclusion be internal, not external.

In United States v. Rioux, 97 F.3d 648 (2d Cir. 1996), the Second Circuit again employed this internal-versus-external cause approach in rejecting a Sixth Amendment fair-cross-section challenge based on underrepresentation alleged to result from a failure to serve juror questionnaires returned as undeliverable, among other factors.  Although the court found that the defendant had not established an unfair representation of African-Americans and Hispanics, thus failing the second Duren prong, it went on to analyze the challenge under the third Duren prong, systematic exclusion.  In doing so, the court noted that the "inability to serve juror questionnaires because they were returned as undeliverable is not due to the system itself, but to

outside forces, such as demographic changes." <u>Rioux</u>, 97 F.3d at 658.

This court distills from the above dictionary definition and cases a number of factors that are instructive.  While no one factor is necessarily determinative, they should be considered in determining whether an action is systematic.  <u>Frequency</u>: If the action occurs often over an extended period of time, for example, "weekly ... for a period of a year," <u>Duren</u>, 439 U.S. at 366, that could be one strong support for the conclusion that it is systematic; whereas if the action is isolated, a fluke, then that would point in the opposite direction.  <u>Policy or rule</u>: An adopted policy or rule would be systematic, and conduct consistent with that policy or rule would be systematic too; whereas conduct in violation of that policy or rule would point in the other direction, though a violation could be systematic if it "more honored in the breach than the observance."  William Shakespeare, <u>Hamlet</u>, Act I, scene

97

iv.[44]  <u>Level of decision</u>: An act done by a decisionmaker

would more likely reflect policy and thus be systematic;

whereas an occasional act by a non-decisionmaker might

not be systematic, though an act regularly repeated by

the non-decisionmaker could.  <u>Tolerance</u>:  Conduct that,

though done by non-decisionmakers, is known, or should be

known by decisionmakers, would more likely be systematic.

<u>Intent</u>:   While  negligent  conduct  can  be  systematic,

intentional conduct would more likely be so.  <u>Impact</u>:

While  the  challenger  does  not  have  to  show  that  the

conduct prejudiced him, the breadth and pervasiveness of

the impact of the conduct should be considered.  <u>Internal</u>

<u>or external cause</u>:  When the Supreme Court held that the

"underrepresentation   [must   be]   <u>due   to</u>   systematic

exclusion of the group in the jury-selection process,"

_____

44. The court recognizes that the meaning of this
phrase from <u>Hamlet</u> has been turned around to mean, as
intended in this opinion, that the rule is broken more
often than obeyed.  Hamlet meant something else:  When he
described his stepfather's boozy carryings-on as a custom
"more honored in the breach than the observance," he
meant it was a bad custom, more honored when violated
than when followed.

Duren, 439 U.S. at 364 (emphasis added), this refers to a cause that is within the jury-selection system, not one outside that system.

The court now applies the above dictionary definition and case-applications of the term 'systematic' to the conduct challenged in this case.  While some of the actions that depressed African-American participation in the system may have resulted from court policy (for example, failure to update juror addresses and follow up with non-responders) or may have otherwise been implemented by the court clerk (for example, failure to train and supervise jury administrators), and while some of the challenged conduct was pervasive (for example, granting almost all requests for deferrals), no one of these actions, by itself or in conjunction with one or two other related actions, had a sufficient impact on the presence of African-Americans throughout the process to be called systematic.

In reaching this conclusion, the court has considered whether small violations of the jury-selection plan combine to create a systematic exclusion. Of course, this court would condemn any notion that separate actions should never be consolidated in determining whether there is a systematic depression of African-American presence in jury participation. The question is whether the separate actions are related in some way. Separate internal actions that nonetheless had a systematic relationship should be considered together. But here, there is no evidence of a systematic relationship between the challenged actions or conduct such that they could combine to meet the greater-than-10 % rule under <u>Duren</u>'s second prong.

Of course, one potential, but prospective, benefit of this litigation is to create a relationship between these separate actions where none existed before. Where responsible court officials are aware of separate internal actions that together substantially depress

100

African-American participation and those officials fail to take adequate measures to address those actions, it could be reasonably argued that the actions, although separate, are part of systematic plan.  Thus, if, in the wake of this litigation, this court as a whole were to fail to address the actions and conduct challenged here and if the second <u>Duren</u> factor were later met, this court would run the serious risk of being confronted with a Sixth Amendment fair-cross-section prima-facie case.  <u>Cf.</u> <u>Jackman</u>, 46 F.3d at 1245 (in concluding that a Sixth Amendment violation had occurred, the court observed that, "as often happens in overburdened courts (like other institutions), the failure to adopt a proper procedure might have resulted simply from the unwarranted assumptions by all concerned--in this instance, judges and staff--that the problem was being solved").

Additionally, the court is cognizant of the internal-versus-external factor to be considered in determining whether a challenged action is systematic.  For example,

the defendants challenge the jury administrator's failure to supplement voter registration lists where African-Americans are substantially underrepresented on such lists.  This conduct and its causal contribution to the 'smaller' percentage of African-Americans in the jury-selection process could be viewed as benign, external to the jury-selection process, and not part of any determination of whether the third Duren prong has been satisfied.  See Osorio, 801 F.Supp. at 980 (citing United States v. Young, 822 F.2d 1234, 1239 (2d Cir. 1987).  In light of the conclusion reached in the preceding paragraphs, the court need not specifically resolve that question at this time.

In sum, the court concludes that the defendants have failed to meet both the second and third prongs of Duren.  Accordingly, their fair-cross-section claims under the JSSA and the Sixth Amendment must be rejected.

## C. Fifth Amendment Claims

### 1. Equal protection

The court has no difficulty in adopting the magistrate judge's recommendation that the defendants' Fifth Amendment equal protection claim be rejected. To prove an equal-protection violation in the jury-selection context, a defendant must prove intentional discrimination. Grisham, 63 F.3d at 1081. Pursuant to the burden-shifting framework of Batson v. Kentucky, 476 U.S. 79, 93-98 (1986), a jury-selection challenge under the equal protection clause begins with the defendant's burden to establish a prima-facie case consisting of three elements: that (1) he or she is a member of a group capable of being singled out for discriminatory treatment; (2) members of this group were substantially underrepresented; and (3) the challenged jury selection procedure provided an opportunity for discrimination because it was susceptible of abuse or not racially neutral. Cunningham, 928 F.2d at 1013; see also

Castaneda, 430 U.S. at 494.  Once a prima-facie case is established, there is a "presumption of discrimination," id. at 494, and the burden then shifts to the government to "dispel the inference of intentional discrimination" and "provide[] a legitimate explanation" for the disparity, Grisham, 63 F.3d at 1081.  "[T]he ultimate burden of proving discriminatory intent rests on the defendant challenging the jury selection process."  Id. Thus, "Although the prima facie case for an equal protection claim resembles the elements of a fair cross-section claim, the purpose of an equal protection claim is to determine whether the disparity in the jury venire is the result of a discriminatory purpose."  Id. at 1081.

The record reflects absolutely no evidence of discriminatory purpose; indeed, the defendants do not allege that the jury administrators at any time had the specific intent of reducing African-American representation in the jury-selection process.

## 2. Due process

Finally, in reliance on <u>Peters v. Kiff</u>, 407 U.S. 493 (1972), the defendants allege that the district's jury-selection process violated the due process clause of the Fifth Amendment.  In <u>Peters</u>, the Supreme Court analyzed a state jury system alleged to exclude systematically African-Americans under the due process guarantee of the Fourteenth Amendment.  There, the defendant's trial had taken place before the Sixth Amendment's right to a petit jury was made applicable to the States in <u>Duncan v. Louisiana</u>, 391 U.S. 145 (1968).

Precedent exists suggesting that a due process challenge may still be brought to a jury-selection process.  <u>United States v. Maldonado</u>, 849 F.2d 522, 523 (11th Cir. 1988) ("A claim of denial of this due process right requires a showing that the jury selection process tended to exclude or underrepresent some discernible class of persons and consequently to defeat a fair

possibility for obtaining a truly representative cross section." (quoting <u>Kennedy</u>, 548 F.2d at 614)); <u>see also</u> <u>United States v. Hawkins</u>, 566 F.2d 1006, 1014-15 (5th Cir. 1978).  Arguably, though, challenges to alleged systematic exclusion in a jury-selection process, whether state or federal, are now properly brought under the more precise doctrinal framework of the sixth amendment.  The court therefore agrees with the magistrate judge that the defendants' Fifth Amendment due process claim should be denied on the ground that it requires the same proof as the Sixth Amendment claim.


## V. CONCLUSION

The court will adopt the magistrate judge's recommendation and reject the defendants' challenge to this court's jury-selection process.  However, while the defendants are not entitled to new trials, it should not be overlooked that they have identified several undisputed violations of the JSSA and the Middle

District's jury plan.   It is also apparent that the
defendants are narrowly shy of having satisfied the
second Duren factor of a greater-than-10 % absolute
racial disparity.

The court therefore also adopts the magistrate
judge's caution that there is "a compelling need for the
Middle District of Alabama to examine, and undertake to
remedy, administrative inaction and operational
deficiencies which may undermine the integrity of, and
public confidence in, the District's Jury Plan."
Magistrate judge recommendation, at 100 n.147.   A
recommendation will be made to the court as a whole (that
is, to all active district judges of the Middle District
of the Alabama) that the Administrative Office of the
United States Courts ("AO") be immediately invited down
to do a complete audit of the court's jury-selection
process, to make recommendations to remedy any failings
the AO should find, and to provide training designed to
prevent future problems with the jury-selection process.

In offering help on what to do with the racially non-identifying 546 jurors (discussed earlier), AO staff members (in particular, those from the jury division) made clear that they were ready and available to help not only with that issue but to come down and help with any and all other problems relating this district's jury-selection process.  The AO has on staff not only needed experts and theoreticians but also a direct line to other trial courts that have confronted issues similar to those confronting this court and that thus can provide practical lessons on how to address those issues.

Accordingly, it is ORDERED as follows:

(1) The government's and defendants Leon Carmichael, Sr. and Freddie Williams's objections (doc. nos. 743 & 746) are overruled.

(2) The recommendation of the United States Magistrate Judge (doc. no. 737) is adopted.

(3) Defendants Carmichael and Williams's objections to the composition of the venire and the method of

**108**

selection of the venire (doc. nos. 400, 493 & 637) are overruled and their motion to dismiss the indictment (doc. no. 400) is denied.

It is further RECOMMENDED to the court as a whole that the Administrative Office of the United States Courts be immediately invited down to do a complete audit of the jury-selection process for the Middle District of Alabama, to make recommendations to remedy any failings the office should find, and to provide training designed to prevent future problems with the jury-selection process.

DONE, this the 18th day of December, 2006.


    /s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE